IN THE CIRCUIT COURT OF THE
FIFTEENTH JUDICIAL CIRCUIT IN AND
FOR PALM BEACH COUNTY, FLORIDA

CASE NO.: 50 2013 CA 006293XXXXMB
DIVISION: AH

QUANTUM TOWN CENTER, LLC f/k/a
QUANTUM PARK & VILLAGE, LLC, a Florida
Limited Liability Company,

     Plaintiff,

v.

LEIGHTON MCGINN COMPANY, a
Florida corporation; JADE HOME DECOR,
INC., a Florida corporation; FRANKLIN
BAY GENERAL CONTRACTORS, INC.,
a Florida corporation; THE GLIDDEN
COMPANY, a foreign corporation,
d/b/a ICI PAINTS; AKZO NOBEL PAINTS,
LLC,  a foreign corporation; and PPG
INDUSTRIES, INC.,

     Defendants.
_____/

## SECOND AMENDED COMPLAINT

    Plaintiff, QUANTUM TOWN CENTER, LLC f/k/a QUANTUM PARK & VILLAGE, LLC

(hereinafter "QUANTUM"), by and through its undersigned attorneys, sues Defendants,

LEIGHTON MCGINN COMPANY (hereinafter "LEIGHTON"); JADE HOME DECOR, INC.,

(hereinafter "JADE"); FRANKLIN BAY GENERAL CONTRACTORS (hereinafter "FRANKLIN");

THE GLIDDEN COMPANY d/b/a ICI PAINTS (hereinafter "GLIDDEN"); AKZO NOBEL

PAINTS, LLC (hereinafter "AKZO"); and  PPG INDUSTRIES, INC. (hereinafter "PPG") and

alleges:

## GENERAL ALLEGATIONS

1.      This is an action for money damages in excess of Fifteen Thousand Dollars ($15,000.00), exclusive of interest, costs and attorney's fees.

2.      The claims giving rise to this action occurred in Palm Beach County, Florida.

3.      The Plaintiff, QUANTUM TOWN CENTER, is a Florida limited liability company, located and doing business in Palm Beach County, Florida.

4.      Defendant, LEIGHTON, is a Florida corporation doing business in Palm Beach County, Florida.

5.      Defendant, JADE, is a Florida corporation doing business in Palm Beach County, Florida, as a painting contractor.

6.      Defendant, FRANKLIN BAY, is a Florida corporation doing business in Palm Beach County, Florida, as a painting contractor.

7.      Defendant, GLIDDEN, is a foreign corporation which at all times material hereto conducted business in Palm Beach County, Florida.

8.      Upon information and belief, the Defendant, THE GLIDDEN COMPANY, was conducting business under the name "ICI Paints". THE GLIDDEN COMPANY was purchased by AKZO NOBEL PAINTS, LLC. AKZO NOBEL PAINTS, LLC was then purchased by PPG INDUSTRIES, INC.

9.      Defendants, GLIDDEN, AKZO and PPG are subject to the long arm jurisdiction of Florida, given that these Defendants maintained sufficient minimum business contacts in the State of Florida by providing and selling painting material throughout the State of Florida and issuing warranties to Florida companies and other Florida entities for painting materials sold within the State of Florida.

2

10.     Defendants, GLIDDEN, AKZO and PPG, are jointly and severally liable for the actions and wrongdoings of GLIDDEN by virtue of the acquisition, assignment, purchase, sale and/or assumption of the assets and liabilities of GLIDDEN.

11.     Venue is proper in Palm Beach County, Florida, pursuant to Fla. Stat. 47.051, because the causes of action alleged herein accrued in Palm Beach County, Florida, and the apartment buildings, which are the subjects of this Second Amended Complaint, are located in Palm Beach County, Florida.

12.     All conditions precedent to the filing of this action have been performed, waived or have been excused.

13.     Plaintiff has fully complied with Chapter 558, Florida Statutes.

14.     Despite due notice and ample opportunity, the Defendants failed to repair or otherwise resolve the claim, hereby necessitating that the Plaintiff resort to litigation to resolve the matters asserted in the Chapter 558 written notices.

## COUNT I
## BREACH OF CONTRACT
## (AGAINST LEIGHTON MCGINN)

15.     Plaintiff repeats the allegations contained in paragraphs 1 through 14 as if fully set forth herein.

16.     Plaintiff was the developer of the apartment complex known as Quantum Park at Boynton Beach Apartments and/or Quantum Lake Villas Apartments (hereinafter "QUANTUM ").

17.     Plaintiff entered into several contracts with Defendant, LEIGHTON MCGINN, as the general contractor for QUANTUM. Said contracts are marked as Composite **Exhibit A.**

3

18. The contracts between Plaintiff and Defendant, LEIGHTON MCGINN, obligated Defendant, LEIGHTON MCGINN, to perform the work on the buildings at Quantum Apartments without defects in workmanship or materials.

19. Under Paragraph 14.1 of each of the contracts executed by Defendant, LEIGHTON MCGINN, Defendant, LEIGHTON MCGINN, agreed that it would repair or replace any defects in workmanship upon notice by Plaintiff that a defect in workmanship became apparent.

20. Defendant, LEIGHTON MCGINN, breached paragraph 14.1 of the contract by failing to "correct any defect in the work or materials" as required by paragraph 14.1. The breach by Defendant, LEIGHTON MCGINN, includes but is not limited to, improperly preparing the painting surface, improperly applying the painting materials and using defective materials, including defective paints. The breach by Defendant, LEIGHTON MCGINN, also includes the use of sub-contractors who improperly prepared the painting surface, improperly applied the painting materials and used defective materials, including defective paints.

21. As a result of Defendant's, LEIGHTON MCGINN, breach, the paint on the exterior of almost all of the apartment buildings has failed. The failure includes, but is not limited to, the paint changing color from the original color of the paint as originally applied by Defendant, LEIGHTON MCGINN or by one of LEIGHTON MCGINN's subcontractors. Likewise, the paint has changed color from the original color chosen by Plaintiff.

22. Given Defendant's, LEIGHTON MCGINN, breach, Plaintiff has suffered damages in that Plaintiff must repaint the buildings and pay a contractor for the repainting. Plaintiff has given Defendant, LEIGHTON MCGINN, the opportunity to take corrective action, but to date, Defendant, LEIGHTON MCGINN, has failed to avail itself of this opportunity.

4

23.     Plaintiff has been required to retain an attorney and has agreed to pay the attorney a reasonable fee for a services rendered. Plaintiff is entitled to recover attorney's fees from Defendant, LEIGHTON MCGINN, under paragraph 14.1 of the attached contracts.

WHEREFORE, the Plaintiff respectfully requests that this Court enter judgment against Defendant, LEIGHTON MCGINN, for all actual, compensatory, consequential and incidental damages, plus interest (pre-judgment and post-judgment), costs and attorney's fees, pursuant to paragraph 14.1 of said contracts marked Composite **Exhibit A**, and such further relief as this Court deems just and proper.

**COUNT II**
**BREACH OF EXPRESS WARRANTY**
**(AGAINST JADE HOME DECOR, INC.)**

24.     Plaintiff repeats the allegations contained in paragraphs 1 through 14 as if fully set forth herein.

25.     Defendant, LEIGHTON MCGINN, executed several contracts with Plaintiff. Said contracts are marked as Composite **Exhibit A.**

26.     The contracts between Plaintiff and Defendant, LEIGHTON MCGINN, obligated Defendant, LEIGHTON MCGINN, to perform work on the buildings at QUANTUM. Such work included, but was not limited to, the painting of the exterior of the buildings.

27.     Defendant, JADE, was contracted as a sub-contractor by the Defendant, LEIGHTON, to pressure clean, seal, caulk and paint the exterior of the buildings in Quantum Apartments.

28.     Pursuant to the acceptance of its obligations, Defendant, JADE, issued a written warranty to Plaintiff against any loss or damage due to defects in workmanship or materials furnished under the contract. Said warranties are attached hereto and marked as Composite

5

**Exhibit B**.

29.    The paint on the exterior of the buildings has failed. Such failure includes, but is not limited to, the substantial changing of the color of the paint due to defects in workmanship or material furnished.

30.    Plaintiff has notified Defendant, JADE, that Plaintiff is enforcing the terms of the warranties issued by Defendant, JADE; however, Defendant, JADE has refused to honor or abide by the terms of its warranties.

31.    Plaintiff has suffered damages as a result of Defendant's, JADE, breach of the terms of its warranties in that Plaintiff must repaint the buildings and pay a contractor for the repainting.

WHEREFORE, the Plaintiff respectfully requests that this Court enter judgment against Defendant, JADE, for all actual, compensatory, consequential and incidental damages, plus interest (pre-judgment and post-judgment), costs and such further relief as this Court deems just and proper.

## COUNT III
### BREACH OF EXPRESS WARRANTY
### (AGAINST FRANKLIN BAY GENERAL CONTRACTORS, INC.)

32.    Plaintiff repeats the allegations contained in paragraphs 1 through 14 as if fully set forth herein.

33.    Defendant, LEIGHTON MCGINN, executed several contracts with Plaintiff. Said contracts are marked as Composite **Exhibit A.**

34.    The contracts between Plaintiff and Defendant, LEIGHTON MCGINN, obligated Defendant, LEIGHTON MCGINN, to perform work on the buildings at QUANTUM. Such work included, but was not limited to, the painting of the exterior of the buildings.

6

35.     Defendant, FRANKLIN, was contracted as a sub-contractor by the Defendant, LEIGHTON, to pressure clean, seal, caulk and paint the exterior of the buildings in Quantum Apartments.

36.     Pursuant to the acceptance of its obligations, Defendant, FRANKLIN, issued a written warranty to Plaintiff against any loss or damage due to defects in workmanship or materials furnished under the contract.  Said warranty is attached hereto and marked as **Exhibit C.**

37.     The paint on the exterior of the buildings has failed.  Such failure includes, but is not limited to, the substantial changing of the color of the paint due to defects in workmanship or material furnished.

38.     Plaintiff has notified Defendant, FRANKLIN, that Plaintiff is enforcing the terms of the warranties issued by Defendant, FRANKLIN; however, Defendant, FRANKLIN, has refused to honor or abide by the terms of its warranty.

39.     Plaintiff has suffered damages as a result of Defendant's, FRANKLIN, breach of the terms of its warranty in that Plaintiff must repaint the buildings and pay a contractor for the repainting.

WHEREFORE, the Plaintiff respectfully requests that this Court enter judgment against Defendant, FRANKLIN, for all actual, compensatory, consequential and incidental damages, plus interest (pre-judgment and post-judgment), costs and such further relief as this Court deems just and proper.

7

## COUNT IV
### BREACH OF EXPRESS WARRANTY
### (AGAINST THE GLIDDEN COMPANY d/b/a ICI PAINTS), AKZO NOBEL PAINTS, LLC
### and PPG INDUSTRIES, INC)

40.     Plaintiff repeats the allegations contained in paragraphs 1through14 as if fully set forth herein.

41.     Defendant, LEIGHTON MCGINN, executed several contracts with Plaintiff. Said contracts are marked as Composite **Exhibit A.**

42.     The contracts between Plaintiff and Defendant, LEIGHTON MCGINN, obligated Defendant, LEIGHTON MCGINN, to perform work on the buildings at QUANTUM. Such work included, but was not limited to, the painting of the exterior of the buildings.

43.     Defendants, GLIDDEN, AKZO and/or PPG supplied the paint and painting materials that were used in the painting of the exterior of the buildings at Quantum Apartments. Said written warranty was confirmed in writing as part if the contract entered into with Defendant, FRANKLIN, as stated in the section entitled "warranties" in **Exhibit C.**

44.     Defendants, GLIDDEN, AKZO and/or PPG, made verbal representations that they were providing a seven (7) year warranty on their paints and painting materials for any area wherein the paint would fail. Defendants, GLIDDEN, AKZO and/or PPG further made verbal representations to Plaintiff that they would issue a written seven (7) year warranty to Plaintiff; however, Defendants, GLIDDEN, AKZO and/or PPG failed to provide a written warranty to Plaintiff.

45.     Defendants, GLIDDEN, AKZO and/or PPG provided the paint and painting material to be used in several other apartment complexes owned by Plaintiff and/or Plaintiff's related entities. In the instances involving the other apartment complexes, Defendants,

8

GLIDDEN, AKZO and/or PPG  have issued a seven (7) year warranty in writing to Plaintiff and/or to Plaintiff's related entities.

46.     Under each and every warranty issued by Defendants, GLIDDEN, AKZO and/or PPG, to Plaintiff, Defendants, GLIDDEN, AKZO and/or PPG  agreed to repaint any failed area within seven (7) years from the date of the execution of the warranty. The seven (7) year time frame regarding the apartment building at Quantum Apartments has not expired.

47.     Under each and every warranty issued by Defendants, GLIDDEN, AKZO and/or PPG , to Plaintiff, Defendants, GLIDDEN, AKZO and/or PPG, agreed to cover materials (coatings) and labor for repainting of any failed area.

48.     In addition to the verbal representations made by Defendants, GLIDDEN, AKZO and/or PPG , Plaintiff was provided with written proof that Defendants, GLIDDEN, AKZO and/or PPG, were warrantying the painting materials, including the paint for seven (7) years. This documentation is indicated in a portion of an ostensible contract between Defendant, LEIGHTON MCGINN, and Defendant, FRANKLIN BAY, wherein Defendant, FRANKLIN BAY would provide painting services for "Quantum Lakes Villas - BLDG. #s 1 thru 19". On Page 13, Section D, of the portion of the contract provided to Plaintiff, it states that "ICI Paints shall warranty all paint materials and sundry items related to paint failure, for seven (7) years against chipping, peeling, or flaking and excessive chalking, as a direct result of faulty workmanship and/or material failure, respectively." The portion of the contract available to Plaintiff indicating Defendants, GLIDDEN, AKZO and/or PPG's warranty are marked as **Exhibit C**.

49.     The entire exterior areas of the buildings in the complex are "failed areas." The failure of the painted areas, include but is not limited to, the paint on those buildings, as

9

supplied by Defendants, GLIDDEN, AKZO and/or PPG , turning into a substantially different color than the color when the paint was first applied and the color is not the original color chosen by the Plaintiff.

50.     The failed areas on the affected buildings in the complex are directly caused by defective materials and paint provided by Defendants, GLIDDEN, AKZO and/or PPG.

51.     Defendants, GLIDDEN, AKZO and/or PPG, have breached the warranties by failing to provide labor and materials for repainting of the failed areas within the seven (7) year warranty period.

52.     Plaintiff has notified Defendants, GLIDDEN, AKZO and/or PPG , that Plaintiff is enforcing the terms of the warranties issued by Defendants, GLIDDEN, AKZO and/or PPG; however, Defendants, GLIDDEN, AKZO and/or PPG, have refused to uphold the terms of the warranty.

53.     Plaintiff has suffered damages as a result of Defendants, GLIDDEN, AKZO and/or PPG's, refusal to satisfy the terms of the warranty in that Plaintiff must repaint the buildings and pay a contractor for the repainting.

WHEREFORE, the Plaintiff respectfully requests that this Court enter judgment for damages against Defendants, GLIDDEN, AKZO and/or PPG, for all actual, compensatory, consequential and incidental damages, plus interest (pre-judgment and post-judgment), court costs and such further relief as this Court deems just and proper.

## CERTIFICATE OF SERVICE

HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via email to: Raymond J. Rotella, Esquire, Kosto & Rotella, P.A., Attorneys for Franklin Bay, Rrotella@kostoandrotella.com; Richard B. Doyle, Jr., Esquire, Akzo Nobel Paints, LLC,

10  .

pleadings@loughren-doyle.com; and Richard Chaves, Esquire, Leighton McGinn Company,

rchaves@ciklinlubitz.com on this 26th day of November, 2013.

> SACHS SAX CAPLAN
> Attorneys for Plaintiff
> 6111 Broken Sound Parkway, Suite 200
> Boca Raton, Florida 33487
> Telephone: (561) 994-4499
> Facsimile: (561) 994-4985
> Email: jkenwood@ssclawfirm.com

> */s/ Joel D. Kenwood*

By: _____

> Joel D. Kenwood
> Florida Bar No.: 254487

·1997 EDITION

# AIA DOCUMENT    A111-1997

 *Standard Form of Agreement Between Owner and Contractor where the basis of payment is the COST OF THE WORK PLUS A FEE*

AGREEMENT made as of the 20ᵗʰ day of February in the year Two-Thousand-Seven.
*(In words, indicate day, month and year)*

BETWEEN the Owner:
*(Name, address and other information)*

*Quantum Park & Village, LLC*
*1062 Coral Ridge Drive*
*Coral Springs, FL 33071*
*(954) 340-4904*

and the Contractor:
*(Name, address and other information)* ·

Leighton McGinn
1983 PGA Blvd Suite 104
Palm Beach Gardens, FL 33408  .

The Project is:
*(Name and location)*

Quantum Town Center Mixed Use Buildings
1000 Gateway Blvd., Boynton Beach, FL 33426

Construction Contract for three (3) Mixed Use Buildings
Bldg # 1, 1054 Gateway Blvd., Unit #s 1 – 11 & Suite #s  1 - 10
Bldg # 2, 1034 Gateway Blvd., Unit #s 1 – 11 & Suite #s  1 - 10
Bldg # 3, 1014 Gateway Blvd., Unit #s 1 – 11 & Suite #s  1 - 10

The Architect is:
*(Name, address and other information)·*

Quincy Johnson Jones Myott Williams
949 Clint Moore Road
Boca Raton, FL 33487  .

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted in this document  . by reference. Do not use with other general conditions unless this document is modified.

This document has been approved and endorsed by The Associated General Contractors of America.

The Owner and Contractor agree as follows.

Copyright 1916, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of ·Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution. WARNING: THIS DOCUMENT HAS BEEN MODIF̲——— ——— ———————— ————— —— —  . ⸱ . . ⸱⸱⸱⸱⸱ .⸱ ⸱ ————————— ———— ———— ——————— ———————————

©1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute of Architects
1735 New York Avenue, N.W
Washington, D.C. 20006-5292

Exhibit A

## ARTICLE 1    THE CONTRACT DOCUMENTS

The Contract Documents consist of this Agreement, Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to execution of this Agreement, other documents listed in this Agreement and Modifications issued after execution of this Agreement; these form the Contract, and are as fully a part of the Contract as if attached to this Agreement or repeated herein. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. An enumeration of the Contract Documents, other than Modifications, appears in Article 15. If anything in the other Contract Documents is inconsistent with this Agreement, this Agreement shall govern.

## ARTICLE 2    THE WORK OF THIS CONTRACT

The Contractor shall fully execute the Work described in the Contract Documents, except to the extent specifically indicated in the Contract Documents to be the responsibility of others. General Conditions Costs related to performance of this work are defined in separate agreement between owner and contractor

## ARTICLE 3    RELATIONSHIP OF THE PARTIES

The contractor accepts the relationship of trust and confidence established by this Agreement and covenants with the Owner to cooperate with the Architect and exercise the Contractor's skill and judgment in furthering the interests of the Owner; to furnish efficient business administration and supervision; to furnish at all times an adequate supply of workers and materials; and to perform the Work in an expeditious and economical manner consistent with the Owner's interests. The Owner agrees to furnish and approve, in a timely manner, information required by the Contractor and to make payments to the Contractor in accordance with the requirements of the Contract Documents.

## ARTICLE 4    DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

4 . 1       The date of commencement of the Work shall be the date of this Agreement unless a different date is stated below or provision is made for the date to be fixed in a notice to proceed issued by the Owner.

*(Insert the date of commencement if it differs from the date of this Agreement or, if applicable, state that the date will be fixed in a notice to proceed.)*

*Date of Commencement shall be the latter date of issuance of the Building Permit, execution of this agreement and recording of the Notice of Commencement.*

If, prior to the commencement of the Work, the Owner requires time to file mortgages, mechanic's liens and other security interests, the Owner's time requirement shall be as follows:

*N/A*

4 . 2       The Contract Time shall be measured from the date of commencement, *as defined above.*



©1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W
Washington, D.C. 20006-5292

Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.
WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and



4.3    The contractor shall achieve Substantial Completion of the entire Work not later than Two Hundred Forty (240) days from the date of commencement, or as follows:
*(Insert number of calendar days. Alternatively, a calendar date may be used when coordinated with the date of commencement. Unless stated elsewhere in the Contract Documents, insert any requirements for earlier Substantial Completion of certain portions of the Work.)*

*Date of Commencement shall be established as defined above.  In the event jurisdictional and governing authorities will not allow phased occupancy approval, substantial completion shall be stated in a certificate of substantial completion executed by the Owner, and Contractor,*

subject to adjustments of this Contract Time as provided in the Contract Documents: *N/A*
*(Insert provisions, if any, for liquidated damages relating to failure to complete on time or for bonus payments for early completion of the Work.)*

## ARTICLE 5   BASIS FOR PAYMENT

### 5.1   CONTRACT SUM

5.1.1  The Owner shall pay the Contractor the Contract Sum in current funds for the Contractor's performance of the Contract.  The Contract Sum is the Cost of the Work as defined in Article 7 plus the Contractor's Fee.

5.1.2  The Contractor's Fee is:
*(State a lump sum, percentage of Cost of the Work or other provision for determining the Contractor's Fee, and describe the method of adjustment of the Contractor's Fee for changes in the Work.)*

*Six percent (6%) for the Cost of Construction not including Contractor's General Conditions which are addressed under separate agreement.*

5.1.3  Any Change Orders or extras shall be approved by Owner; the increase in Contract Sum shall be solely for the Cost of the Change Order.  No additional fees are to be applied to any Change Order(s) or extras related to this contract, consequently, the Builder's Fees for Change Order(s) or extras will be Zero percent (0%).

## ARTICLE 6     TERMINATION OR SUSPENSION

### 6.1   DEFAULT
In addition to those instances of default otherwise set forth in this Agreement, Contractor shall be in default hereunder if

6.1.1    Contractor fails to furnish sufficient workmen or material to perform at the time and pace prescribed by Owner, or fails to cooperate with Owner, or interferes with or damages the work of any other subcontractor on the project, or;

6.1.2    A strike, work stoppage, picket line, or other labor disturbance at the construction site has occurred or is threatened by reason of a dispute directly or indirectly involving Contractor, or;

6.1.3    Contractor fails or is about to fail to pay for any labor, material or services supplied in connection with the work covered by this Contract, or a mechanic's or material man's lien is recorded against any part of the project.

### 6.2   CONTRACTOR'S REMEDIES.
When Contractor is in default, Owner may serve Contractor written notice thereof and require Contractor to cure such default within seventy-two (72) hours thereafter, or to satisfy Owner of its ability to do so within a time acceptable to Owner.  If such default is not cured or Owner is not so satisfied as aforesaid, Owner may declare this Contract terminated.  Owner may contract with other contractors or subcontractors to correct such default and to complete the performance



@1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT

Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.
WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and




required under this Contract Documents for the account of Contractor. Owner may charge and obligate Contractor for the costs and expenses thereof and for all damages suffered by Owner. Any notice given hereunder is voluntary.

## ARTICLE 7 COSTS TO BE REIMBURSED

### 7.1 COST OF THE WORK

The term Cost of the Work shall mean costs necessarily incurred by the Contractor in the proper performance of the Work. Such costs shall be at rates not higher than the standard paid at the place of the Project except with prior consent of the Owner. The Cost of the Work shall include only the items set forth in the Article 7.

### 7.2 LABOR COSTS

7.2.1 Wages of construction workers directly employed by the Contractor to perform the construction of the Work at the site or, with the Owner's approval, at off-site workshops.

7.2.2 Wages or salaries of the Contractor's supervisory personnel shall include project manager and superintendent stationed at the site, or home office.

7.2.3 Wages and salaries of the Contractor's supervisory or administrative personnel engaged, at factories, workshops or on the road, in expediting the production or transportation of materials or equipment required for the Work, but only for that portion of their time required for the Work.

7.2.4 Costs paid or incurred by the Contractor for taxes, insurance, contributions, assessments and benefits required by law or collective bargaining agreements and, for personnel not covered by such agreements, customary benefits such as sick leave, medical and health benefits, holidays, vacations and pensions, provided such costs are based on wages and salaries included in the Cost of the Work under Subparagraphs 7.2.1 through 7.2.3.

### 7.3 SUBCONTRACT COSTS

7.3.1 Payments made by the Contractor to Subcontractors in accordance with the requirements of the subcontracts.

### 7.4 COSTS OF MATERIALS AND EQUIPMENT INCORPORATED IN THE COMPLETED CONSTRUCTION

7.4.1 Costs, including transportation and storage, of materials and equipment incorporated or to be incorporated in the completed construction.

7.4.2 Costs of materials described in the preceding Subparagraph 7.4.1 in excess of those actually installed to allow for reasonable waste and spoilage. Unused excess materials, if any, shall become the Owner's property at the completion of the Work or, at the Owner's option, shall be sold by the Contractor. Any amounts realized from such sales shall be credited to the Owner as a deduction from the Cost of the Work.

### 7.5 COSTS OF OTHER MATERIALS AND EQUIPMENT, TEMPORARY FACILITIES AND RELATED ITEMS

7.5.1 Costs, including transportation and storage, installation, maintenance, dismantling and removal of materials, supplies, temporary facilities, machinery, equipment, and hand tools not customarily owned by construction workers, that are provided by the Contractor at the site and fully consumed in the performance of the Work; and cost (less salvage value) of



©1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT
The American Institute
of Architects
1735 New York Avenue, N.W
Washington, D.C, 20006-5292

Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.
WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S, copyright laws and



such items if not fully consumed, whether sold to others or retained by the Contractor. Cost for items previously used by the Contractor shall mean fair market value.

7.5.2    Rental charges for temporary facilities, machinery, equipment, and hand tools not customarily owned by construction worked that are provided by the Contractor at the site, whether rented from the Contractor or others, and costs of transportation, installation, minor repairs and replacements, dismantling and removal thereof.

7.5.3    Costs of transportation and removal of debris from the site.

7.5.4    Costs of document reproductions, facsimile transmissions and long-distance telephone calls, postage and parcel delivery charges, telephone service at the site and reasonable petty cash expenses of the site office.

7.5.5    That portion of the reasonable expenses of the Contractor's personnel incurred while traveling in discharge of duties connected with the Work.

7.5.6    Costs of materials and equipment suitably stored off the site at a mutually acceptable location, if approved in advance by the Owner.

## 7.6   MISCELLANEOUS COSTS

7.6.1    That portion of insurance and bond premiums that can be directly attributed to this Contract.

7.6.2    Sales, use or similar taxes imposed by a governmental authority that are related to the Work.

7.6.3    Fees and assessments for the building permit and for other permits, licenses and inspections for which the Contractor is required by the Contract Documents to pay.

7.6.4    Fees of laboratories for tests required by the Contract Documents, except those related to defective or nonconforming Work shall be reimbursed by Owner.

7.6.5    Royalties and license fees paid for the use of a particular design, process or product required by the Contract Documents; the cost of defending suits or claims for infringement of patent rights arising from such requirement of the Contract Documents; and payments made in accordance with legal judgments against the Contractor resulting from such suits or claims and payments of settlements made with the Owner's consent. However, such costs of legal defenses, judgments and settlements shall not be included in the calculation of the Contractor's Fee or subject to the Guaranteed Maximum Price. If such royalties, fees and costs are excluded other provisions of the Contract Documents, then they shall not be included in the Cost of the Work.

7.6.6    Data processing costs related to the Work.

7.6.7    Deposits lost for causes other than the Contractor's negligence or failure to fulfill a specific responsibility to the Owner as set forth in the Contract Documents.

7.6.8    Legal, mediation and arbitration costs, including attorneys' fees, other than those arising from disputes between the Owner and Contractor, reasonably incurred by the Contractor in the performance of the Work and with the Owner's prior written approval; which approval shall not be unreasonably withheld.



©1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W
Washington, D.C. 20006-5292



Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution. WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and

7.6.9    Expenses incurred in accordance with the Contractor's standard personnel policy for relocation and temporary living allowances of personnel required for the Work.

### 7.7 OTHER COSTS AND EMERGENCIES

7.7.1    Other costs incurred in the performance of the Work if and to the extent approved in advance in writing by the Owner.

7.7.2    Costs due to emergencies incurred in taking action to prevent threatened damage, injury or loss in case of an emergency affecting the safety of persons and property.

7.7.3    Costs of repairing or correcting damaged or nonconforming Work executed by the Contractor, Subcontractors or suppliers, provided that such damaged or nonconforming Work was not caused by negligence or failure to fulfill a specific responsibility of the Contractor and only to the extent that the cost of repair or correction is not recoverable by the Contractor from insurance, sureties, Subcontractors or suppliers. Contractor shall correct or secure life safety issues within a seventy-two (72) hour time period of written notification. All other issues will be completed within a one-week time period of written notification.

### ARTICLE 8    COSTS NOT TO BE REIMBURSED    *** *Not Applicable* ***

8.1    The Cost of the Work shall not include:

8.1.1    Salaries and other compensation of the Contractor's personnel stationed at the Contractor's principal office or offices other that the site office, except as specifically provided in Subparagraph 7.2.2 and 7.2.3 or as may be provided in Article 14.

8.1.2    Expenses of the Contractor's principal office and offices other than the site office.

8.1.3    Overhead and general expenses, except as may be expressly included in Article 7.

8.1.4    The Contractor's capital expenses, including interest on the Contractor's capital employed for the Work.

8.1.5    Rental costs of machinery and equipment, except as specifically provided in Subparagraph 7.5.2.

8.1.6    Except as provided in Subparagraph 7.7.3 of this Agreement, costs due to the negligence or failure to fulfill a specific responsibility of the Contractor, Subcontractors and suppliers or anyone directly or indirectly employed by any of them or for whose acts any of them may be liable.

8.1.7    Any cost not specifically and expressly described in Article 7.

### ARTICLE 9    DISCOUNTS, REBATES AND REFUNDS    *** *Not Applicable* ***

9.1    Cash discounts obtained on payments made by the Contractor shall accrue to the Owner if (1) before making the payment, the Contractor included them in an Application for Payment and received payment therefore from the Owner, or (2) the Owner has deposited funds with the Contractor with which to make payments; otherwise, cash discounts shall accrue to the Contractor. Trade discounts, rebates, refunds and amounts received from sales of surplus materials and equipment shall accrue to the Owner, and the Contractor shall make provisions so that they can be secured.



@1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W
Washington, D.C. 20006-6292

Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, @ 1997 by The American Institute of .
Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the
AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.
WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and




9.2 Amounts that accrue to the Owner in accordance with the provisions of Paragraph 9.1 shall be credited to the Owner as a deduction from the Cost of the Work.

## ARTICLE 10  SUBCONTRACTS AND OTHER AGREEMENTS *** *Not Applicable* ***

10.1 Those portions of the Work that the Contractor does not customarily perform with the Contractor's own personnel shall be performed under subcontracts or by other appropriate agreements with the Contractor. The Owner may designate specific persons or entities from whom the Contractor shall obtain bids. The Contractor shall obtain bids from Subcontractors and from suppliers of materials or equipment fabricated especially for the Work and shall deliver such bids to the Owner. The Owner shall then determine, with the advice of the Contractor, which bids will be accepted. The Contractor shall not be required to contract with anyone to whom the Contractor has reasonable objection.

10.2 Subcontracts or other agreements shall conform to the applicable payment provisions of this Agreement, and shall not be awarded on the basis of cost plus a fee without the prior consent of the Owner.

## ARTICLE 11  ACCOUNTING RECORDS

The Contractor shall keep full and detailed accounts and exercise such controls as may be necessary for proper financial management under this Contract, and the accounting and control systems shall be satisfactory to the Owner. The Owner and the Owner's accountants shall be afforded access to, and shall be permitted to audit and copy, the Contractor's records, books, correspondence, instructions, drawings, receipts, subcontracts, purchase orders, vouchers, memoranda and other data relating to this Contract, and the Contractor shall preserve these for a period of three years after final payment, or for such longer period as may be required by law.

## ARTICLE 12 PAYMENTS
### 12.1 PROGRESS PAYMENTS

12.1.1  Based upon Applications for Payment submitted to the Owner by the Contractor and the Owner shall make progress payment on account of the Contract Sum to the Contractor as provided below and elsewhere in the Contract Documents.

12.1.2  The period covered by each Application for Payment shall be one (1) calendar month ending on the last day of the month, or as follows:

> *The period covered by each application for payment shall be one (1) calendar month ending on the thirtieth (30th) day of each month.*

12.1.3  Provided that an Application for Payment is received by the Owner on or before the Thirtieth (30th) day of the month, the Owner shall make payment to the Contractor on or about the Thirtieth (30th) day of the following month, depending on Funding schedule. If an Application for Payment is received, by the Owner, after the application date fixed above, the Owner shall process the Application for Payment in the next billing cycle.

12.1.4  With each Application for Payment and as applicable to contract, the Contractor shall submit payrolls, petty cash accounts, receipted invoices or invoices with check vouchers attached, and any other evidence required by the Owner or Architect to demonstrate that cash disbursements already made by the Contractor on account of the Cost of the Work equal or exceed (1) progress payments already received by the Contractor; less (2) that portion of those payments attributable to the Contractor's Fee; plus (3) payrolls for the period covered by the present Application for Payment.



©1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W
Washington, D.C, 20006-5292

Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.
WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and

12.1.5  Each Application for Payment shall be based on the most recent schedule of values submitted by the Contractor in accordance with the Contract Documents. The schedule of values shall allocate costs among the various portions of the Work, except that the Contractor's Fee shall be shown as a single separate item. The schedule of values shall be prepared in such form and supported by such data to substantiate its accuracy as the Owner may require. This schedule, unless objected to by the Owner, shall be used as a basis for reviewing the Contractor's Application for Payment.

12.1.6  Applications for Payment shall show the percentage of completion of each portion of the Work as of the end of the period covered by the Application for Payment.

12.1.7  With each Application for payment, the Contractor shall submit Material and labor conditional lien releases from all persons and entities supplying material, labor or services to or for the work done by Contractor as of the end of the period covered by the Application for Payment. Such releases shall be on forms established by Owner and subject to Owner's reasonable approval.

12.1.8  Subject to other provisions of the Contract Documents, the amount of each progress payment shall be computed as follows:

.1  take that portion of the cost properly allocable to completed Work as determined by multiplying the percentage completion of each portion of the Work by the share of the cost allocated to that portion of the Work in the schedule of values,

.2  add that portion of the cost properly allocable to materials and equipment delivered and suitably stored at the site for subsequent incorporation in the Work, or if approved in advance by the Owner, suitably stored off the site at a location agreed upon in writing);

.3  add the Contractor's Fee, less retainage of Ten percent (10 %). The Contractor's Fee shall be computed upon the cost of the Work described in the two preceding Clauses at the rate stated in Subparagraph 5.1.2 or, if the Contractor's Fee is stated as a fixed sum in that Subparagraph, shall be an amount that bears the same ratio to that fixed-sum fee as the Cost of the Work in the two preceding Clauses bears to a reasonable estimate of the probable Cost of the Work upon its completion;

.4  subtract the aggregate of previous payments made by the Owner;

.5  subtract the shortfall, if any, indicated by the Contractor in the documentation required by Paragraph 12.1.4 to substantiate prior Applications for Payment, or resulting from error subsequently discovered by the Owner's accountants in such documentation; and

.6  subtract amounts, if any, for which the Owner has withheld or nullified a Certificate for Payment.

12.1.9  Except with the Owner's prior approval, payments to Subcontractors shall be subject to retainage of not less than Ten percent (10 %). The Owner and the Contractor shall agree upon a mutually acceptable procedure for review and approval of payments and retention for Subcontractor.

12.1.10  The progress payment amount determined in accordance with Subparagraph

.1  Add, upon Substantial Completion of the Work, a sum sufficient to increase the total payments to the full amount of the Contract Sum, less such amounts as the Owner shall determine for incomplete Work, retainage applicable to such work and unsettled claims; and

.2  Add, if final completion of the Work is thereafter materially delayed through no



©1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W
Washington, D.C, 20006-5292



Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, @ 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.
WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and

fault of the Contractor, any additional amounts payable in accordance with Subparagraph 9.10.3 of AIA Document A201-1997.

12.1.11 Reduction of limitation of retainage, if any, shall be as follows:

*Retention of ten (10%) shall be withheld from each Application for Payment through fifty percent (50%) completion of the work. Upon fifty percent (50%) completion of the Work retention shall be reduced to five percent and the remaining five percent shall be released to Contractor.    Subsequent Application for Payment shall withhold retention in an amount that upon- completion of the Work shall not exceed five percent of the contract sum. The total amount of retention held shall be released to Contractor upon substantial completion of the work and Contract delivery to Owner of the conditional waivers of lien from applicable subcontractors.*

## 12.2 PAYMENTS ON BEHALF OF SUBCONTRACTOR.

Owner reserves the right to make payment on behalf of Contractor directly to persons or other entity supplying labor, materials or supplies, or to any labor union, health, welfare or pension funds covered by this Contract. In the alternative, Owner may make payment to contractor in the form of a check made payable jointly to Contractor and such persons or entities. All amounts so paid shall be deemed an advance to Contractor on this Subcontract and shall not make Owner the employer of such labor.

### 12.3    FINAL PAYMENT

12.3.1    Final payment, constituting the entire unpaid balance of the Contract Sum, shall be made by the Owner to the Contractor when:

.1    the Contractor has fully performed the Contract except for the Contractor's responsibility to correct Work.

12.3.2    Final Application for payment shall be accompanied by Final Conditional Releases from the Contractor and all entities supplying material, labor or services to or for the work done by Contractor as of the end of the period covered by the Final Application for Payment. As conditions to Final Payment owner shall require the delivery of full warranty, closeout package and all applicable insurance binders. In the case that any legitimate complaints involving Contractor's work have been received, Contractor shall provider Owner with reasonable evidence that such complaints have been corrected by Contractor. Owner's building acceptance is conditioned to the completion of all work and punch list.

12.3.3    Final Payment shall be made on or about thirty (30) days from the last day of the month of issuance of certificate of substantial completion.

12.3.4    The Owner's accountants will review and report in writing on the Contractor's final accounting on or about 30 days after delivery of the final accounting to the Owner by the Contractor.

12.3.5    If the Owner's accountants report the Cost of the Work as substantiated by the Contractor's final accounting to be less than claimed by the Contractor, the Contractor shall be entitled to demand arbitration of the disputed amount.

12.3.6    If, subsequent to final payment and at the Owner's request, the Contractor incurs costs described in Article 7 and not excluded by Article 8 to correct defective or nonconforming Work, the Owner shall reimburse the Contractor such costs and the Contractor's Fee applicable thereto on the same basis as if such costs had been incurred prior to final payment.

## ARTICLE 14 MISCELLANEOUS PROVISIONS

### 14.1    DEFECTS IN WORKMANSHIP OR MATERIALS

Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution. WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and



©1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W
Washington, D.C. 20006-5292



Contractor hereby guarantees Owner against any loss or damage due to defects in workmanship or materials furnished under this contract. Upon notification of defects from Owner, Contractor shall within 72 hours with due diligence, at his own expense, correct any defect in the work or materials. Upon failure of the Contractor to correct such defects, Owner may, at Contractor's expense, furnish materials and/or labor to bring the work and materials up to the required standard. Owner shall submit to Contractor in writing a demand for payment of all costs incurred. These costs shall include all costs and attorney fees incurred by the Owner in connection with any litigation or other efforts which relate to the correction of any defect in materials or poor workmanship, including removal and replacement of defective materials furnished by the Contractor.

Contractor hereby agrees that for a period of one (1) year after the issuance of certificate of substantial completion for the last improvement contemplated by the General Contract, or for a period of one (1) year from the date of issuance of Certificate of Compliance from jurisdictional entity, whichever date is later, Contractor, upon notice from Owner, shall without delay and at its own cost cure and correct any defect in material or work performed under this Contract. Contractor shall bear all costs and expenses arising from such defects, including the repair

14.2 Payments due and unpaid under the Contract shall bear interest from the date payment is due at the rate stated below, or in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located. *Legal prevailing rate as allowed by Florida Statute.*

14.3 The Owner's representative is:

*(Name, address and other information)*

Steve Fike
Quantum Park & Village, LLC
1062 Coral Ridge Drive
Coral Springs, FL 33071

14.4 The Contractor's representative is:

*(Name, address and other information)*

James F. McGinn
Leighton McGinn Company
1983 PGA Blvd, Suite 104
Palm Beach Gardens, Florida 33408

14.5 Neither the Owner's nor the Contractor's representative shall be changed without ten days' written notice to the other party.

14.6 Other provisions: *Work is further described and subject to Exhibit 'A' entitled "Preliminary Construction Budget" and Exhibit 'C' entitled "Project Schedule", attached hereto and made part hereof.*

## ARTICLE 15 ENUMERATION OF CONTRACT DOCUMENTS

15.1 The Contract Documents, except for Modifications issued after execution of this Agreement, are enumerated as follows:

15.1.1 The Agreement is this executed modified version of the 1997 edition of the Standard Form of Agreement Between Owner and Contractor, AIA Document A111-1997.

15.1.3 The Drawings are as follows and are dated     unless a different date is shown below:
*(Either list the Specifications here or refer to an exhibit attached to this Agreement.)*

See Exhibit B entitled "Schedule of Drawings"

Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.
WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and



©1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT
The American Institute
of Architects
1735 New York Avenue, N.W
Washington, D.C. 20006-5292





15.1.4   The Addenda, if any, are as follows: N/A

15.1.5   Other documents, if any, forming part of the Contract Documents are as follows:

*Exhibit "A" entitled "Preliminary Construction Budget" attached hereto and made part hereof.*

*Exhibit "B" entitled "Schedule of Drawings" attached hereto and made part hereof.*

*Exhibit "C" entitled "Project Schedule" attached hereto and made part hereof.*

*Exhibit "D" entitled "Releases of Lien" attached hereto and made part hereof.*

## ARTICLE 16  INSURANCE

16.1 Contractor is required to provide properly executed Certificates of Insurance prior to the mobilization of equipment or forces onto the site and/or the commencement of work described in the contract documents. Certificate of insurance shall be issued in accordance to the requirements specified below. Contractor and all persons and entities supplying material, labor or services shall provide at Owner's request additional Certificates of Insurance for Owner, Lender and other applicable entities.

16.1.1 Contractor's evidence of coverage for Workers Compensation shall reflect statutory limits and $100,000 each accident, $500,000 el. Disease - policy limit and $100,000 el Disease - each employee. General Liability with limits of $1,000,000 and a general aggregate with limits of $2,000,000. Automobile Liability with limits not less than $1,000,000.00. Excess / Umbrella Liability with limits of $5,000,000 each occurrence and $5,000,000 aggregate. Both Auto and General Liability must have combined single limit. General Liability must be on a per occurrence basis, and Automobile Liability shall include all owned, non-owned and hired vehicles. The cancellation box on each certificate must show 30 DAYS written notice.

16.1.2 Insurance coverage shall be confirmed by Owner prior to the release any draw payments. Proof of this coverage shall reflect the exact requirements listed below:

The "**DESCRIPTION OF OPERATIONS**" must state:

Quantum Park & Village - South Retail Center
Lots 100, 62, 63, 64, 65-A & 65-B
1000 Gateway Boulevard, Boynton Beach, FL 33426
Certificate Holder has been added and named Additional Insured

An additional Insured Endorsement Must be submitted with Insurance Certificate

The "**CERTIFICATE HOLDER**" should be listed as:

Quantum Park & Village, LLC. [OWNER]
1062 Coral Ridge Drive
Coral Springs, FL 33071

Olen Properties, Corp.
7 Corporate Plaza
Newport Beach, CA 92660

Secured Holdings, Inc.
7 Corporate Plaza
Newport Beach, CA 92660

16.1.3 Insurance Certificate for all persons and entities supplying material, labor or services shall be confirmed by Owner prior to the release any draw payments.

### 16.2 PERFORMANCE BONDS



©1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W
Washington, D.C. 20006-5292



Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of
Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the
AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.
WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and

Owner may, at Owner's option, require Contractor to provide a performance bond in the amount of the total contract price. The cost of the premium for such bond, to the extent of the ordinary premium, shall be paid by Owner but any additional premium or charge which Contractor is required to pay to obtain such bond shall be at Contractor's expense.

This agreement is entered into as of the day and year first written above and is executed in the least three original copies, of which one is to be delivered to the Contractor and the remainder to the Owner.

QUANTUM PARK & VILLAGE, LLC
Owner

LEIGHTON MCGINN COMPANY
Contractor

By: _____ 3/14/07

Steve Fike
V.P. of Construction
FL Region

By: _____
James McGinn



The American Institute
of Architects
1735 New York Avenue, N.W
Washington, D.C. 20006-5292

The American Institute
of Architects
1735 New York Avenue, N.W
Washington, D.C. 20006-5292

Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1987 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.
WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and

# 1997 EDITION

## AIA DOCUMENT   A111-1997

 *Standard Form of Agreement Between Owner and Contractor where the basis of payment is the COST OF THE WORK PLUS A FEE*

**AGREEMENT** made as of the 30th day of July in the year Two-Thousand-Seven.
*(In words, indicate day, month and year)*

**BETWEEN the Owner:**
*(Name, address and other information)*

*Quantum Park & Village, LLC*
*1062 Coral Ridge Drive*
*Coral Springs, FL 33071*
*(954) 340-4904*

and the Contractor:
*(Name, address and other information)*

Leighton McGinn
1983 PGA Blvd Suite 104
Palm Beach Gardens, FL 33408

The Project is:
*(Name and location)*

Quantum Town Center
1000 Gateway Blvd., Boynton Beach, FL 33426

Construction Contract for Retail Building No. 4
1050 Gateway Boulevard
Boynton Beach, FL 33426

The Architect is:
*(Name, address and other information)*

Johnson Jones Myott Williams Architects
949 Clint Moore Road
Boca Raton, FL 33487

The Owner and Contractor agree as follows.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

This document has been approved and endorsed by The Associated General Contractors of America.



©1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute of Architects
1735 New York Avenue, N.W
Washington, D.C. 20006-5292

Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution. WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

## ARTICLE 1 THE CONTRACT DOCUMENTS

The Contract Documents consist of this Agreement, Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to execution of this Agreement, other documents listed in this Agreement and Modifications issued after execution of this Agreement; these form the Contract, and are as fully a part of the Contract as if attached to this Agreement or repeated herein. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. An enumeration of the Contract Documents, other than Modifications, appears in Article 15. If anything in the other Contract Documents is inconsistent with this Agreement, this Agreement shall govern.

## ARTICLE 2 THE WORK OF THIS CONTRACT

The Contractor shall fully execute the Work described in the Contract Documents, except to the extent specifically indicated in the Contract Documents to be the responsibility of others. General Conditions Costs related to performance of this work are defined in separate agreement between owner and contractor

## ARTICLE 3 RELATIONSHIP OF THE PARTIES

The contractor accepts the relationship of trust and confidence established by this Agreement and covenants with the Owner to cooperate with the Architect and exercise the Contractor's skill and judgment in furthering the interests of the Owner; to furnish efficient business administration and supervision; to furnish at all times an adequate supply of workers and materials; and to perform the Work in an expeditious and economical manner consistent with the Owner's interests. The Owner agrees to furnish and approve, in a timely manner, information required by the Contractor and to make payments to the Contractor in accordance with the requirements of the Contract Documents.

## ARTICLE 4 DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

4.1 The date of commencement of the Work shall be the date of this Agreement unless a different date is stated below or provision is made for the date to be fixed in a notice to proceed issued by the Owner.

*(Insert the date of commencement if it differs from the date of this Agreement or, if applicable, state that the date will be fixed in a notice to proceed.)*

*Date of Commencement shall be the latter date of issuance of the Building Permit, execution of this agreement and recording of the Notice of Commencement.*

If, prior to the commencement of the Work, the Owner requires time to file mortgages, mechanic's liens and other security interests, the Owner's time requirement shall be as follows:

*N/A*

4.2 The Contract Time shall be measured from the date of commencement, *as defined above.*



©1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution. WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.



4.3     The contractor shall achieve Substantial Completion of the entire Work not later than Two Hundred Forty (240) days from the date of commencement, or as follows:
*(Insert number of calendar days. Alternatively, a calendar date may be used when coordinated with the date of commencement. Unless stated elsewhere in the Contract Documents, insert any requirements for earlier Substantial Completion of certain portions of the Work.)*

> *Date of Commencement shall be established as defined above. In the event jurisdictional and governing authorities will not allow phased occupancy approval, substantial completion shall be stated in a certificate of substantial completion executed by the Owner, and Contractor.*

subject to adjustments of this Contract Time as provided in the Contract Documents: *N/A*
*(Insert provisions, if any, for liquidated damages relating to failure to complete on time or for bonus payments for early completion of the Work.)*

## ARTICLE 5   BASIS FOR PAYMENT

### 5.1   CONTRACT SUM

5.1.1   The Owner shall pay the Contractor the Contract Sum in current funds for the Contractor's performance of the Contract. The Contract Sum is the Cost of the Work as defined in Article 7 plus the Contractor's Fee.

5.1.2   The Contractor's Fee is:
*(State a lump sum, percentage of Cost of the Work or other provision for determining the Contractor's Fee, and describe the method of adjustment of the Contractor's Fee for changes in the Work.)*

> *Six percent (6%) for the Cost of Construction not including Contractor's General Conditions which are addressed under separate agreement.*

## ARTICLE 6   TERMINATION OR SUSPENSION

### 6.1   DEFAULT

In addition to those instances of default otherwise set forth in this Agreement, Contractor shall be in default hereunder if

6.1.1   Contractor fails to furnish sufficient workmen or material to perform at the time and pace prescribed by Owner, or fails to cooperate with Owner, or interferes with or damages the work of any other subcontractor on the project, or;

6.1.2   A strike, work stoppage, picket line, or other labor disturbance at the construction site has occurred or is threatened by reason of a dispute directly or indirectly involving Contractor, or;

6.1.3   Contractor fails or is about to fail to pay for any labor, material or services supplied in connection with the work covered by this Contract, or a mechanic's or material man's lien is recorded against any part of the project.

### 6.2   CONTRACTOR'S REMEDIES.

When Contractor is in default, Owner may serve Contractor written notice thereof and require Contractor to cure such default within seventy-two (72) hours thereafter, or to satisfy Owner of its ability to do so within a time acceptable to Owner. If such default is not cured or Owner is not so satisfied as aforesaid, Owner may declare this Contract terminated. Owner may contract with other contractors or subcontractors to correct such default and to complete the performance required under this Contract Documents for the account of Contractor. Owner may charge and obligate Contractor for the costs and expenses thereof and for all damages suffered by Owner. Any notice given hereunder is voluntary.



©1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C, 20006-5292

Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, @ 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution. WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.



## ARTICLE 7 COSTS TO BE REIMBURSED

### 7.1 COST OF THE WORK

The term Cost of the Work shall mean costs necessarily incurred by the Contractor in the proper performance of the Work. Such costs shall be at rates not higher than the standard paid at the place of the Project except with prior consent of the Owner. The Cost of the Work shall include only the items set forth in the Article 7.

### 7.2 LABOR COSTS

7.2.1 Wages of construction workers directly employed by the Contractor to perform the construction of the Work at the site or, with the Owner's approval, at off-site workshops.

7.2.2 Wages or salaries of the Contractor's supervisory personnel shall include project manager and superintendent stationed at the site, or home office.

7.2.3 Wages and salaries of the Contractor's supervisory or administrative personnel engaged, at factories, workshops or on the road, in expediting the production or transportation of materials or equipment required for the Work, but only for that portion of their time required for the Work.

7.2.4 Costs paid or incurred by the Contractor for taxes, insurance, contributions, assessments and benefits required by law or collective bargaining agreements and, for personnel not covered by such agreements, customary benefits such as sick leave, medical and health benefits, holidays, vacations and pensions, provided such costs are based on wages and salaries included in the Cost of the Work under Subparagraphs 7.2.1 through 7.2.3.

### 7.3 SUBCONTRACT COSTS

7.3.1 Payments made by the Contractor to Subcontractors in accordance with the requirements of the subcontracts.

### 7.4 COSTS OF MATERIALS AND EQUIPMENT INCORPORATED IN THE COMPLETED CONSTRUCTION

7.4.1 Costs, including transportation and storage, of materials and equipment incorporated or to be incorporated in the completed construction.

7.4.2 Costs of materials described in the preceding Subparagraph 7.4.1 in excess of those actually installed to allow for reasonable waste and spollage. Unused excess materials, if any, shall become the Owner's property at the completion of the Work or, at the Owner's option, shall be sold by the Contractor. Any amounts realized from such sales shall be credited to the Owner as a deduction from the Cost of the Work.

### 7.5 COSTS OF OTHER MATERIALS AND EQUIPMENT, TEMPORARY FACILITIES AND RELATED ITEMS

7.5.1 Costs, including transportation and storage, installation, maintenance, dismantling and removal of materials, supplies, temporary facilities, machinery, equipment, and hand tools not customarily owned by construction workers, that are provided by the Contractor at the site and fully consumed in the performance of the Work; and cost (less salvage value) of such items if not fully consumed, whether sold to others or retained by the Contractor. Cost for items previously used by the Contractor shall mean fair market value.



©1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT



The American Institute
of Architects
1735 New York Avenue, N.W
Washington, D.C. 20006-5292

Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution. WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

**7.5.2** Rental charges for temporary facilities, machinery, equipment, and hand tools not customarily owned by construction worked that are provided by the Contractor at the site, whether rented from the Contractor or others, and costs of transportation, installation, minor repairs and replacements, dismantling and removal thereof.

**7.5.3** Costs of transportation and removal of debris from the site,

**7.5.4** Costs of document reproductions, facsimile transmissions and long-distance telephone calls, postage and parcel delivery charges, telephone service at the site and reasonable petty cash expenses of the site office,

**7.5.5** That portion of the reasonable expenses of the Contractor's personnel incurred while traveling in discharge of duties connected with the Work.

**7.5.6** Costs of materials and equipment suitably stored off the site at a mutually acceptable location, if approved in advance by the Owner.

## 7.6 MISCELLANEOUS COSTS

**7.6.1** That portion of insurance and bond premiums that can be directly attributed to this Contract.

**7.6.2** Sales, use or similar taxes imposed by a governmental authority that are related to the Work.

**7.6.3** Fees and assessments for the building permit and for other permits, licenses and inspections for which the Contractor is required by the Contract Documents to pay.

**7.6.4** Fees of laboratories for tests required by the Contract Documents, except those related to defective or nonconforming Work shall be reimbursed by Owner.

**7.6.5** Royalties and license fees paid for the use of a particular design, process or product required by the Contract Documents; the cost of defending suits or claims for infringement of patent rights arising from such requirement of the Contract Documents; and payments made in accordance with legal judgments against the Contractor resulting from such suits or claims and payments of settlements made with the Owner's consent. However, such costs of legal defenses, judgments and settlements shall not be included in the calculation of the Contractor's Fee or subject to the Guaranteed Maximum Price. If such royalties, fees and costs are excluded other provisions of the Contract Documents, then they shall not be included in the Cost of the Work.

**7.6.6** Data processing costs related to the Work.

**7.6.7** Deposits lost for causes other than the Contractor's negligence or failure to fulfill a specific responsibility to the Owner as set forth in the Contract Documents.

**7.6.8** Legal, mediation and arbitration costs, including attorneys' fees, other than those arising from disputes between the Owner and Contractor, reasonably incurred by the Contractor in the performance of the Work and with the Owner's prior written approval; which approval shall not be unreasonably withheld.

**7.6.9** Expenses incurred in accordance with the Contractor's standard personnel policy for relocation and temporary living allowances of personnel required for the Work.



©1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT



The American Institute
of Architects
1735 New York Avenue, N.W
Washington, D.C. 20006-5292

Copyright 1916, 1919, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.
WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

### 7.7 OTHER COSTS AND EMERGENCIES

7.7.1 Other costs incurred in the performance of the Work if and to the extent approved in advance in writing by the Owner.

7.7.2 Costs due to emergencies incurred in taking action to prevent threatened damage, injury or loss in case of an emergency affecting the safety of persons and property.

7.7.3 Costs of repairing or correcting damaged or nonconforming Work executed by the Contractor, Subcontractors or suppliers, provided that such damaged or nonconforming Work was not caused by negligence or failure to fulfill a specific responsibility of the Contractor and only to the extent that the cost of repair or correction is not recoverable by the Contractor from insurance, sureties, Subcontractors or suppliers. Contractor shall correct or secure life safety issues within a seventy-two (72) hour time period of written notification. All other issues will be completed within a one-week time period of written notification.

### ARTICLE 8 COSTS NOT TO BE REIMBURSED

8.1 The Cost of the Work shall not include:

8.1.1 Salaries and other compensation of the Contractor's personnel stationed at the Contractor's principal office or offices other that the site office, except as specifically provided in Subparagraph 7.2.2 and 7.2.3 or as may be provided in Article 14.

8.1.2 Expenses of the Contractor's principal office and offices other than the site office.

8.1.3 Overhead and general expenses, except as may be expressly included in Article 7.

8.1.4 The Contractor's capital expenses, including interest on the Contractor's capital employed for the Work.

8.1.5 Rental costs of machinery and equipment, except as specifically provided in Subparagraph 7.5.2.

8.1.6 Except as provided in Subparagraph 7.7.3 of this Agreement, costs due to the negligence or failure to fulfill a specific responsibility of the Contractor, Subcontractors and suppliers or anyone directly or indirectly employed by any of them or for whose acts any of them may be liable.

8.1.7 Any cost not specifically and expressly described in Article 7.

### ARTICLE 9 DISCOUNTS, REBATES AND REFUNDS

9.1 Cash discounts obtained on payments made by the Contractor shall accrue to the Owner if (1) before making the payment, the Contractor included them in an Application for Payment and received payment therefore from the Owner, or (2) the Owner has deposited funds with the Contractor with which to make payments; otherwise, cash discounts shall accrue to the Contractor. Trade discounts, rebates, refunds and amounts received from sales of surplus materials and equipment shall accrue to the Owner, and the Contractor shall make provisions so that they can be secured.

9.2 Amounts that accrue to the Owner in accordance with the provisions of Paragraph 9.1 shall be credited to the Owner as a deduction from the Cost of the Work.



@1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT



The American Institute
of Architects
1735 New York Avenue, N.W
Washington, D.C. 20006-5292

Copyright 1916, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, @ 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.
WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

## ARTICLE 10   SUBCONTRACTS AND OTHER AGREEMENTS

10.1   Those portions of the Work that the Contractor does not customarily perform with the Contractor's own personnel shall be performed under subcontracts or by other appropriate agreements with the Contractor. The Owner may designate specific persons or entities from whom the Contractor shall obtain bids. The Contractor shall obtain bids from Subcontractors and from suppliers of materials or equipment fabricated especially for the Work and shall deliver such bids to the Owner. The Owner shall then determine, with the advice of the Contractor, which bids will be accepted. The Contractor shall not be required to contract with anyone to whom the Contractor has reasonable objection.

10.2   Subcontracts or other agreements shall conform to the applicable payment provisions of this Agreement, and shall not be awarded on the basis of cost plus a fee without the prior consent of the Owner.

## ARTICLE 11   ACCOUNTING RECORDS

The Contractor shall keep full and detailed accounts and exercise such controls as may be necessary for proper financial management under this Contract, and the accounting and control systems shall be satisfactory to the Owner. The Owner and the Owner's accountants shall be afforded access to, and shall be permitted to audit and copy, the Contractor's records, books, correspondence, instructions, drawings, receipts, subcontracts, purchase orders, vouchers, memoranda and other data relating to this Contract, and the Contractor shall preserve these for a period of three years after final payment, or for such longer period as may be required by law.

## ARTICLE 12 PAYMENTS
### 12.1 PROGRESS PAYMENTS

12.1.1   Based upon Applications for Payment submitted to the Owner by the Contractor and the Owner shall make progress payment on account of the Contract Sum to the Contractor as provided below and elsewhere in the Contract Documents.

12.1.2   The period covered by each Application for Payment shall be one (1) calendar month ending on the last day of the month, or as follows:

*The period covered by each application for payment shall be one (1) calendar month ending on the thirtieth (30th) day of each month.*

12.1.3   Provided that an Application for Payment is received by the Owner on or before the <u>Thirtieth (30th) day</u> of the month, the Owner shall make payment to the Contractor on or about the <u>Thirtieth (30th) day</u> of the following month, depending on Funding schedule. If an Application for Payment is received, by the Owner, after the application date fixed above, the Owner shall process the Application for Payment in the next billing cycle.

12.1.4   With each Application for Payment and as applicable to contract, the Contractor shall submit payrolls, petty cash accounts, receipted invoices or invoices with check vouchers attached, and any other evidence required by the Owner or Architect to demonstrate that cash disbursements already made by the Contractor on account of the Cost of the Work equal or exceed (1) progress payments already received by the Contractor; less (2) that portion of those payments attributable to the Contractor's Fee; plus (3) payrolls for the period covered by the present Application for Payment.

12.1.5   Each Application for Payment shall be based on the most recent schedule of values



©1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W
Washington, D.C. 20006-5292

Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, @ 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution. WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

submitted by the Contractor in accordance with the Contract Documents. The schedule of values shall allocate costs among the various portions of the Work, except that the Contractor's Fee shall be shown as a single separate item. The schedule of values shall be prepared in such form and supported by such data to substantiate its accuracy as the Owner may require. This schedule, unless objected to by the Owner, shall be used as a basis for reviewing the Contractor's Application for Payment.

12.1.6  Applications for Payment shall show the percentage of completion of each portion of the Work as of the end of the period covered by the Application for Payment.

12.1.7  With each Application for payment, the Contractor shall submit Material and labor conditional lien releases from all persons and entities supplying material, labor or services to or for the work done by Contractor as of the end of the period covered by the Application for Payment. Such releases shall be on forms established by Owner and subject to Owner's reasonable approval.

12.1.8  Subject to other provisions of the Contract Documents, the amount of each progress payment shall be computed as follows:

.1    take that portion of the cost properly allocable to completed Work as determined by multiplying the percentage completion of each portion of the Work by the share of the cost allocated to that portion of the Work in the schedule of values;

.2    add that portion of the cost properly allocable to materials and equipment delivered and suitably stored at the site for subsequent incorporation in the Work, or if approved in advance by the Owner, suitably stored off the site at a location agreed upon in writing);

.3    add the Contractor's Fee, less retainage of Ten percent (10 %). The Contractor's Fee shall be computed upon the cost of the Work described in the two preceding Clauses at the rate stated in Subparagraph 5.1.2 or, if the Contractor's Fee is stated as a fixed sum in that Subparagraph, shall be an amount that bears the same ratio to that fixed-sum fee as the Cost of the Work in the two preceding Clauses bears to a reasonable estimate of the probable Cost of the Work upon its completion;

.4    subtract the aggregate of previous payments made by the Owner;

.5    subtract the shortfall, if any, indicated by the Contractor in the documentation required by Paragraph 12.1.4 to substantiate prior Applications for Payment, or resulting from error subsequently discovered by the Owner's accountants in such documentation; and

.6    subtract amounts, if any, for which the Owner has withheld or nullified a Certificate for Payment.

12.1.9  Except with the Owner's prior approval, payments to Subcontractors shall be subject to retainage of not less that Ten percent (10 %). The Owner and the Contractor shall agree upon a mutually acceptable procedure for review and approval of payments and retention for Subcontractor.

12.1.10  The progress payment amount determined in accordance with Subparagraph

.1    Add, upon Substantial Completion of the Work, a sum sufficient to increase the total payments to the full amount of the Contract Sum, less such amounts as the Owner shall determine for incomplete Work, retainage applicable to such work and unsettled claims; and

.2    Add, if final completion of the Work is thereafter materially delayed through no fault of the Contractor, any additional amounts payable in accordance with Subparagraph 9.10.3 of AIA Document A201-1997.



The American Institute
of Architects
1735 New York Avenue, N.W
Washington, D.C. 20006-5292



The American Institute
of Architects
1735 New York Avenue, N.W
Washington, D.C. 20006-5292

Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution. WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

12.1.11 Reduction of limitation of retainage, if any, shall be as follows:

> *Retention of ten (10%) shall be withheld from each Application for Payment through fifty percent (50%) completion of the work. Upon fifty percent (50%) completion of the Work retention shall be reduced to five percent and the remaining five percent shall be released to Contractor. Subsequent Application for Payment shall withhold retention in an amount that upon completion of the Work shall not exceed five percent of the contract sum. The total amount of retention held shall be released to Contractor upon substantial completion of the work and Contract delivery to Owner of the conditional waivers of lien from applicable subcontractors.*

## 12.2 PAYMENTS ON BEHALF OF SUBCONTRACTOR.

Owner reserves the right to make payment on behalf of Contractor directly to persons or other entity supplying labor, materials or supplies, or to any labor union, health, welfare or pension funds covered by this Contract. In the alternative, Owner may make payment to contractor in the form of a check made payable jointly to Contractor and such persons or entities. All amounts so paid shall be deemed an advance to Contractor on this Subcontract and shall not make Owner the employer of such labor.

## 12.3 FINAL PAYMENT

12.3.1 Final payment, constituting the entire unpaid balance of the Contract Sum, shall be made by the Owner to the Contractor when:

.1 the Contractor has fully performed the Contract except for the Contractor's responsibility to correct Work.

12.3.2 Final Application for payment shall be accompanied by Final Conditional Releases from the Contractor and all entities supplying material, labor or services to or for the work done by Contractor as of the end of the period covered by the Final Application for Payment. As conditions to Final Payment owner shall require the delivery of full warranty, closeout package and all applicable insurance binders. In the case that any legitimate complaints involving Contractor's work have been received, Contractor shall provider Owner with reasonable evidence that such complaints have been corrected by Contractor. Owner's building acceptance is conditioned to the completion of all work and punch list.

12.3.3 Final Payment shall be made on or about thirty (30) days from the last day of the month of issuance of certificate of substantial completion.

12.3.4 The Owner's accountants will review and report in writing on the Contractor's final accounting on or about 30 days after delivery of the final accounting to the Owner by the Contractor.

12.3.5 If the Owner's accountants report the Cost of the Work as substantiated by the Contractor's final accounting to be less than claimed by the Contractor, the Contractor shall be entitled to demand arbitration of the disputed amount.

12.3.6 If, subsequent to final payment and at the Owner's request, the Contractor incurs costs described in Article 7 and not excluded by Article 8 to correct defective or nonconforming Work, the Owner shall reimburse the Contractor such costs and the Contractor's Fee applicable thereto on the same basis as if such costs had been incurred prior to final payment.

## ARTICLE 14 MISCELLANEOUS PROVISIONS

### 14.1 DEFECTS IN WORKMANSHIP OR MATERIALS

Contractor hereby guarantees Owner against any loss or damage due to defects in workmanship or materials furnished under this contract. Upon notification of defects from Owner, Contractor

Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, @ 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.
WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.



©1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT
The American Institute
of Architects
1735 New York Avenue, N.W
Washington, D.C. 20006-5292



shall within 72 hours with due diligence, at his own expense, correct any defect in the work or materials. Upon failure of the Contractor to correct such defects, Owner may, at Contractor's expense, furnish materials and/or labor to bring the work and materials up to the required standard, Owner shall submit to Contractor in writing a demand for payment of all costs incurred. These costs shall include all costs and attorney fees incurred by the Owner in connection with any litigation or other efforts which relate to the correction of any defect in materials or poor workmanship, including removal and replacement of defective materials furnished by the Contractor.

Contractor hereby agrees that for a period of one (1) year after the issuance of certificate of substantial completion for the last improvement contemplated by the General Contract, or for a period of one (1) year from the date of issuance of Certificate of Compliance from jurisdictional entity, whichever date is later, Contractor, upon notice from Owner, shall without delay and at its own cost cure and correct any defect in material or work performed under this Contract. Contractor shall bear all costs and expenses arising from such defects, including the repair

14.2 Payments due and unpaid under the Contract shall bear interest from the date payment is due at the rate stated below, or in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located. *Legal prevailing rate as allowed by Florida Statute.*

14 . 3 The Owner's representative is:

*(Name, address and other information)*

      *Steve Fike*
      *Quantum Park & Village, LLC*
      *1062 Coral Ridge Drive*
      *Coral Springs, FL 33071*

14.4 The Contractor's representative is:

*(Name, address and other information)*

      *James F. McGinn*
      *Leighton McGinn Company*
      *1983 PGA Blvd, Suite 104*
      *Palm Beach Gardens, Florida 33408*

14.5 Neither the Owner's nor the Contractor's representative shall be changed without ten days' written notice to the other party.

14.6 Other provisions: *Work is further described and subject to Exhibit 'A' entitled "Preliminary Construction Budget" and Exhibit 'C' entitled "Project Schedule", attached hereto and made part hereof.*

### ARTICLE 15    ENUMERATION OF CONTRACT DOCUMENTS

15.1 The Contract Documents, except for Modifications issued after execution of this Agreement, are enumerated as follows:

15.1.1 The Agreement is this executed modified version of the 1997 edition of the Standard Form of Agreement Between Owner and Contractor, AIA Document A111-1997.

15.1.2 The Specifications are those contained as follows:
*(Either list the Specifications here or refer to an exhibit attached to this Agreement.)*

      *Finish specifications remain pending. Owner is to establish a 'unit' or 'bay' standard within current budget projections. Upgrades of the standard may be established in the future. The cost associated with selection(s) will be addressed by terms of this Agreement.*



©1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT

Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.
WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.



The American Institute
of Architects
1735 New York Avenue, N.W
Washington, D.C. 20006-5292

**15.1.3** The Drawings are as follows and are dated      unless a different date is shown below:

*(Either list the Specifications here or refer to an exhibit attached to this Agreement.)*

    *See Exhibit B entitled "Schedule of Drawings"*

**15.1.4** The Addenda, if any, are as follows: N/A

**15.1.5** Other documents, if any, forming part of the Contract Documents are as follows:

    *Exhibit "A" entitled "Preliminary Construction Budget" attached hereto and made part hereof.*

    *Exhibit "B" entitled "Schedule of Drawings" attached hereto and made part hereof.*

    *Exhibit "C" entitled "Project Schedule" attached hereto and made part hereof.*

    *Exhibit "D" entitled "Releases of Lien" attached hereto and made part hereof.*

## ARTICLE 16   INSURANCE

16.1 Contractor is required to provide properly executed Certificates of Insurance prior to the mobilization of equipment or forces onto the site and/or the commencement of work described in the contract documents. Certificate of insurance shall be issued in accordance to the requirements specified below

16.1.1   Contractor's evidence of coverage for Workers Compensation shall reflect statutory limits and $100,000 each accident, $500,000 el. Disease - policy limit and $100,000 el Disease - each employee. General Liability with limits of $1,000,000 and a general aggregate with limits of $2,000,000, Automobile Liability with limits not less than $1,000,000.00, Excess / Umbrella Liability with limits of $5,000,000 each occurrence and $5,000,000 aggregate. Both Auto and General Liability must have combined single limit. General Liability must be on a per occurrence basis, and Automobile Liability shall include all owned, non-owned and hired vehicles. The cancellation box on each certificate must show 30 DAYS written notice.

16.1.2   Insurance coverage shall be confirmed by Owner prior to the release any draw payments. Proof of this coverage shall reflect the exact requirements listed below:

The **"DESCRIPTION OF OPERATIONS"** must state:

    Quantum Park & Village - South Retail Center
    Lots 100, 62, 63, 64, 65-A & 65-B
    1000 Gateway Boulevard, Boynton Beach, FL 33426
    Certificate Holder has been added and named Additional Insured

An additional Insured Endorsement Must be submitted with Insurance Certificate

The **"CERTIFICATE HOLDER"** should be listed as:

    Quantum Park & Village, LLC, [OWNER]
    1062 Coral Ridge Drive
    Coral Springs, FL 33071

    Olen Properties, Corp.
    7 Corporate Plaza
    Newport Beach, CA 92660

    Secured Holdings, Inc.
    7 Corporate Plaza
    Newport Beach, CA 92660



©1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W
Washington, D.C. 20006-5292



Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of this material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution. WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

**16.1.3** Insurance Certificate for all persons and entities supplying material, labor or services shall be confirmed by Owner prior to the release any draw payments.

## 16.2 PERFORMANCE BONDS

Owner may, at Owner's option, require Contractor to provide a performance bond in the amount of the total contract price. The cost of the premium for such bond, to the extent of the ordinary premium, shall be paid by Owner but any additional premium or charge which Contractor is required to pay to obtain such bond shall be at Contractor's expense.

This agreement is entered into as of the day and year first written above and is executed in the least three original copies, of which one is to be delivered to the Contractor and the remainder to the Owner.

QUANTUM PARK & VILLAGE, LLC
Owner

LEIGHTON McGINN COMPANY
Contractor

By: _____
Steve Fike
V.P. of Construction
FL Region

By: _____
James McGinn



©1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292



Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.
WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

# 1997 EDITION

## AIA DOCUMENT   A111-1997



*Standard Form of Agreement Between Owner and Contractor where the basis of payment is the COST OF THE WORK PLUS A FEE*

AGREEMENT made as of the Thirtieth day of July in the year Two-Thousand-Seven.
*(in words, indicate day, month and year)*

BETWEEN the Owner:
*(Name, address and other information)*

*Quantum Park & Village, LLC*
*1962 Coral Ridge Drive*
*Coral Springs, FL 33071*
*(954) 340-4904*

and the Contractor:
*(Name, address and other information)*

Leighton McGinn
1983 PGA Blvd Suite 104
Palm Beach Gardens, FL 33408

The Project is:
*(Name and location)*

Quantum Town Center
1000 Gateway Blvd., Boynton Beach, FL 33426

Construction Contract for Retail Building No. 5
1040 Gateway Boulevard
Boynton Beach, FL 33426

The Architect is:
*(Name, address and other information)*

Johnson Jones Myott Williams Architects
949 Clint Moore Road
Boca Raton, FL 33487

The Owner and Contractor agree as follows.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

This document has been approved and endorsed by The Associated General Contractors of America.



© 1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W
Washington, D.C. 20006-5292

Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution. WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

## ARTICLE 1    THE CONTRACT DOCUMENTS

The Contract Documents consist of this Agreement, Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to execution of this Agreement, other documents listed in this Agreement and Modifications issued after execution of this Agreement; these form the Contract, and are as fully a part of the Contract as if attached to this Agreement or repeated herein. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. An enumeration of the Contract Documents, other than Modifications, appears in Article 15.   If anything in the other Contract Documents is inconsistent with this Agreement, this Agreement shall govern.

## ARTICLE 2    THE WORK OF THIS CONTRACT

The Contractor shall fully execute the Work described in the Contract Documents, except to the extent specifically indicated in the Contract Documents to be the responsibility of others. General Conditions Costs related to performance of this work are defined in separate agreement between owner and contractor

## ARTICLE 3    RELATIONSHIP OF THE PARTIES

The contractor accepts the relationship of trust and confidence established by this Agreement and covenants with the Owner to cooperate with the Architect and exercise the Contractor's skill and judgment in furthering the interests of the Owner; to furnish efficient business administration and supervision; to furnish at all times an adequate supply of workers and materials; and to perform the Work in an expeditious and economical manner consistent with the Owner's interests.   The Owner agrees to furnish and approve, in a timely manner, information required by the Contractor and to make payments to the Contractor in accordance with the requirements of the Contract Documents.

## ARTICLE 4    DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

4 . 1    The date of commencement of the Work shall be the date of this Agreement unless a different date is stated below or provision is made for the date to be fixed in a notice to proceed issued by the Owner.

*(Insert the date of commencement if it differs from the date of this Agreement or, if applicable, state that the date will be fixed in a notice to proceed.)*

*Date of Commencement shall be the latter date of issuance of the Building Permit, execution of this agreement and recording of the Notice of Commencement.*

If, prior to the commencement of the Work, the Owner requires time to file mortgages, mechanic's liens and other security interests, the Owner's time requirement shall be as follows:

*N/A*

4 . 2    The Contract Time shall be measured from the date of commencement, *as defined above.*



©1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292.


Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.
WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

4.3     The contractor shall achieve Substantial Completion of the entire Work not later than Two Hundred Forty (240) days from the date of commencement, or as follows:
*(Insert number of calendar days. Alternatively, a calendar date may be used when coordinated with the date of commencement. Unless stated elsewhere in the Contract Documents, insert any requirements for earlier Substantial Completion of certain portions of the Work.)*

> *Date of Commencement shall be established as defined above.   In the event jurisdictional and governing authorities will not allow phased occupancy approval, substantial completion shall be stated in a certificate of substantial completion executed by the Owner, and Contractor.*

subject to adjustments of this Contract Time as provided in the Contract Documents: *N/A*
*(Insert provisions, if any, for liquidated damages relating to failure to complete on time or for bonus payments for early completion of the Work.)*

## ARTICLE 5   BASIS FOR PAYMENT

### 5.1   CONTRACT SUM

5.1.1 The Owner shall pay the Contractor the Contract Sum in current funds for the Contractor's performance of the Contract.  The Contract Sum is the Cost of the Work as defined in Article 7 plus the Contractor's Fee.

5.1.2 The Contractor's Fee is:

*(State a lump sum, percentage of Cost of the Work or other provision for determining the Contractor's Fee, and describe the method of adjustment of the Contractor's Fee for changes in the Work.)*

> *Six percent (6%) for the Cost of Construction not including Contractor's General Conditions which are addressed under separate agreement.*

## ARTICLE 6     TERMINATION OR SUSPENSION

### 6.1   DEFAULT

· In addition to those instances of default otherwise set forth in this Agreement, Contractor shall be in default hereunder if

6.1.1    Contractor fails to furnish sufficient workmen or material to perform at the time and pace prescribed by Owner, or fails to cooperate with Owner, or interferes with or damages the work of any other subcontractor on the project, or;

6.1.2    A strike, work stoppage, picket line, or other labor disturbance at the construction site has occurred or is threatened by reason of a dispute directly or indirectly involving ' Contractor, or;

6.1.3    Contractor fails or is about to fail to pay for any labor, material or services supplied in connection with the work covered by this Contract, or a mechanic's or material man's lien is recorded against any part of the project.

### 6.2   CONTRACTOR'S REMEDIES.

When Contractor is in default, Owner may serve Contractor written notice thereof and require Contractor to cure such default within seventy-two (72) hours thereafter, or to satisfy Owner of its ability to do so within a time acceptable to Owner.  If such default is not cured or Owner is not ' so satisfied as aforesaid, Owner may declare this Contract terminated.  Owner may contract with other contractors or subcontractors to correct such default and to complete the performance required under this Contract Documents for the account of Contractor.  Owner may charge and obligate Contractor for the costs and expenses thereof and for all damages suffered by Owner.  Any notice given hereunder is voluntary.



©1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, NW
Washington, D.C. 20006-5292



Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution. WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

## ARTICLE 7   COSTS TO BE REIMBURSED

### 7.1   COST OF THE WORK

The term Cost of the Work shall mean costs necessarily incurred by the Contractor in the proper performance of the Work. Such costs shall be at rates not higher than the standard paid at the place of the Project except with prior consent of the Owner. The Cost of the Work shall include only the items set forth in this Article 7.

### 7.2   LABOR COSTS

7.2.1   Wages of construction workers directly employed by the Contractor to perform the construction of the Work at the site or, with the Owner's approval, at off-site workshops.

7.2.2   Wages or salaries of the Contractor's supervisory personnel shall include project manager and superintendent stationed at the site, or home office.

7.2.3   Wages and salaries of the Contractor's supervisory or administrative personnel engaged, at factories, workshops or on the road, in expediting the production or transportation of materials or equipment required for the Work, but only for that portion of their time required for the Work.

7.2.4   Costs paid or incurred by the Contractor for taxes, insurance, contributions, assessments and benefits required by law or collective bargaining agreements and, for personnel not covered by such agreements, customary benefits such as sick leave, medical and health benefits, holidays, vacations and pensions, provided such costs are based on wages and salaries included in the Cost of the Work under Subparagraphs 7.2.1 through 7.2.3.

### 7.3   SUBCONTRACT COSTS

7.3.1   Payments made by the Contractor to Subcontractors in accordance with the requirements of the subcontracts.

### 7.4   COSTS OF MATERIALS AND EQUIPMENT INCORPORATED IN THE COMPLETED CONSTRUCTION

7.4.1   Costs, including transportation and storage, of materials and equipment incorporated or to be incorporated in the completed construction.

7.4.2   Costs of materials described in the preceding Subparagraph 7.4.1 in excess of those actually installed to allow for reasonable waste and spoilage. Unused excess materials, if any, shall become the Owner's property at the completion of the Work or, at the Owner's option, shall be sold by the Contractor. Any amounts realized from such sales shall be credited to the Owner as a deduction from the Cost of the Work.

### 7.5   COSTS OF OTHER MATERIALS AND EQUIPMENT, TEMPORARY FACILITIES AND RELATED ITEMS

7.5.1   Costs, including transportation and storage, installation, maintenance, dismantling and removal of materials, supplies, temporary facilities, machinery, equipment, and hand tools not customarily owned by construction workers, that are provided by the Contractor at the site and fully consumed in the performance of the Work; and cost (less salvage value) of such items if not fully consumed, whether sold to others or retained by the Contractor. Cost for items previously used by the Contractor shall mean fair market value.



©1997 AIA
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, ©1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution. WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

7.5.2    Rental charges for temporary facilities, machinery, equipment, and hand tools not customarily owned by construction worked that are provided by the Contractor at the site, whether rented from the Contractor or others, and costs of transportation, installation, minor repairs and replacements, dismantling and removal thereof.

7.5.3    Costs of transportation and removal of debris from the site.

7.5.4    Costs of document reproductions, facsimile transmissions and long-distance ·· telephone calls, postage and parcel delivery charges, telephone service at the site and reasonable petty cash expenses of the site office.

7.5.5    That portion of the reasonable expenses of the Contractor's personnel incurred while traveling in discharge of duties connected with the Work.

7.5.6    Costs of materials and equipment suitably stored off the site at a mutually acceptable location, if approved in advance by the Owner.

7.6  MISCELLANEOUS COSTS

7.6.1    That portion of insurance and bond premiums that can be directly attributed to this Contract.

7.6.2    Sales, use or similar taxes imposed by a governmental authority that are related to the Work.

7.6.3    Fees and assessments for the building permit and for other permits, licenses and·· inspections for which the Contractor is required by the Contract Documents to pay.

7.6.4    Fees of laboratories for tests required by the Contract Documents, except those related to defective or nonconforming Work shall be reimbursed by Owner.

7.6.5    Royalties and license fees paid for the use of a particular design, process or product required by the Contract Documents; the cost of defending suits or claims for infringement of patent rights arising from such requirement of the Contract Documents; and payments made in accordance with legal judgments against the Contractor resulting from' such suits or claims and payments of settlements made with the Owner's consent. However, such costs of legal defenses, judgments and settlements shall not be included in the calculation of the Contractor's Fee or subject to the Guaranteed Maximum Price. If such royalties, fees and costs are excluded other provisions of the Contract Documents, then they shall not be included in the Cost of the Work.

7.6.6    Data processing costs related to the Work.

7.6.7    Deposits lost for causes other than the Contractor's negligence or failure to fulfill a specific responsibility to the Owner as set forth in the Contract Documents.

7.6.8    Legal, mediation and arbitration costs, including attorneys' fees, other than those arising from disputes between the Owner and Contractor, reasonably incurred by the Contractor in the performance of the Work and with the Owner's prior written approval; which approval shall not be unreasonably withheld.

7.6.9    Expenses incurred in accordance with the Contractor's standard personnel policy , for relocation and temporary living allowances of personnel required for the Work.



©1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W
Washington, D.C, 20006-5292

Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution. WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.



## 7.7   OTHER COSTS AND EMERGENCIES

7.7.1   Other costs incurred in the performance of the Work if and to the extent approved in advance in writing by the Owner.

7.7.2   Costs due to emergencies incurred in taking action to prevent threatened damage, injury or loss in case of an emergency affecting the safety of persons and property.

7.7.3   Costs of repairing or correcting damaged or nonconforming Work executed by the Contractor, Subcontractors or suppliers, provided that such damaged or nonconforming Work was not caused by negligence or failure to fulfill a specific responsibility of the Contractor and only to the extent that the cost of repair or correction is not recoverable by the Contractor from insurance, sureties, Subcontractors or suppliers. Contractor shall correct or secure life safety issues within a seventy-two (72) hour time period of written notification. All other issues will be completed within a one-week time period of written notification.

## ARTICLE 8   COSTS NOT TO BE REIMBURSED
8.1   The Cost of the Work shall not include:

8.1.1   Salaries and other compensation of the Contractor's personnel stationed at the Contractor's principal office or offices other than the site office, except as specifically provided in Subparagraph 7.2.2 and 7.2.3 or as may be provided in Article 14.

8.1.2   Expenses of the Contractor's principal office and offices other than the site office.

8.1.3   Overhead and general expenses, except as may be expressly included in Article 7.

8.1.4   The Contractor's capital expenses, including interest on the Contractor's capital employed for the Work.

8.1.5   Rental costs of machinery and equipment, except as specifically provided in Subparagraph 7.5.2.

8.1.6   Except as provided in Subparagraph 7.7.3 of this Agreement, costs due to the negligence or failure to fulfill a specific responsibility of the Contractor, Subcontractors and suppliers or anyone directly or indirectly employed by any of them or for whose acts any of them may be liable.

8.1.7   Any cost not specifically and expressly described in Article 7.

## ARTICLE 9   DISCOUNTS, REBATES AND REFUNDS
9.1   Cash discounts obtained on payments made by the Contractor shall accrue to the Owner if (1) before making the payment, the Contractor included them in an Application for Payment and received payment therefore from the Owner, or (2) the Owner has deposited funds with the Contractor with which to make payments; otherwise, cash discounts shall accrue to the Contractor. Trade discounts, rebates, refunds and amounts received from sales of surplus materials and equipment shall accrue to the Owner, and the Contractor shall make provisions so that they can be secured.

9.2   Amounts that accrue to the Owner in accordance with the provisions of Paragraph 9.1 shall be credited to the Owner as a deduction from the Cost of the Work.



©1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

Copyright 1818, 1848, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, @ 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.
WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

## ARTICLE 10  SUBCONTRACTS AND OTHER AGREEMENTS

10.1 Those portions of the Work that the Contractor does not customarily perform with the ^^ Contractor's own personnel shall be performed under subcontracts or by other appropriate agreements with the Contractor. The Owner may designate specific persons or entities from whom the Contractor shall obtain bids. The Contractor shall obtain bids from Subcontractors and from suppliers of materials or equipment fabricated especially for the Work and shall deliver such bids to the Owner. The Owner shall then determine, with the advice of the Contractor, which bids will be accepted. The Contractor shall not be required to contract with anyone to whom the Contractor has reasonable objection.

10.2 Subcontracts or other agreements shall conform to the applicable payment provisions of this '' Agreement, and shall not be awarded on the basis of cost plus a fee without the prior consent of the Owner.

## ARTICLE 11   ACCOUNTING RECORDS

The Contractor shall keep full and detailed accounts and exercise such controls as may be necessary for proper financial management under this Contract, and the accounting and control systems shall be satisfactory to the Owner. The Owner and the Owner's accountants shall be afforded access to, and shall be permitted to audit and copy, the Contractor's records, books, correspondence, instructions, drawings, receipts, subcontracts, purchase orders, vouchers, memoranda and other data relating to this Contract, and the Contractor shall preserve these for a period of three years after final payment, or for such longer period as may be required by law.

## ARTICLE 12 PAYMENTS

### 12.1 PROGRESS PAYMENTS

12.1.1 Based upon Applications for Payment submitted to the Owner by the Contractor'' and the Owner shall make progress payment on account of the Contract Sum to the Contractor as provided below and elsewhere in the Contract Documents.

12.1.2 The period covered by each Application for Payment shall be one (1) calendar month ending on the last day of the month, or as follows:

> *The period covered by each application for payment shall be one (1) calendar month ending on the thirtieth (30th) day of each month.*

12.1.3 Provided that an Application for Payment is received by the Owner on or before the Thirtieth (30th) day of the month, the Owner shall make payment to the Contractor on or about the Thirtieth (30th) day of the following month, depending on Funding schedule. If an Application for Payment is received, by the Owner, after the application date fixed above, the Owner shall process the Application for Payment in the next billing cycle.

12.1.4 With each Application for Payment and as applicable to contract, the Contractor shall submit payrolls, petty cash accounts, receipted invoices or invoices with check vouchers attached, and any other evidence required by the Owner or Architect to demonstrate that cash disbursements already made by the Contractor on account of the Cost of the Work equal or exceed (1) progress payments already received by the Contractor; less (2) that portion of those payments attributable to the Contractor's Fee; plus (3) payrolls for the period covered by the present Application for Payment.

12.1.5 Each Application for Payment shall be based on the most recent schedule of values



©1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT

Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution. WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.



The American Institute
of Architects
1735 New York Avenue, N.W
Washington, D.C. 20006-5292

submitted by the Contractor in accordance with the Contract Documents. The schedule of values shall allocate costs among the various portions of the Work, except that the . . Contractor's Fee shall be shown as a single separate item. The schedule of values shall be prepared in such form and supported by such data to substantiate its accuracy as the Owner may require. This schedule, unless objected to by the Owner, shall be used as a basis for reviewing the Contractor's Application for Payment.

12.1.6   Applications for Payment shall show the percentage of completion of each portion of the Work as of the end of the period covered by the Application for Payment.

12.1.7   With each Application for payment, the Contractor shall submit Material and labor -- conditional lien releases from all persons and entities supplying material, labor or services to or for the work done by Contractor as of the end of the period covered by the Application for Payment. Such releases shall be on forms established by Owner and subject to Owner's reasonable approval.

12.1.8   Subject to other provisions of the Contract Documents, the amount of each progress payment shall be computed as follows:

   .1   take that portion of the cost properly allocable to completed Work as determined by multiplying the percentage completion of each portion of the Work by the . . share of the cost allocated to that portion of the Work in the schedule of values,

   .2   add that portion of the cost properly allocable to materials and equipment delivered and suitably stored at the site for subsequent incorporation in the Work, or if approved in advance by the Owner, suitably stored off the site at a location agreed upon in writing);

   .3   add the Contractor's Fee, less retainage of Ten percent (10 %). The Contractor's Fee shall be computed upon the cost of the Work described in the two preceding Clauses at the rate stated in Subparagraph 5.1.2 or, if the Contractor's Fee is stated as a fixed sum in that Subparagraph, shall be an amount that bears the same ratio to that fixed-sum fee as the Cost of the Work in the two preceding Clauses bears to a reasonable estimate of the probable Cost of the Work upon its completion;

   .4   subtract the aggregate of previous payments made by the Owner;

   .5   subtract the shortfall, if any, indicated by the Contractor in the documentation required by Paragraph 12.1.4 to substantiate prior Applications for Payment, or resulting from error subsequently discovered by the Owner's accountants in such documentation; and

   .6   subtract amounts, if any, for which the Owner has withheld or nullified a Certificate for Payment.

12.1.9   Except with the Owner's prior approval, payments to Subcontractors shall be subject to retainage of not less that Ten percent (10 %). The Owner and the Contractor shall agree upon a mutually acceptable procedure for review and approval of payments and retention for Subcontractor.

12.1.10  The progress payment amount determined in accordance with Subparagraph

   .1   Add, upon Substantial Completion of the Work, a sum sufficient to increase the total payments to the full amount of the Contract Sum, less such amounts as the Owner shall determine for incomplete Work, retainage applicable to such work and unsettled claims; and

   .2   Add, if final completion of the Work is thereafter materially delayed through no fault of the Contractor, any additional amounts payable in accordance with Subparagraph 9.10.3 of AIA Document A201-1997.



The American Institute
of Architects
1735 New York Avenue, N.W
Washington, D.C. 20006-5292

The American Institute
of Architects
1735 New York Avenue, N.W
Washington, D.C. 20006-5292



Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.
WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

12.1.11 Reduction of limitation of retainage, if any, shall be as follows:

> *Retention of ten (10%) shall be withheld from each Application for Payment through fifty percent (50%) completion of the work. Upon fifty percent (50%) completion of the Work retention shall be reduced to five percent and the remaining five percent shall be released to Contractor. Subsequent Application for Payment shall withhold retention in an amount that upon completion of the Work shall not exceed five percent of the contract sum. The total amount of retention held shall be released to Contractor upon substantial completion of the work and Contract delivery to Owner of the conditional waivers of lien from applicable subcontractors.*

## 12.2 PAYMENTS ON BEHALF OF SUBCONTRACTOR.

Owner reserves the right to make payment on behalf of Contractor directly to persons or other entity supplying labor, materials or supplies, or to any labor union, health, welfare or pension funds covered by this Contract. In the alternative, Owner may make payment to contractor in the form of a check made payable jointly to Contractor and such persons or entities. All amounts so paid shall be deemed an advance to Contractor on this Subcontract and shall not make Owner the employer of such labor.

## 12.3 FINAL PAYMENT

12.3.1 Final payment, constituting the entire unpaid balance of the Contract Sum, shall be made by the Owner to the Contractor when:

.1 the Contractor has fully performed the Contract except for the Contractor's responsibility to correct Work.

12.3.2 Final Application for payment shall be accompanied by Final Conditional Releases from the Contractor and all entities supplying material, labor or services to or for the work done by Contractor as of the end of the period covered by the Final Application for Payment. As conditions to Final Payment owner shall require the delivery of full warranty, closeout package and all applicable insurance binders. In the case that any legitimate complaints involving Contractor's work have been received, Contractor shall provider Owner with reasonable evidence that such complaints have been corrected by Contractor. Owner's building acceptance is conditioned to the completion of all work and punch list.

12.3.3 Final Payment shall be made on or about thirty (30) days from the last day of the month of issuance of certificate of substantial completion.

12.3.4 The Owner's accountants will review and report in writing on the Contractor's final accounting on or about 30 days after delivery of the final accounting to the Owner by. . the Contractor.

12.3.5 If the Owner's accountants report the Cost of the Work as substantiated by the Contractor's final accounting to be less than claimed by the Contractor, the Contractor shall be entitled to demand arbitration of the disputed amount.

12.3.6 If, subsequent to final payment and at the Owner's request, the Contractor incurs costs described in Article 7 and not excluded by Article 8 to correct defective or nonconforming Work, the Owner shall reimburse the Contractor such costs and the Contractor's Fee applicable thereto on the same basis as if such costs had been incurred prior to final payment.

## ARTICLE 14 MISCELLANEOUS PROVISIONS

### 14.1 DEFECTS IN WORKMANSHIP OR MATERIALS

Contractor hereby guarantees Owner against any loss or damage due to defects in workmanship or materials furnished under this contract. Upon notification of defects from Owner, Contractor



©1987 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT
The American Institute
of Architects
1735 New York Avenue, N.W
Washington, D.C. 20006-5292

Copyright 1958, 1948, 1928, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution. WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

shall within 72 hours with due diligence, at his own expense, correct any defect in the work or materials. Upon failure of the Contractor to correct such defects, Owner may, at Contractor's expense, furnish materials and/or labor to bring the work and materials up to the required standard. Owner shall submit to Contractor in writing a demand for payment of all costs incurred. These costs shall include all costs and attorney fees incurred by the Owner in connection with any litigation or other efforts which relate to the correction of any defect in materials or poor workmanship, including removal and replacement of defective materials furnished by the Contractor.

Contractor hereby agrees that for a period of one (1) year after the issuance of certificate of substantial completion for the last improvement contemplated by the General Contract, or for a period of one (1) year from the date of issuance of Certificate of Compliance from jurisdictional entity, whichever date is later, Contractor, upon notice from Owner, shall without delay and at its own cost cure and correct any defect in material or work performed under this Contract. Contractor shall bear all costs and expenses arising from such defects, including the repair

14.2 Payments due and unpaid under the Contract shall bear interest from the date payment is due at the rate stated below, or in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located. *Legal prevailing rate as allowed by Florida Statute.*

14.3 The Owner's representative is;

(*Name, address and other information*)

  Steve Fike
  Quantum Park & Village, LLC
  1062 Coral Ridge Drive
  Coral Springs, FL 33071

14.4 The Contractor's representative is:

(*Name, address and other information*)

  James F. McGinn
  Leighton McGinn Company
  1983 PGA Blvd, Suite 104
  Palm Beach Gardens, Florida 33408

14.5 Neither the Owner's nor the Contractor's representative shall be changed without ten days' written notice to the other party.

14.6 Other provisions: *Work is further described and subject to Exhibit 'A' entitled "Preliminary Construction Budget" and Exhibit 'C' entitled "Project Schedule", attached hereto and made part hereof.*

ARTICLE 15 ENUMERATION OF CONTRACT DOCUMENTS

15.1 The Contract Documents, except for Modifications issued after execution of this Agreement, are enumerated as follows:

15.1.1 The Agreement is this executed modified version of the 1997 edition of the Standard Form of Agreement Between Owner and Contractor, AIA Document A111-1997.

15.1.2 The Specifications are those contained as follows:
(*Either list the Specifications here or refer to an exhibit attached to this Agreement.*)

  *Finish specifications remain pending. Owner is to establish a 'unit' or 'bay' standard within current budget projections. Upgrades of the standard may be established in the future. The cost associated with selection(s) will be addressed by terms of this Agreement.*



©1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT

Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution. WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.



The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

15.1.3    The Drawings are as follows and are dated        unless a different date is shown below:

*(Either list the Specifications here or refer to an exhibit attached to this Agreement.)*

See Exhibit B entitled "Schedule of Drawings"

15.1.4    The Addenda, if any, are as follows:  N/A

15.1.5    Other documents, if any, forming part of the Contract Documents are as follows:

Exhibit "A" entitled "Preliminary Construction Budget" attached hereto and made part hereof;

Exhibit "B" entitled "Schedule of Drawings" attached hereto and made part hereof;

Exhibit "C" entitled "Project Schedule" attached hereto and made part hereof;

Exhibit "D" entitled "Releases of Lien" attached hereto and made part hereof;

## ARTICLE 16   INSURANCE

16.1 Contractor is required to provide properly executed Certificates of Insurance prior to the mobilization of equipment or forces onto the site and/or the commencement of work described in the contract documents. Certificate of insurance shall be issued in accordance to the requirements specified below

16.1.1    Contractor's evidence of coverage for Workers Compensation shall reflect statutory limits and $100,000 each accident, $500,000 el. Disease - policy limit and $100,000 el Disease - each employee. General Liability with limits of $1,000,000 and a general aggregate with limits of $2,000,000. Automobile Liability with limits not less than $1,000,000.00. Excess / Umbrella Liability with limits of $5,000,000 each occurrence and $5,000,000 aggregate. Both Auto and General Liability must have combined single limit. General Liability must be on a per occurrence basis, and Automobile Liability shall include all owned, non-owned and hired vehicles. The cancellation box on each certificate must show 30 DAYS written notice.

16.1.2    Insurance coverage shall be confirmed by Owner prior to the release any draw payments. Proof of this coverage shall reflect the exact requirements listed below:

The "DESCRIPTION OF OPERATIONS" must state:

Quantum Park & Village - South Retail Center
Lots 100, 62, 63, 64, 65-A & 65-B
1000 Gateway Boulevard, Boynton Beach, FL 33426
Certificate Holder has been added and named Additional Insured

An additional Insured Endorsement Must be submitted with Insurance Certificate

The "CERTIFICATE HOLDER" should be listed as:

Quantum Park & Village, LLC. [OWNER]
1062 Coral Ridge Drive
Coral Springs, FL 33071

Olen Properties, Corp.
7 Corporate Plaza
Newport Beach, CA 92660

Secured Holdings, Inc.
7 Corporate Plaza
Newport Beach, CA 92660



©1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W
Washington, D.C. 20006-5292

Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.
WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

16.1.3   Insurance Certificate for all persons and entities supplying material, labor or services shall be confirmed by Owner prior to the release any draw payments.

### 16.2 PERFORMANCE BONDS

Owner may, at Owner's option, require Contractor to provide a performance bond in the amount of the total contract price. The cost of the premium for such bond, to the extent of the ordinary premium, shall be paid by Owner but any additional premium or charge which Contractor is required to pay to obtain such bond shall be at Contractor's expense.

This agreement is entered into as of the day and year first written above and is executed in the least three original copies, of which one is to be delivered to the Contractor and the remainder to the Owner.

**QUANTUM PARK & VILLAGE, LLC**
**Owner**

**LEIGHTON MCGINN COMPANY**
**Contractor**

By: _____  8/3/07

Steve Fike
V.P. of Construction
FL Region

By: _____

James McGinn



©1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W
Washington, D.C. 20006-5292



Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, @ 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.
WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

1997 EDITIÓN

## AIA DOCUMENT   A111-1997



*Standard Form of Agreement Between Owner and Contractor   where the basis of payment is the COST OF THE WORK PLUS A FEE*

AGREEMENT made as of the 4th day of January in the year Two-Thousand-Seven.
*(in words, indicate day, month and year)*

BETWEEN the Owner:
*(Name, address and other information)*

*Quantum Park & Village, LLC*
*1062 Coral Ridge Drive*
*Coral Springs, FL 33071*
*(954) 340-4904*

and the Contractor:
*(Name, address and other information)*

Leighton McGinn
1983 PGA Blvd Suite 104
Palm Beach Gardens, FL 33408

The Project is:
*(Name and location)*

Quantum Town Center Residential Apartments
901-943 Gateway Blvd, Suites #1-18
Boynton Beach, FL 33426

The Architect is:
*(Name, address and other information)*

Quincy Johnson Jones Myott Williams
949 Clint Moore Road
Boca Raton, FL 33487

The Owner and Contractor agree as follows.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

This document has been approved and endorsed by The Associated General Contractors of America.



© 1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR AGREEMENT

The American Institute of Architects
1735 New York Avenue, N.W
Washington, D.C. 20006-5292

Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.
WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S.

## ARTICLE 1    THE CONTRACT DOCUMENTS

The Contract Documents consist of this Agreement, Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to execution of this Agreement, other documents listed in this Agreement and Modifications issued after execution of this Agreement; these form the Contract, and are as fully a part of the Contract as if attached to this Agreement or repeated herein. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. An enumeration of the Contract Documents, other than Modifications, appears in Article 15. If anything in the other Contract Documents is inconsistent with this Agreement, this Agreement shall govern.

## ARTICLE 2    THE WORK OF THIS CONTRACT

The Contractor shall fully execute the Work described in the Contract Documents, except to the extent specifically indicated in the Contract Documents to be the responsibility of others. General Conditions Costs related to performance of this work are defined in separate agreement between owner and contractor

## ARTICLE 3    RELATIONSHIP OF THE PARTIES

The contractor accepts the relationship of trust and confidence established by this Agreement and covenants with the Owner to cooperate with the Architect and exercise the Contractor's skill and judgment in furthering the interests of the Owner; to furnish efficient business administration and supervision; to furnish at all times an adequate supply of workers and materials; and to perform the Work in an expeditious and economical manner consistent with the Owner's interests. The Owner agrees to furnish and approve, in a timely manner, information required by the Contractor and to make payments to the Contractor in accordance with the requirements of the Contract Documents.

## ARTICLE 4    DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

4.1      The date of commencement of the Work shall be the date of this Agreement unless a different date is stated below or provision is made for the date to be fixed in a notice to proceed issued by the Owner.   .

*(Insert the date of commencement if it differs from the date of this Agreement or, if applicable, state that the date will be fixed in a notice to proceed.)*

*Date of Commencement shall be the latter date of issuance of the Building Permit, execution of this agreement and recording of the Notice of Commencement.*

If, prior to the commencement of the Work, the Owner requires time to file mortgages, mechanic's liens and other security interests, the Owner's time requirement shall be as follows:

*N/A*

4.2      The Contract Time shall be measured from the date of commencement, *as defined above.*



AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W
Washington, D.C. 20006-5292

Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.
WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and



4.3     The contractor shall achieve Substantial Completion of the entire Work not later than Two Hundred Forty (240) days from the date of commencement, or as follows:
*(Insert number of calendar days. Alternatively, a calendar date may be used when coordinated with the date of commencement. Unless stated elsewhere in the Contract Documents, insert any requirements for earlier Substantial Completion of certain portions of the Work.)*

    *Date of Commencement shall be established as defined above. In the event jurisdictional and governing authorities will not allow phased occupancy approval, substantial completion shall be stated in a certificate of substantial completion executed by the Owner, and Contractor,*

subject to adjustments of this Contract Time as provided in the Contract Documents; *N/A*
*(Insert provisions, if any, for liquidated damages relating to failure to complete on time or for bonus payments for early completion of the Work.)*

## ARTICLE 5    BASIS FOR PAYMENT

### 5.1    CONTRACT SUM

5.1.1   The Owner shall pay the Contractor the Contract Sum in current funds for the Contractor's performance of the Contract. The Contract Sum is the Cost of the Work as defined in Article 7 plus the Contractor's Fee.

5.1.2   The Contractor's Fee is:
*(State a lump sum, percentage of Cost of the Work or other provision for determining the Contractor's Fee, and describe the method of adjustment of the Contractor's Fee for changes in the Work.)*

    *Six percent (6%) for the Cost of Construction not including Contractor's General Conditions which are addressed under separate agreement.*

5.1.3   Any Change Orders or extras shall be approved by Owner; the increase in Contract Sum shall be solely for the Cost of the Change Order. No additional fees are to be applied to any Change Order(s) or extras related to this contract, consequently, the Builder's Fees for Change Order(s) or extras will be Zero percent (0%).

## ARTICLE 6    TERMINATION OR SUSPENSION

### 6.1    DEFAULT

In addition to those instances of default otherwise set forth in this Agreement, Contractor shall be in default hereunder if

6.1.1   Contractor fails to furnish sufficient workmen or material to perform at the time and pace prescribed by Owner, or fails to cooperate with Owner, or interferes with or damages the work of any other subcontractor on the project, or;

6.1.2   A strike, work stoppage, picket line, or other labor disturbance at the construction site has occurred or is threatened by reason of a dispute directly or indirectly involving Contractor, or;

6.1.3   Contractor fails or is about to fail to pay for any labor, material or services supplied in connection with the work covered by this Contract, or a mechanic's or material man's lien is recorded against any part of the project.

### 6.2    CONTRACTOR'S REMEDIES.

When Contractor is in default, Owner may serve Contractor written notice thereof and require Contractor to cure such default within seventy-two (72) hours thereafter, or to satisfy Owner of its ability to do so within a time acceptable to Owner. If such default is not cured or Owner is not so satisfied as aforesaid, Owner may declare this Contract terminated. Owner may contract with other contractors or subcontractors to correct such default and to complete the performance required under this Contract Documents for the account of Contractor. Owner may charge and



©1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W
Washington, D.C. 20006-5292

Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material hereln or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.
WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S, copyright laws and



obligate Contractor for the costs and expenses thereof and for all damages suffered by Owner. Any notice given hereunder is voluntary.

## ARTICLE 7    COSTS TO BE REIMBURSED

### 7.1    COST OF THE WORK

The term Cost of the Work shall mean costs necessarily incurred by the Contractor in the proper performance of the Work. Such costs shall be at rates not higher than the standard paid at the place of the Project except with prior consent of the Owner. The Cost of the Work shall include only the items set forth in the Article 7.

### 7.2    LABOR COSTS

7.2.1    Wages of construction workers directly employed by the Contractor to perform the construction of the Work at the site or, with the Owner's approval, at off-site workshops.

7.2.2    Wages or salaries of the Contractor's supervisory personnel shall include project manager and superintendent stationed at the site, or home office.

7.2.3    Wages and salaries of the Contractor's supervisory or administrative personnel engaged, at factories, workshops or on the road, in expediting the production or transportation of materials or equipment required for the Work, but only for that portion of their time required for the Work.

7.2.4    Costs paid or incurred by the Contractor for taxes, insurance, contributions, assessments and benefits required by law or collective bargaining agreements and, for personnel not covered by such agreements, customary benefits such as sick leave, medical and health benefits, holidays, vacations and pensions, provided such costs are based on wages and salaries included in the Cost of the Work under Subparagraphs 7.2.1 through 7.2.3.

### 7.3    SUBCONTRACT COSTS

7.3.1    Payments made by the Contractor to Subcontractors in accordance with the requirements of the subcontracts.

### 7.4    COSTS OF MATERIALS AND EQUIPMENT INCORPORATED IN THE COMPLETED CONSTRUCTION

7.4.1 Costs, including transportation and storage, of materials and equipment incorporated or to be incorporated in the completed construction.

7.4.2 Costs of materials described in the preceding Subparagraph 7.4.1 in excess of those actually installed to allow for reasonable waste and spoilage. Unused excess materials, if any, shall become the Owner's property at the completion of the Work or, at the Owner's option, shall be sold by the Contractor. Any amounts realized from such sales shall be credited to the Owner as a deduction from the Cost of the Work.

### 7.5    COSTS OF OTHER MATERIALS AND EQUIPMENT, TEMPORARY FACILITIES AND RELATED ITEMS

7.5.1    Costs, including transportation and storage, installation, maintenance, dismantling and removal of materials, supplies, temporary facilities, machinery, equipment, and hand tools not customarily owned by construction workers, that are provided by the Contractor at the site and fully consumed in the performance of the Work; and cost (less salvage value) of such items if not fully consumed, whether sold to others or retained by the Contractor. Cost



©1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT
The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292


Copyright 1916, 1925, 1927, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.
WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and

for items previously used by the Contractor shall mean fair market value.

7.5.2    Rental charges for temporary facilities, machinery, equipment, and hand tools not customarily owned by construction worked that are provided by the Contractor at the site, whether rented from the Contractor or others, and costs of transportation, installation, minor repairs and replacements, dismantling and removal thereof.

7.5.3    Costs of transportation and removal of debris from the site.

7.5.4    Costs of document reproductions, facsimile transmissions and long-distance telephone calls, postage and parcel delivery charges, telephone service at the site and reasonable petty cash expenses of the site office.

7.5.5    That portion of the reasonable expenses of the Contractor's personnel incurred while traveling in discharge of duties connected with the Work.

7.5.6    Costs of materials and equipment suitably stored off the site at a mutually acceptable location, if approved in advance by the Owner.

7.6   MISCELLANEOUS COSTS

7.6.1    That portion of insurance and bond premiums that can be directly attributed to this Contract.

7.6.2    Sales, use or similar taxes imposed by a governmental authority that are related to the Work.

7.6.3    Fees and assessments for the building permit and for other permits, licenses and inspections for which the Contractor is required by the Contract Documents to pay.

7.6.4    Fees of laboratories for tests required by the Contract Documents, except those related to defective or nonconforming Work shall be reimbursed by Owner.

7.6.5    Royalties and license fees paid for the use of a particular design, process or product required by the Contract Documents; the cost of defending suits or claims for infringement of patent rights arising from such requirement of the Contract Documents; and payments made in accordance with legal judgments against the Contractor resulting from such suits or claims and payments of settlements made with the Owner's consent. However, such costs of legal defenses, judgments and settlements shall not be included in the calculation of the Contractor's Fee or subject to the Guaranteed Maximum Price. If such royalties, fees and costs are excluded other provisions of the Contract Documents, then they shall not be included in the Cost of the Work.

7.6.6    Data processing costs related to the Work.

7.6.7    Deposits lost for causes other than the Contractor's negligence or failure to fulfill a specific responsibility to the Owner as set forth in the Contract Documents.

7.6.8    Legal, mediation and arbitration costs, including attorneys' fees, other than those arising from disputes between the Owner and Contractor, reasonably incurred by the Contractor in the performance of the Work and with the Owner's prior written approval; which approval shall not be unreasonably withheld.

7.6.9    Expenses incurred in accordance with the Contractor's standard personnel policy



©1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292



Copyright 1916, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.
WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and

for relocation and temporary living allowances of personnel required for the Work.

## 7.7 OTHER COSTS AND EMERGENCIES

7.7.1    Other costs incurred in the performance of the Work if and to the extent approved in advance in writing by the Owner.

7.7.2    Costs due to emergencies incurred in taking action to prevent threatened damage, injury or loss in case of an emergency affecting the safety of persons and property.

7.7.3    Costs of repairing or correcting damaged or nonconforming Work executed by the Contractor, Subcontractors or suppliers, provided that such damaged or nonconforming Work was not caused by negligence or failure to fulfill a specific responsibility of the Contractor and only to the extent that the cost of repair or correction is not recoverable by the Contractor from insurance, sureties, Subcontractors or suppliers.  Contractor shall correct or secure life safety issues within a seventy-two (72) hour time period of written notification.  All other issues will be completed within a one-week time period of written notification.

## ARTICLE 8   COSTS NOT TO BE REIMBURSED

8.1       The Cost of the Work shall not include:

8.1.1    Salaries and other compensation of the Contractor's personnel stationed at the Contractor's principal office or offices other that the site office, except as specifically provided in Subparagraph 7.2.2 and 7.2.3 or as may be provided in Article 14.

8.1.2    Expenses of the Contractor's principal office and offices other than the site office.

8.1.3    Overhead and general expenses, except as may be expressly included in Article 7.

8.1.4    The Contractor's capital expenses, including interest on the Contractor's capital employed for the Work.

8.1.5    Rental costs of machinery and equipment, except as specifically provided in Subparagraph 7.5.2.

8.1.6    Except as provided in Subparagraph 7.7.3 of this Agreement, costs due to the negligence or failure to fulfill a specific responsibility of the Contractor, Subcontractors and suppliers or anyone directly or indirectly employed by any of them or for whose acts any of them may be liable.

8.1.7    Any cost not specifically and expressly described in Article 7.

## ARTICLE 9   DISCOUNTS, REBATES AND REFUNDS

9.1   Cash discounts obtained on payments made by the Contractor shall accrue to the Owner if (1) before making the payment, the Contractor included them in an Application for Payment and received payment therefore from the Owner, or (2) the Owner has deposited funds with the Contractor with which to make payments; otherwise, cash discounts shall accrue to the Contractor.  Trade discounts, rebates, refunds and amounts received from sales of surplus materials and equipment shall accrue to the Owner, and the Contractor shall make provisions so that they can be secured.

9.2   Amounts that accrue to the Owner in accordance with the provisions of Paragraph 9.1 shall



©1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W
Washington, D.C. 20006-5292

Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.
WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and



be credited to the Owner as a deduction from the Cost of the Work.

## ARTICLE 10    SUBCONTRACTS AND OTHER AGREEMENTS

10.1 Those portions of the Work that the Contractor does not customarily perform with the Contractor's own personnel shall be performed under subcontracts or by other appropriate agreements with the Contractor. The Owner may designate specific persons or entities from whom the Contractor shall obtain bids. The Contractor shall obtain bids from Subcontractors and from suppliers of materials or equipment fabricated especially for the Work and shall deliver such bids to the Owner. The Owner shall then determine, with the advice of the Contractor, which bids will be accepted. The Contractor shall not be required to contract with anyone to whom the Contractor has reasonable objection.

10.2 Subcontracts or other agreements shall conform to the applicable payment provisions of this Agreement, and shall not be awarded on the basis of cost plus a fee without the prior consent of the Owner.

## ARTICLE 11    ACCOUNTING RECORDS

The Contractor shall keep full and detailed accounts and exercise such controls as may be necessary for proper financial management under this Contract, and the accounting and control systems shall be satisfactory to the Owner. The Owner and the Owner's accountants shall be afforded access to, and shall be permitted to audit and copy, the Contractor's records, books, correspondence, instructions, drawings, receipts, subcontracts, purchase orders, vouchers, memoranda and other data relating to this Contract, and the Contractor shall preserve these for a period of three years after final payment, or for such longer period as may be required by law.

## ARTICLE 12 PAYMENTS

### 12.1 PROGRESS PAYMENTS

12.1.1 Based upon Applications for Payment submitted to the Owner by the Contractor and the Owner shall make progress payment on account of the Contract Sum to the Contractor as provided below and elsewhere in the Contract Documents.

12.1.2 The period covered by each Application for Payment shall be one (1) calendar month ending on the last day of the month, or as follows:

*The period covered by each application for payment shall be one (1) calendar month ending on the thirtieth (30th) day of each month.*

12.1.3 Provided that an Application for Payment is received by the Owner on or before the Thirtieth (30th) day of the month, the Owner shall make payment to the Contractor on or about the Thirtieth (30th) day of the following month, depending on Funding schedule. If an Application for Payment is received, by the Owner, after the application date fixed above, the Owner shall process the Application for Payment in the next billing cycle.

12.1.4 With each Application for Payment and as applicable to contract, the Contractor shall submit payrolls, petty cash accounts, receipted invoices or invoices with check vouchers attached, and any other evidence required by the Owner or Architect to demonstrate that cash disbursements already made by the Contractor on account of the Cost of the Work equal or exceed (1) progress payments already received by the Contractor; less (2) that portion of those payments attributable to the Contractor's Fee; plus (3) payrolls for the period covered by the present Application for Payment.



©1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W
Washington, D.C. 20006-5292



Copyright 1916, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.
WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and

12.1.5   Each Application for Payment shall be based on the most recent schedule of values submitted by the Contractor in accordance with the Contract Documents. The schedule of values shall allocate costs among the various portions of the Work, except that the Contractor's Fee shall be shown as a single separate item. The schedule of values shall be prepared in such form and supported by such data to substantiate its accuracy as the Owner may require. This schedule, unless objected to by the Owner, shall be used as a basis for reviewing the Contractor's Application for Payment.

12.1.6   Applications for Payment shall show the percentage of completion of each portion of the Work as of the end of the period covered by the Application for Payment.

12.1.7   With each Application for payment, the Contractor shall submit Material and labor conditional lien releases from all persons and entities supplying material, labor or services to or for the work done by Contractor as of the end of the period covered by the Application for Payment. Such releases shall be on forms established by Owner and subject to Owner's reasonable approval.

12.1.8   Subject to other provisions of the Contract Documents, the amount of each* progress payment shall be computed as follows:

   .1   take that portion of the cost properly allocable to completed Work as determined by multiplying the percentage completion of each portion of the Work by the share of the cost allocated to that portion of the Work in the schedule of values,

   .2   add that portion of the cost properly allocable to materials and equipment delivered and suitably stored at the site for subsequent incorporation in the Work, or if approved in advance by the Owner, suitably stored off the site at a location agreed upon in writing);

   .3   add the Contractor's Fee, less retainage of Ten percent (10 %). The Contractor's Fee shall be computed upon the cost of the Work described in the two preceding Clauses at the rate stated in Subparagraph 5.1.2 or, if the Contractor's Fee is stated as a fixed sum in that Subparagraph, shall be an amount that bears the same ratio to that fixed-sum fee as the Cost of the Work in the two preceding Clauses bears to a reasonable estimate of the probable Cost of the Work upon its completion;

   .4   subtract the aggregate of previous payments made by the Owner;

   .5   subtract the shortfall, if any, indicated by the Contractor in the documentation required by Paragraph 12.1.4 to substantiate prior Applications for Payment, or resulting from error subsequently discovered by the Owner's accountants in such documentation; and

   .6   subtract amounts, if any, for which the Owner has withheld or nullified a Certificate for Payment.

12.1.9   Except with the Owner's prior approval, payments to Subcontractors shall be subject to retainage of not less than Ten percent (10 %). The Owner and the Contractor shall agree upon a mutually acceptable procedure for review and approval of payments and retention for Subcontractor.

12.1.10   The progress payment amount determined in accordance with Subparagraph

   1   Add, upon Substantial Completion of the Work, a sum sufficient to increase the total payments to the full amount of the Contract Sum, less such amounts as the Owner shall determine for incomplete Work, retainage applicable to such work and unsettled claims; and

   .2   Add, if final completion of the Work is thereafter materially delayed through no



©1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W
Washington, D.C. 20006-5292

Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.
WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and

fault of the Contractor, any additional amounts payable in accordance with Subparagraph 9.10.3 of AIA Document A201-1997.

12.1.11 Reduction of limitation of retainage, if any, shall be as follows:

> *Retention of ten (10%) shall be withheld from each Application for Payment through fifty percent (50%) completion of the work. Upon fifty percent (50%) completion of the Work retention shall be reduced to five percent and the remaining five percent shall be released to Contractor. Subsequent Application for Payment shall withhold retention in an amount that upon completion of the Work shall not exceed five percent of the contract sum. The total amount of retention held shall be released to Contractor upon substantial completion of the work and Contract delivery to Owner of the conditional waivers of lien from applicable subcontractors.*

## 12.2 PAYMENTS ON BEHALF OF SUBCONTRACTOR.

Owner reserves the right to make payment on behalf of Contractor directly to persons or other entity supplying labor, materials or supplies, or to any labor union, health, welfare or pension funds covered by this Contract. In the alternative, Owner may make payment to contractor in the form of a check made payable jointly to Contractor and such persons or entities. All amounts so paid shall be deemed an advance to Contractor on this Subcontract and shall not make Owner the employer of such labor.

### 12.3   FINAL PAYMENT

12.3.1   Final payment, constituting the entire unpaid balance of the Contract Sum, shall be made by the Owner to the Contractor when:
 .1   the Contractor has fully performed the Contract except for the Contractor's responsibility to correct Work.

12.3.2   Final Application for payment shall be accompanied by Final Conditional Releases from the Contractor and all entities supplying material, labor or services to or for the work done by Contractor as of the end of the period covered by the Final Application for Payment. As conditions to Final Payment owner shall require the delivery of full warranty, closeout package and all applicable insurance binders. In the case that any legitimate complaints involving Contractor's work have been received, Contractor shall provider Owner with reasonable evidence that such complaints have been corrected by Contractor. Owner's building acceptance is conditioned to the completion of all work and punch list.

12.3.3   Final Payment shall be made on or about thirty (30) days from the last day of the month of issuance of certificate of substantial completion.

12.3.4   The Owner's accountants will review and report in writing on the Contractor's final accounting on or about 30 days after delivery of the final accounting to the Owner by the Contractor.

12.3.5   If the Owner's accountants report the Cost of the Work as substantiated by the Contractor's final accounting to be less than claimed by the Contractor, the Contractor shall be entitled to demand arbitration of the disputed amount.

12.3.6   If, subsequent to final payment and at the Owner's request, the Contractor incurs costs described in Article 7 and not excluded by Article 8 to correct defective or nonconforming Work, the Owner shall reimburse the Contractor such costs and the Contractor's Fee applicable thereto on the same basis as if such costs had been incurred prior to final payment.

## ARTICLE 14 MISCELLANEOUS PROVISIONS

### 14.1 DEFECTS IN WORKMANSHIP OR MATERIALS

Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution. WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and





©1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT
The American Institute
of Architects
1735 New York Avenue, N.W
Washington, D.C. 20006-5292

Contractor hereby guarantees Owner against any loss or damage due to defects in workmanship or materials furnished under this contract. Upon notification of defects from Owner, Contractor shall within 72 hours with due diligence, at his own expense, correct any defect in the work or materials. Upon failure of the Contractor to correct such defects, Owner may, at Contractor's expense, furnish materials and/or labor to bring the work and materials up to the required standard. Owner shall submit to Contractor in writing a demand for payment of all costs incurred. These costs shall include all costs and attorney fees incurred by the Owner in connection with any litigation or other efforts which relate to the correction of any defect in materials or poor workmanship, including removal and replacement of defective materials furnished by the Contractor.

Contractor hereby agrees that for a period of one (1) year after the issuance of certificate of substantial completion for the last improvement contemplated by the General Contract, or for a period of one (1) year from the date of issuance of Certificate of Compliance from jurisdictional entity, whichever date is later, Contractor, upon notice from Owner, shall without delay and at its own cost cure and correct any defect in material or work performed under this Contract. Contractor shall bear all costs and expenses arising from such defects, including the repair

14.2 Payments due and unpaid under the Contract shall bear interest from the date payment is due at the rate stated below, or in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located. *Legal prevailing rate as allowed by Florida Statute.*

14.3 The Owner's representative is:

*(Name, address and other information)*

> Steve Fike
> Quantum Park & Village, LLC
> 1062 Coral Ridge Drive
> Coral Springs, FL 33071

14.4 The Contractor's representative is:

*(Name, address and other information)*

> James F. McGinn
> Leighton McGinn Company
> 1983 PGA Blvd, Suite 104
> Palm Beach Gardens, Florida 33408

14.5 Neither the Owner's nor the Contractor's representative shall be changed without ten days' written notice to the other party.

14.6 Other provisions: *Work is further described and subject to Exhibit 'A' entitled "Preliminary Construction Budget" and Exhibit 'C' entitled "Project Schedule", attached hereto and made part hereof.*

## ARTICLE 15   ENUMERATION OF CONTRACT DOCUMENTS

15.1 The Contract Documents, except for Modifications issued after execution of this Agreement, are enumerated as follows:

15.1.1 The Agreement is this executed modified version of the 1997 edition of the Standard Form of Agreement Between Owner and Contractor, AIA Document A111-1997.

15.1.2 The Specifications are those contained as follows:
*(Either list the Specifications here or refer to an exhibit attached to this Agreement.)*

> *Finish specifications remain pending. Owner is to establish a 'unit' or 'bay' standard within current budget projections. Upgrades of the standard may be established in the future. The cost associated with selection(s) will be addressed*



©1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W
Washington, D.C. 20006-5292

Copyright 1915, 1918, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1997, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution. WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and .



*by terms of this Agreement.*

15.1.3   The Drawings are as follows and are dated          unless a different date is shown below:

*(Either list the Specifications here or refer to an exhibit attached to this Agreement.)*

*See Exhibit B entitled "Schedule of Drawings"*

15.1.4   The Addenda, if any, are as follows:  N/A

15.1.5   Other documents, if any, forming part of the Contract Documents are as follows:

*Exhibit "A" entitled "Preliminary Construction Budget" attached hereto and made part hereof.*

*Exhibit "B" entitled "Schedule of Drawings" attached hereto and made part hereof.*

*Exhibit "C" entitled "Project Schedule" attached hereto and made part hereof.*

*Exhibit "D" entitled "Releases of Lien" attached hereto and made part hereof.*

## ARTICLE 16  INSURANCE

16.1 Contractor is required to provide properly executed Certificates of Insurance prior to the mobilization of equipment or forces onto the site and/or the commencement of work described in the contract documents. Certificate of insurance shall be issued in accordance to the requirements specified below. Contractor and all persons and entities supplying material, labor or services shall provide at Owner's request additional Certificates of Insurance for Owner, Lender and other applicable entities.

16.1.1   Contractor's evidence of coverage for Workers Compensation shall reflect statutory limits and $100,000 each accident, $500,000 of. Disease - policy limit and $100,000 of Disease - each employee. General Liability with limits of $1,000,000 and a general aggregate with limits of $2,000,000, Automobile Liability with limits not less than $1,000,000.00. Excess / Umbrella Liability with limits of $5,000,000 each occurrence and $5,000,000 aggregate. Both Auto and General Liability must have combined single limit. General Liability must be on a per occurrence basis, and Automobile Liability shall include all owned, non-owned and hired vehicles. The cancellation box on each certificate must show 30 DAYS written notice.

16.1.2   Insurance coverage shall be confirmed by Owner prior to the release any draw payments. Proof of this coverage shall reflect the exact requirements listed below:

The "DESCRIPTION OF OPERATIONS" must state:

Quantum Park & Village - South Retail Center
Lots 100, 62, 63, 64, 65-A & 65-B
1000 Gateway Boulevard, Boynton Beach, FL  33426
Certificate Holder has been added and named Additional Insured

An additional Insured Endorsement Must be submitted with Insurance Certificate

The "CERTIFICATE HOLDER" should be listed as:

Quantum Park & Village, LLC. [OWNER]
1062 Coral Ridge Drive
Coral Springs, FL 33071

Olen Properties, Corp.
7 Corporate Plaza
Newport Beach, CA 92660



©1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT
The American Institute
of Architects
1735 New York Avenue, N.W
Washington, D.C. 20006-5292



Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution. WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and

Secured Holdings, Inc.
7 Corporate Plaza
Newport Beach, CA 92660

16.1.3    Insurance Certificate for all persons and entities supplying material, labor or services shall be confirmed by Owner prior to the release any draw payments.

16.2 PERFORMANCE BONDS

Owner may, at Owner's option, require Contractor to provide a performance bond in the amount of the total contract price. The cost of the premium for such bond, to the extent of the ordinary premium, shall be paid by Owner but any additional premium or charge which Contractor is required to pay to obtain such bond shall be at Contractor's expense.

This agreement is entered into as of the day and year first written above and is executed in the least three original copies, of which one is to be delivered to the Contractor and the remainder to the Owner.

QUANTUM PARK & VILLAGE, LLC
Owner

LEIGHTON MCGINN COMPANY
Contractor

By: _____ 3/12/07
    Steve Fike
    V.P. of Construction
    FL Region

By: _____
    James McGinn



©1997 AIA®
AIA DOCUMENT A111-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W
Washington, D.C. 20006-5292

Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of this material herein or substantial quotation of its provisions without permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.
WARNING: THIS DOCUMENT HAS BEEN MODIFIED FOR PROJECT REQUIREMENTS. Unlicensed photocopying violates U.S. copyright laws and

# Jade Home Decor Inc.

2721 Vista Parkway  C-8
West Palm Beach, FL 33411
Office: 561-686-0949  Fax: 561-686-0776

## *WARRANTY*

| | |
|---|---|
| OWNER: | Quantum Park & Village, LLC |
| PROJECT: | Quantum Town Center . |
| | Mixed Use Building #1 |
| | 1054 Gateway Blvd |
| | Boynton Beach, FL 33426 |
| ARCHITECT: | Quincy Johnson Jones Myott Williams |
| CONTRACTOR: | Leighton McGinn |
| WARRANTY PERIOD: | One (1) Year |

In accordance with the project documents, incorporated change orders and Owner authorized modifications, we hereby warranty all work on the above referenced project against any defective or substandard labor, material, equipment, or workmanship for a period of one (1) year from the date of substantial completion.

Should any defects develop within the specified warranty period, we do hereby agree to replace or correct, within five days of receiving written or verbal notice from and without cost to the Owner and/or General Contractor, such work as may be found to be improper or defective and to assist with correction of related damages of other trades that are disturbed as a result of such corrective work, to the satisfaction of the Owner.

The foregoing shall not in any manner limit the Owner's remedy to this subcontractor's liability to these defects; excepting ordinary wear, unusual abuse or neglect, appearing within the warranty period. This subcontractor agrees to perform the work in a proper and timely manner so as to minimize any consequential damage sustained, and so as not to disrupt the operations of the Owner.

SUBCONTRACTOR: _JADE HOME DECOR INC:_

BY: _____

_JOHN CLAPPI   PRESIDENT_

Exhibit B

# Jade Home Decor Inc.

2721 Vista Parkway C-8
West Palm Beach, FL 33411
Office: 561-688-0949 Fax: 561-688-0776

## WARRANTY

| OWNER: | Quantum Park & Village, LLC |
|---|---|
| PROJECT: | Quantum Town Center<br>Mixed Use Building #2<br>1034 Gateway Blvd<br>Boynton Beach, FL 33426 |
| ARCHITECT: | Quincy Johnson Jones Myott Williams |
| CONTRACTOR: | Leighton McGinn |
| WARRANTY PERIOD: | One (1) Year |

In accordance with the project documents, incorporated change orders and Owner authorized modifications, we hereby warranty all work on the above referenced project against any defective or substandard labor, material, equipment, or workmanship for a period of one (1) year from the date of substantial completion.

Should any defects develop within the specified warranty period, we do hereby agree to replace or correct, within five days of receiving written or verbal notice from and without cost to the Owner and/or General Contractor; such work as may be found to be improper or defective and to assist with correction of related damages of other trades that are disturbed as a result of such corrective work, to the satisfaction of the Owner.

The foregoing shall not in any manner limit the Owner's remedy to this subcontractor's liability to those defects; excepting ordinary wear, unusual abuse or neglect, appearing within the warranty period. This subcontractor agrees to perform the work in a proper and timely manner so as to minimize any consequential damage sustained, and so as not to disrupt the operations of the Owner.

SUBCONTRACTOR: _JADE HOME DECOR INC._

BY: _____

_JOHN GLAPHI, PRESIDENT_

# Jade Home Decor Inc.

2721 Vista Parkway C-8
West Palm Beach, FL 33411
Office: 561-686-0949 Fax: 561-686-0776

## *WARRANTY*

| | |
|---|---|
| OWNER: | Quantum Park & Village, LLC |
| PROJECT: | Quantum Town Center |
| | Mixed Use Building #3 |
| | 1014 Gateway Blvd |
| | Boynton Beach, FL 33426 |
| ARCHITECT: | Quincy Johnson Jones Myott Williams |
| CONTRACTOR: | Leighton McGinn |
| WARRANTY PERIOD: | One (1) Year |

In accordance with the project documents, incorporated change orders and Owner authorized modifications, we hereby warranty all work on the above referenced project against any defective or substandard labor, material, equipment, or workmanship for a period of one (1) year from the date of substantial completion.

Should any defects develop within the specified warranty period, we do hereby agree to replace or correct, within five days of receiving written or verbal notice from and without cost to the Owner and/or General Contractor; such work as may be found to be improper or defective and to assist with correction of related damages of other trades that are disturbed as a result of such corrective work, to the satisfaction of the Owner.

The foregoing shall not in any manner limit the Owner's remedy to this subcontractor's liability to those defects; excepting ordinary wear, unusual abuse or neglect, appearing within the warranty period. This subcontractor agrees to perform the work in a proper and timely manner so as to minimize any consequential damage sustained, and so as not to disrupt the operations of the Owner.

SUBCONTRACTOR: _____ JADE HOME DECOR INC. _____

BY: _____

_____ JOHN CLAPPI, PRESIDENT _____

# Jade Home Decor Inc.

2721 Vista Parkway C-8
West Palm Beach, FL 33411
Office: 561-686-0949  Fax: 561-686-0776

## WARRANTY

OWNER:                    Quantum Park & Village, LLC

PROJECT:                  Quantum Tower Center
                          Residential Apartments
                          901-943 Gateway Blvd, Suites 74-18
                          Boynton Beach, FL 33426

ARCHITECT:                Quincy Johnson Jones Myott Williams

CONTRACTOR:               Leighton McGinn

WARRANTY PERIOD:          One (1) year

In accordance with the project documents, incorporated change orders and Owner authorized modifications, we hereby warranty all work on the above referenced project against any defective or substandard labor, material, equipment, or workmanship for a period of one (1) year from the date of substantial completion.

Should any defects develop within the specified warranty period, we do hereby agree to replace or correct, within five days of receiving written or verbal notice from and without cost to the Owner and/or General Contractor, such work may be found to be improper or defective and to assist with correction of related damages of other trades that are distributed as a result of such corrective work, to the satisfaction of the Owner.

The foregoing shall not in any manner limit the Owner's remedy to this subcontractor's liability to those defects, excepting ordinary wears, unusual abuse or neglect, appearing within the warranty period. This subcontractor agrees to perform the work in a proper and timely manner so as to minimize any consequential damage sustained, and so as not to disrupt the operations of the Owner.

SUBCONTRACTOR:    JADE HOME DECOR INC

BY:

JOHN CLAPP, PRESIDENT

| | |
|---|---|
| **Subcontractor:** | Franklin Bay General Contractors, Inc. |
| **Trade:** | Exterior Painting |
| **Contract No.** | QLV I - 022220 |
| **Page No.** | 1 of 15 |

CITY/STATE LICENSE: _____

OCCUPATIONAL LICENSE: _____

INSURANCE CERTIFICATE: _____

## CONSTRUCTION AGREEMENT

THIS AGREEMENT, made this 20ᵗʰ day of ⟶June⟵ _____, 20 07 __, between **VILLAS AT QUANTUM LAKES, INC.,** (hereinafter referred to as "Owner")whose address is, **1062 CORAL RIDGE DRIVE, CORAL SPRINGS, FL 33071 ● PHONE (954) 340-4904 ● FAX (954) 344-4608** and **FRANKLIN BAY GENERAL CONTRACTORS, INC,** (hereinafter referred to as "Subcontractor") whose address is **4407 VINELAND ROAD, SUITE D-11, ORLANDO, FL 32811 ● PHONE (407) 650-0284 ● FAX (407) 650-8249.** Whereas Owner is carrying out the Exterior Painting of **QUANTUM LAKE VILLAS – PHASE I** a __272_ units multi-family apartment complex, consisting of (19 ) apartment buildings, (1) clubhouse, (1) dumpster enclosure, (2) monument signs, (5) columns and all gutters and downspouts located at **2700 QUANTUM LAKES DRIVE, BOYNTON BEACH, FL 33426.**

Owner and Subcontractor further agree as follows:

1. **CONTRACT PRICE.** The total contract price to be paid for all work to be done under this Subcontract Agreement including all taxes and charges thereon of any nature whatsoever, shall be **ONE HUNDRED FORTY NINE THOUSAND ONE HUNDRED SEVENTY DOLLARS** and__24_/100 **($149,170.24).**

2. **WORK COVERED AND SUBCONTRACTOR'S PERFORMANCE STANDARD.** Subcontractor agrees to perform in good and workmanlike manner, and to furnish all labor, materials, supplies, services, machinery, tools and other facilities of every description required for the prompt and efficient execution of the work as outlined herein. All materials shall be new unless otherwise specified by Owner. Subcontractor shall provide at its own cost all required permits, licenses and similar documents necessary or convenient to performance hereunder.

The work to be performed hereunder shall be the completion of **PRESSURE CLEANING, SEALING, CAULKING, EXTERIOR PAINTING AND ALL RELATED WORK** (the "Subcontract Work") as more completely shown on the plans and specifications dated as per **Addendum A** and all amendments thereto, applicable government laws, ordinances and regulations, including requirements of the United States Occupational Safety and Health Act, and special conditions as listed below:

3. **PLANS, SPECIFICATIONS AND GOVERNMENTAL REQUIREMENTS.** Subcontractor shall furnish all labor, materials and services reasonably required to complete the Subcontract Work in conformance with the Contract Documents, whether or not such labor, materials or services are specifically mentioned in the Plans or Specifications. The Plans and Specifications are intended to supplement each other, so that any work shown in either and not mentioned in the other are to be executed the same as if they were mentioned and set forth in both. In the event of any inconsistency between the plans and the specifications, then the specifications shall govern. In the event of any discrepancies between the plans and specifications on the one hand and this Agreement, including exhibits and any other documents incorporated herein by reference, this Agreement shall govern. Should there be any inconsistency between the plans and specifications on the one hand and this Agreement, including the exhibits, drawings and details mentioned herein, this Agreement shall govern. Should there be any inconsistency between the plans and the specifications, then the specifications shall govern. Should there be any discrepancies between this Agreement and the plans and/or specifications on the one hand and the ordinances, laws,

QUANTUM LAKE VILLAS – BLDG. #s 1 thru 19

Owner: _____

Subcontractor: _____

Exhibit C

| | |
|---|---|
| Subcontractor: | Franklin Bay General Contractors, Inc. |
| Trade: | Exterior Painting |
| Contract No. | QLV I - 022220 |
| Page No. | 2 of 15 |

rules, regulations, specifications and requirements of the governmental agencies, then the ordinances, laws, rules, regulations, specifications and requirements of the governmental agencies shall govern. Owner assumes no liability for failure of this Agreement and/or the plans and/or specifications and requirements of any or all of the governmental agencies, and Subcontractor acknowledges that it is familiar with the same. The work to be performed and/or materials to be furnished are to be in accordance with the same irrespective of the provisions of the Agreement and/or the plans and/or specifications.

4.  **TIME FOR PERFORMANCE.** Subcontractor agrees to commence the work herein within seven (7) days of notice from Owner, and to perform said work in a prompt and diligent manner. Time is of the essence of this Agreement. Owner may, to ensure the uninterrupted progress of the project, change the time or order of exterior painting, in which case Subcontractor will proceed in accordance with such schedule as amended.

4.1 TIME FOR PERFORMANCE (SPECIFIC)

Subcontractor agrees to follow the Owner's direction of four buildings at a time during the completion of all pressure cleaning, sealing, caulking and exterior painting. I.e. buildings 1 & 19 shall be fully pressure cleaned before starting pressure cleaning of adjacent buildings ( 17 & 18).

The Owner will inspect buildings within five (5) working days of notification. In order to maintain a good working schedule, progression of the work must continue beyond one zone at a time; therefore, pressure washing will be permitted in the next scheduled zone, while work of the previous zone is completed.

| Zone One | |
|---|---|
| Bldg. # 1 | 3086 – 3108 Quantum Lakes Drive |
| Bldg. # 19 | 2564 – 2586 Quantum Lakes Drive |
| Bldg. # 18 | 2588 – 2626 Quantum Lakes Drive |
| Bldg. # 17 & Storage | 2628 – 2650 Quantum Lakes Drive |
| Clubhouse & Dumpster | 2700 Quantum Lakes Drive |

| Zone Two | |
|---|---|
| Bldg. # 16 | 2652 – 2678 Quantum Lakes Drive |
| Bldg. # 15 | 2680 – 2698 Quantum Lakes Drive |
| Bldg. # 14 | 2702 – 2720 Quantum Lakes Drive |
| Bldg. # 12 | 2746 – 2772 Quantum Lakes Drive |
| Monument Signs and Columns | |

| Zone Three | |
|---|---|
| Bldg. # 11 | 2774 – 2792 Quantum Lakes Drive |
| Bldg. # 9 | 2834 – 2852 Quantum Lakes Drive |
| Bldg. # 8 | 2854 – 2872 Quantum Lakes Drive |
| Bldg. # 6 | 2898 – 2924 Quantum Lakes Drive |

| Zone Four | |
|---|---|
| Bldg. # 5 | 2926 – 2964 Quantum Lakes Drive |
| Bldg. # 4 | 2966 – 3004 Quantum Lakes Drive |
| Bldg. # 3 | 3006 – 3044 Quantum Lakes Drive |
| Bldg. # 2 | 3046 – 3084 Quantum Lakes Drive |

| Zone Five | |
|---|---|
| Bldg. # 7 | 2874 – 2896 Quantum Lakes Drive |
| Bldg. # 10 | 2794 – 2832 Quantum Lakes Drive |
| Bldg. # 13 | 2722 – 2744 Quantum Lakes Drive |

5.  **INSPECTION OF JOB SITE.** Prior to commencement of performance, Subcontractor agrees to inspect the premises in their entirety, including all installations made and services performed, and in each instance Subcontractor agrees that by commencing such performance he accepts the then condition of the premises as being satisfactory and consonant with full performance hereunder. Owner agrees to make available to Subcontractor all relevant, available engineering studies and Subcontractor agrees to review all such studies as appropriate. If the condition of the premises prior to commencement of performance does not meet with the satisfaction of Subcontractor, it agrees to immediately give detailed notice of each fact in writing

QUANTUM LAKE VILLAS – BLDG. #s 1 thru 19

Owner:

Subcontractor:

| | |
|---|---|
| Subcontractor: | Franklin Bay General Contractors, Inc. |
| Trade: | Exterior Painting |
| Contract No. | QLV I - 022220 |
| Page No. | 3 of 15 |

and a failure to do so will be deemed a breach by Subcontractor and the condition of the premises will not thereafter excuse full performance hereunder.

**6.  INSPECTION OF WORK.** Work will be subject to inspection and approval by the Owner and all applicable governmental authorities. Subcontractor, at its own cost, shall perform such labor and install such materials as are necessary to pass inspection and satisfy the requirements of such agencies, and shall be responsible for seeing that such work is timely inspected by all appropriate agencies.

**7.  CLEANLINESS.** Subcontractor shall maintain its work in a neat and orderly fashion and shall remove from the job site all surplus waste and debris resulting from the performance of its undertaking hereunder, and shall leave the job site in a broom-clean condition. In the event of Subcontractor's failure to do so, the Owner may cause the same to be done and charge the cost to the Subcontractor.

**8.  DEFECTS IN WORKMANSHIP OR MATERIALS.** Subcontractor hereby guarantees Owner against any loss or damage due to defects in workmanship or materials furnished under this contract. Upon notification of defects from Owner, Subcontractor shall within 72 hours with due diligence, at his own expense, correct any defect in the work or materials. Upon failure of the Subcontractor to correct such defects Owner may, at Subcontractor's expense, furnish materials and/or labor to bring the work and materials up to the required standard. Owner shall submit to Subcontractor in writing a demand for payment of all costs incurred. These costs shall include all costs and attorney fees incurred by the Owner in connection with any litigation or other efforts which relate to the correction of any defect in materials or poor workmanship, including removal and replacement of defective materials furnished by the Subcontractor.

Subcontractor hereby agrees that for a period of one (1) year after the recording of the Notice of Completion for the last improvement contemplated by the General Contract, or for a period of one (1) year from the date of occupancy, whichever date is later, Subcontractor, upon notice from Owner, shall without delay and at its own cost cure and correct any defect in material or work performed under this Subcontract. Subcontractor shall bear all costs and expenses arising from such defects, including the repair or replacement of work or installation of Owner or any other Subcontractor damaged by such defect.

**9.  INDEMNITY.** Subcontractor shall indemnify and hold Owner harmless against all claims for damages to persons or property arising out of Subcontractor's execution of the work covered by this Subcontract, and any and all costs, expenses, attorneys fees and liability incurred by Owner in defending against such claims, whether the same proceed to judgment or not, and Subcontractor, at its own expense, agrees upon written request from Owner, to defend any suit or action brought against Owner arising there from. All warranties from manufacturers or material men on materials used by Subcontractor shall be secured for the benefit of Owner and assigned and delivered to Owner prior to final payment.

**10.  PROGRESS PAYMENTS.** Provided Subcontractor is not then in default, Subcontractor shall be entitled to receive progress payments subject to the attached Draw Schedule dated June 20, 2007. All progress payments shall be subject to a ten percent (10%) retention by Owner, which shall be paid to Subcontractor as a final payment forty-five (45) days after the entire project has been completed and after the Subcontractor has complied with all of the provisions of chapter 713 of the Florida Code Statutes.

As a condition to payment, Owner may require:

A.   Material and labor lien releases from all persons and entities supplying material, labor or services to or for the work done by Subcontractor. Such releases to be on forms provided by Owner and subject to Owner's reasonable approval.

B.   Inspection approvals by any applicable governmental authorities.

C.   Evidence reasonably satisfactory to Owner, that any legitimate complaints involving Subcontractor's work have been corrected by Subcontractor.

D.   All applicable insurance binders.

Owner may withhold from any monies payable to Subcontractor a sum sufficient to pay in full all outstanding claims, obligations or liabilities of Subcontractor. All

QUANTUM LAKE VILLAS – BLDG. #s 1 thru 19

Owner:

Subcontractor:

| | |
|---|---|
| Subcontractor: | Franklin Bay General Contractors, Inc. |
| Trade: | Exterior Painting |
| Contract No. | QLV I - 022220 |
| Page No. | 4 of 15 |

payments are received by Subcontractor in trust and as bailee for the sole and express use and purpose of paying all costs and charges for labor and/or materials performed and/or used in connection with the Subcontract Work if they have not been paid, and no title to such payments shall vest in Subcontractor until all such charges and costs have been fully paid and proper release secured therefore. Subcontractor shall promptly pay all valid bills and charges for his materials, labor or otherwise, and shall hold the property and Owner free and harmless from any liens for labor and/or material. Should any lien be filed against the property or should Owner receive notice of any valid unpaid bill or charge, Owner will have the right, at its option, of paying such bill or charge and deducting the amount from sums due Subcontractor. Any progress payments shall not be construed as an acceptance of any of Subcontractor's work.

11. **PAYMENTS ON BEHALF OF SUBCONTRACTOR.** Upon Subcontractor's default, Owner reserves the right to make payment on behalf of Subcontractor directly to persons or other entity supplying labor, materials or supplies, or to any labor union, health, welfare or pension funds covered by this Subcontract. In the alternative, Owner may make payment to Subcontractor in the form of a check made payable jointly to Subcontractor and such persons or entities. All amounts so paid shall be deemed an advance to Subcontractor on this Subcontract and shall not make Owner the employer of such labor.

12. **LABOR UNION AGREEMENT.** Subcontractor covenants that it is a party in good standing to an executed current agreement with all appropriate unions having work and territorial jurisdiction. Subcontractor further agrees all job site work which it subcontracts shall be subcontracted to a Subcontractor that is a party to an agreement as aforesaid.

13. **DEFAULT.** In addition to those instances of default otherwise set forth in this Agreement, Subcontractor shall be in default hereunder if:

    A.    Subcontractor fails to furnish sufficient workmen or material to perform at the time and pace prescribed by Owner, or fails to cooperate with Owner, or interferes with or damages the work of any other Subcontractor on the project, or;

    B.    A strike, work stoppage, picket line, or other labor disturbance at the construction site has occurred or is threatened by reason of a dispute directly or indirectly involving Subcontractor, or;

    C.    Subcontractor fails or is about to fail to pay for any labor, material or services supplied in connection with the work covered by this Subcontract, or a mechanic's or material man's lien is recorded against any part of the project.

14. **OWNER'S REMEDIES.** When Subcontractor is in default, Owner may serve Subcontractor written notice thereof and require Subcontractor to cure such default within twenty-four (24) hours thereafter, or to satisfy Owner of its ability to do so within a time acceptable to Owner. If such default is not cured or Owner is not so satisfied as aforesaid, Owner may declare this Contract terminated. Owner may contract with other Subcontractors to correct such default and to complete the performance required under this Construction Agreement for the account of Subcontractor, and Owner may charge and obligate Subcontractor for the costs and expenses thereof and for all damages suffered by Owner. Any notice given hereunder is voluntary.

15. **INSURANCE.**

    A.    Before commencing the work and until completion and final acceptance of the work, Subcontractor shall procure & maintain, at its own expense, at least the following insurance coverage as determined by Owner:

        (I)    Worker's Compensation Insurance to cover statutory limits of the Worker's Compensation laws of the state of operations and Employer's Liability coverage in limits not less that $100,000 for each accident and $100,000 for each disease for each employee, with $500,000 disease policy limit.

        ~~(II)    Owner's Protective Liability, on an occurrence basis naming the Owner, as additional insured. Such coverage will specifically insure liability~~

QUANTUM LAKE VILLAS – BLDG. #s 1 thru 19

| | |
|---|---|
| Owner: | |
| Subcontractor: | |

Case 6:13-bk-08905-CCJ    Doc 30-3    Filed 08/18/14    Page 68 of 103

| | |
|---|---|
| Subcontractor: | Franklin Bay General Contractors, Inc. |
| Trade: | Exterior Painting |
| Contract No. | QLV I - 022220 |
| Page No. | 5 of 15 |

~~arising from the operations of the Subcontract Work. The insurance required in this subparagraph shall have limits of liability not less than $1,000,000 combined single limit for Bodily Injury, Personal Injury and Property Damage Liability.~~

(iii) Comprehensive General Liability or Commercial Liability on an occurrence basis for hazards, including, but not limited to: (1)Premises-Operations; (2)Elevator and Escalators; (3)Independent Owners; (4)Products and Complete Operation including coverage for explosion, collapse and underground hazards (with Complete Operations coverage to remain in force for two (2) years following the date of acceptance of the Work by Owner); (5)Contractual Liability (either designating this Agreement or written "Blanket" designating all written and oral contracts related to the work); (6)Personal and Bodily Injury (including death) Liability; and, (7)Incidental Malpractice coverage for first aid staffs. Such Comprehensive General Liability insurance must be endorsed with a Broad Form CGL Endorsement and a Broad Form Property Damage Endorsement (including Completed Operations). The Owner will be named as additional insured. The Contractual Liability coverage must be endorsed so that all exclusions relating to water craft, railroad property, products and completed operations and explosion, collapse and underground hazards are deleted. The insurance required by this subparagraph shall have Coverage limits not less than $1,000,000 combined single limit for Bodily Injury Liability, Property Damage Liability and Personal Injury Liability each occurrence per aggregate.

(iv) Automobile Liability Insurance covering all owned, non-owned, and hired automobiles used in connection with the Subcontract Work with the minimum limits of $1,000,000 combined single limit for Bodily Injury Liability and Property Damage Liability, each person, each occurrence.

B. ALL INSURANCE POLICIES SHALL BE WRITTEN SO AS TO PROVIDE INSURANCE COVERAGE ON A PER "OCCURRENCE" BASIS RATHER THAN ON A "CLAIMS MADE" BASIS.

C. *Owner shall be named as "Additional Insured" under these policies of insurance, and shall provide Owner with 2010, or equivalent attached to the certificate of insurance.*

D. Before commencing work, Subcontractor shall have his insurance company or companies (as acceptable to Builder) execute a Certificate of Insurance indicating that the above insurance is in force, stating policy numbers, dates of expiration, and limits of liability thereunder, and further expressly providing that insurance will not be canceled, changed or expire until at least thirty (30) days after written notice of such cancellation, change, or expiration has been received by Owner. Failure to send such certificate shall not invalidate the requirements of Section 14.

E. SUBCONTRACTOR SHALL NOT BE ENTITLED TO MOVE HIS EQUIPMENT OR FORCES ON TO THE SITE OR BEGIN PERFORMANCE OF THE WORK UNDER THIS AGREEMENT UNTIL PROPERLY EXECUTED CERTIFICATES OF INSURANCE ARE RECEIVED BY BUILDER.

F. It is expressly agreed that the Subcontractor shall obtain Contractual Liability Coverage to insure Subcontractor's obligations under this Construction Agreement.

G. In the event of a loss insured under this Section, Subcontractor shall be bound by any adjustment which shall be made between Owner and the Insurance company or companies. Loss, if any, shall be made payable to or Owner, as their interest may appear, for the account of whom it may concern.

16. **PERFORMANCE BONDS.** *** *Not Applicable* ***
Owner may, at Owner's option, require Subcontractor to provide a performance bond in the

QUANTUM LAKE VILLAS – BLDG. #s 1 thru 19

Owner:
Subcontractor:

| Subcontractor: | Franklin Bay General Contractors, Inc. |
|---|---|
| Trade: | Exterior Painting |
| Contract No. | QLV I - 022220 |
| Page No. | 6 of 15 |

amount of the total contract price. The cost of such bond, to the extent of the ordinary premium, shall be paid by Owner but any additional premium or charge which Subcontractor is required to pay to obtain such bond shall be at Subcontractor's expense.

17. **ASSIGNMENT**. This Agreement shall inure to the benefit of the Owner and to all successors, assigns or others claiming under or through them. No undertaking hereunder may be subcontracted by Subcontractor, nor may this Agreement be assigned in whole or in part by Subcontractor without the prior written consent of Owner.

18. **ATTORNEYS' FEES**. Subcontractor agrees to pay and reimburse Owner and all others having an interest therein for any and all reasonable attorneys' fees and court costs which may be paid or incurred, growing out of or caused by the Agreement or performance hereunder, whether in defense of any suits or proceedings against Subcontractor or any of it's workmen or suppliers of materials, or any other matter in connection therewith, or in the prosecution of any suit or suits against Subcontractor and/or material men or sureties.

19. **CHANGE ORDERS AND EXTRAS**. Owner may at any time prior to the project's completion require any change in the specifications without voiding this Construction Agreement. The total contract price as stated in Paragraph 1 shall be accordingly adjusted. No work done or materials furnished of any description, whether growing out of changes, omissions, additions or otherwise shall be considered as extra, not paid for as extra unless Owner shall have approved the same, including any increase in Contract Price relating thereto, in writing prior to the commencement of such work or the furnishing of such materials. All such extras as approved, if any, shall be done under and subject to all of the provisions of this Agreement, and payment for any such additional charges for extras shall be subject to the provisions of Paragraph 10 hereof. Any deviation from this paragraph shall not constitute a waiver of same and Owner shall have the right to enforce same thereafter.

20. **CHANGES - NOTICE**. Any notices required to be given by either party to the other, hereunder, shall be in writing and shall be deemed given, forty-eight (48) hours after mailing via standard overnight deilvery, and addressed to the parties at the addresses shown below under their signatures (or to such other addresses as they may specify). Any notice delivered shall be deemed given on the date delivered.

21. **JURISDICTION**. This Agreement shall be deemed to have been entered into in Coral Springs, Florida.

22. **SOLE AND ONLY AGREEMENT**. This instrument contains the sole and only Agreement of the parties relating to the Subcontract Work and correctly sets forth the rights, duties and obligations of each to the other in connection therewith, and as of its date. Any prior agreements, promises, negotiations, or representations not expressly set forth in this Agreement are of no force or effect. This Agreement may only be changed or amended by a writing signed by both parties.

23. **"ADDENDUM A"**. (See Attached)

24. **"ADDENDUM B"**. (See Attached)

IN WITNESS WHEREOF, the parties have executed this Agreement the day and year first written above.

OWNER:                                          SUBCONTRACTOR:

VILLAS AT QUANTUM LAKES, INC            FRANKLIN BAY GENERAL
                                               CONTRACTORS, INC.

BY: _____            BY: _____
    Danny Owens
    Vice President
    Florida/Property Services

    (954) 340-4904 Phone
    (954) 344-4608 Fax

QUANTUM LAKE VILLAS – BLDG. #s 1 thru 19

|  |  |
|---|---|
| Owner: | |
| Subcontractor: | |

| | |
|---|---|
| Subcontractor: | Franklin Bay General Contractors, Inc. |
| Trade: | Exterior Painting |
| Contract No. | QLV I - 022220 |
| Page No. | 7 of 15 |

## "Addendum A"

Construction Agreement between VILLAS AT QUANTUM LAKES, INC. (OWNER) and

**FRANKLIN BAY GENERAL CONTRACTORS, INC.** (SUBCONTRACTOR); dated *June 20, 2007*

JOB: **QUANTUM LAKE VILLAS – PHASE I, 2700 QUANTUM LAKES DRIVE, BOYNTON BEACH, FL 33426**

Subcontractor shall be responsible for but not limited to the following:

I   **PLANS AND SPECIFICATIONS**

A. Plans entitled "Site Plan" by Parker Yannette Design Group, 900 US Highway One, Suite 104, Jupiter, FL 33477

| ARCHITECTURAL: SHEET | DESCRIPTION | LATEST REVISION |
|---|---|---|
| SP-1 | Site Plan | 04/03/02 |
| SP-2 | Site Plan | 04/03/02 |
| SP-3 | Site Plan | 04/03/02 |

B. Property Map.

II. **GENERAL**

2.01   **SCOPE OF WORK**

A. Subcontractor shall provide all labor, materials, equipment, incidentals and supervision necessary and required but not limited to furnish and install **A COMPLETE PRESSURE CLEANING, SEALING, CAULKING, EXTERIOR PAINTING AND ALL RELATED WORK PACKAGE** for 272 Apartment Units, (19 ) apartment buildings, (1) clubhouse, (1) dumpster enclosure, (2) monument signs, (5) columns and all gutters and downspouts. Scope of work further described in Addendum A III. SCOPE OF WORK "SPECIFIC".

2.02   **QUALITY AND SAFETY ASSURANCE**

A. Use adequate numbers of skilled workmen who are thoroughly trained and experienced in the necessary crafts and who are completely familiar with the specified requirements and the methods needed for proper performance of the work of this Section.

B   Codes and Regulations:

1. In addition to complying with the specified requirements, comply with pertinent regulations of governmental agencies having jurisdiction. This work shall be done without additional cost to the Owner, except in the case of an Owner directed revision for work other than that which is contained in the Plans and Specifications.
2. In the event of conflict between or among specified requirements and pertinent regulations, the more stringent requirement will govern when so directed by the General Owner.

C. Subcontractor shall apply and pay for all business licenses.

D. Subcontractor shall provide to Owner, all necessary licenses as required by the county and/or city in which work is being performed.

E. Subcontractor shall pay for any and all applicable taxes.

F. Subcontractor shall coordinate all required inspections for work performed under this

QUANTUM LAKE VILLAS – BLDG. #s 1 thru 19

Owner:

Subcontractor:

| Subcontractor: | Franklin Bay General Contractors, Inc. |
| Trade: | Exterior Painting |
| Contract No. | QLV I - 022220 |
| Page No. | 8 of 15 |

Contract. Any re-inspection fees shall be paid by the Subcontractor.

G. All defective work performed by Subcontractor will be repaired or replaced by Subcontractor within 72 hours. Owner to determine defective workmanship. Repair or replacement of work is Subcontractor's sole financial responsibility.

H. Subcontractor shall at all times respect the work of other crafts and take all necessary precautions to avoid damaging such work. If such work is damaged by Subcontractor, repairs shall be made at Subcontractor's expense.

I. Commencement of work shall constitute Subcontractor's acceptance of the preceding Subcontractors' work. If preceding Subcontractors' work is unacceptable, Subcontractor shall not proceed, and shall notify Owner.

J. Any questions pertaining to the plans and specifications noted in Section I, Plans and Specifications, shall be directed to the Owner.

K. Subcontractor shall provide for his own clean up pertaining to his trade and maintain a neat, safe and orderly job site daily with removal of all trash, containers and construction materials including building interiors, patios, landings, etc. Building interiors and "under roof" areas are to be broom swept daily after Subcontractor's work. All trash and construction materials will be placed by Subcontractor in designated trash dumpster locations on site. Clean up acceptance will be at the sole discretion of Owner. Upon Owner's request, Subcontractor shall clean job site within 24 hours. Should Subcontractor fail to comply, Owner reserves the right to clean job site at Subcontractor's expense.

L. Subcontractor to provide and be responsible for all necessary safety equipment and devices as required by OSHA including but not limited to: hard hats, footwear, ladders, safety railing, safety support straps, first aid kits, etc.

M. No radio playing shall be allowed on job site.

N. No smoking is allowed in buildings.

### 2.03 SUBMITTALS:

A. Product Data: Within 30 calendar days after the Owner has received the Owner's Notice to Proceed, submit:

1. Shop drawings, show exact layout of work. If all components parts of the system are shown on the drawings and all work shall be performed in accordance with the project drawings and specifications, then provide a written certification making this statement in lieu of the shop drawings.

B. Subcontractor shall provide Owner with copies of material specifications. Owner will incorporate all material specifications to the contract in the form of "ADDENDUM C"

### III. SCOPE OF WORK (SPECIFIC)

A. It is the intent of this agreement to have the Subcontractor provide A COMPLETE PRESSURE CLEANING, SEALING, CAULKING AND EXTERIOR PAINTING AND ALL RELATED WORK PACKAGE. This Subcontractor shall provide all labor, tools, material, equipment, taxes, insurance, permits, and services required to complete this scope of work pursuant to the contract documents and all governing authorities having jurisdiction over the project including but not limited to the following:

1. Subcontractor shall provide finish coats that are compatible with prime paints used. Review other sections of specifications in which prime paints are to be provided to ensure compatibility of total coating system. Provide barrier coats if necessary over incompatible primers or remove and re-prime as required.

2. Subcontractor is to bring to the Owner's attention any discrepancies, conflicts etc. prior to the start of any work covered by this contract scope, notifying him of any

QUANTUM LAKE VILLAS – BLDG. #s 1 thru 19

Owner:

Subcontractor:

| | |
|---|---|
| Subcontractor: | Franklin Bay General Contractors, Inc. |
| Trade: | Exterior Painting |
| Contract No. | QLV I - 022220 |
| Page No. | 9 of 15 |

discrepancies in the plans and/or specifications or problems with existing work in place. The Subcontractor is to ensure that all such discrepancies are resolved prior to the start of his work. By starting his work, the Subcontractor is acknowledging that he accepts the plans and specifications, as well as all existing work in place and as such, any errors in his application resulting from his failure to follow the procedures set forth above. This will result in the Subcontractor bearing the cost of any repairs required to complete his application.

3. Subcontractor is responsible for ensuring that any paint or stain applied is placed in accordance with the manufacturer's stated guidelines with special attention being paid to application requirements during extreme weather conditions, e.g., cold, humid, and wet weather, etc.

4. Subcontractor will not water down or thin any paint or stain to be applied to any finish surfaces on this job beyond the amount approved by the material specifier. All paint and stain applied by this subcontractor is to be as it originally comes out of the can, displaying manufacturers packaging labels, unless otherwise specified.

5. Subcontractor acknowledges that the Owner maintains a right to have the materials and method of application provided by this installer tested at any time throughout the course of the work. In the event that his applications or materials are found to be unacceptable, then this subcontractor shall repair or replace his work to the Owner's satisfaction at no additional cost to Owner and pay for any re-testing that may be required.

6. In the event that this subcontractor, without notifying and gaining prior written approval from Owner, effects any changes in the materials that have been specified, he will be liable for all expenses incurred to repaint and re-strain as required by Owner, any areas where incorrect material was applied

7. Subcontractor shall ensure that all paint installed by him shall be applied in such a fashion that the surface receiving the paint shall be fully covered with a paint film that is of uniform finish, color and appearance, including edges, corners, crevices, welds and fasteners, to the satisfaction of Owner.

8. It is the responsibility of this subcontractor to ensure that all paint touch-up matches the paint originally installed. In the event that a problem occurs regarding the failure of the paint to match during the touch-up, this subcontractor will bear any costs incurred to correct the problem including the cost of repair to any related trades' installations. Due to the paint colors selected by Owner, some paint colors may take up to 60 days to fully cure and weather.

9. Subcontractor shall submit, in writing, the names of all proposed manufacturers and a complete list of all products intended for use, including identifying product names and catalog numbers.

10. After inspection and acceptance of surfaces to be painted, all paint surfaces are to be properly prepared to receive paint by this subcontractor to provide a uniform finish.

11. Exterior stucco to receive paints with full body 100% coverage using proper primer or pre-treat as necessary.

12. At all areas where gaps exist between similar or dissimilar materials, caulk with approved sealant.

13. Subcontractor shall not paint over efflorescence, dirt, dust, rust, chalk, scale, grease, oil, moisture or conditions otherwise detrimental to formation of a durable paint finish. Perform preparations and cleaning procedures in accordance with paint manufacturer instructions.

14. This subcontractor acknowledges that as part of his preparation process prior to the installation of exterior paint applications, he shall caulk, seal, spackle, bond, and/or putty and shall sand smooth all of these surfaces as required to close tight all corners, joints, nicks, tears, nail holes, spurs, knot holes, cracks and dents.

15. Touch-up and restore finish, to point where finish work is free of brush marks, streaks,

QUANTUM LAKE VILLAS – BLDG. #s 1 thru 19

Owner:

Subcontractor:

| | |
|---|---|
| Subcontractor: | Franklin Bay General Contractors, Inc. |
| Trade: | Exterior Painting |
| Contract No. | QLV I - 022220 |
| Page No. | 10 of 16 |

run laps, holidays or any other unsatisfactory finish, to the satisfaction of Owner. Spot painting allowed only when touch-up spot will blend into surrounding finish invisible to normal viewing

16. This subcontractor will correct any items on Owner's punch list.

17. Upon completion of painting work clean all splattered and over sprayed surfaces, by proper methods, using care not to damage finished surface.

18. At completion of the job, the subcontractor will provide Owner with (unopened and appropriately marked) one (1) five-gallon can for each type of paint used on this project at no additional expense to Owner.

19. Subcontractor shall properly Prepare, Caulk, Patch and Paint the following specific areas:

    20.1   All Apartment Building Exteriors (except pre-finished items) including trim.
    20.2   All Horizontal and Vertical Stucco and Masonry Surfaces.
    20.3   Gutters and Down Spouts.
    20.6   Eyebrows
    20.7   Wood Fascia
    20.8   Exterior Utility (electrical, plumbing, telephone, HVAC) Boxes, Covers.
    20.9   Conduit Piping.
    20.10  Banding
    20.11  Metal Flashing.
    20.12  Balcony Walls and Ceilings.
    20.13  Breaker Panels as required by Owner.
    20.14  Any other items which require field painting.
    20.15  Clubhouse
    20.16  Pool Area
    20.17  Dumpster
    20.18  Monument Sign, Columns, etc.
    20.19  Entrance / Perimeter Wall
    Excluding Pool Deck and Railing

**MATERIAL SPECIFICATIONS:**

Specifications for 272 apartment units, (19) apartment buildings, (1) clubhouse, (1) dumpster enclosure, (2) monument signs, (5) columns and all gutters and downspouts, utilizing **ICI Paints** and in accordance to owner's detailed specifications listed below:

### A. Surface Preparation

1. *General*

    1.1   Subcontractor shall thoroughly wash all surfaces to be painted. Washing to be completed under high pressure incorporating a solution of water and TSP to completely remove all dirt, dust, chalking, grime and loose flaking paint to avoid eye or skin irrigation.

    1.2   Subcontractors shall not paint any surface that is not clean and dry.

    1.3   Subcontractor shall ensure that all surfaces are free of any foreign material, which may adversely affect adhesion or appearance of applied coating.

2. *Ferrous Metals*

    2.1   Subcontractor shall ensure that all previously painted surfaces are thoroughly cleaned free of dirt and/or other contaminates.

    2.2   Subcontractor shall remove all loose or peeling paint by scraping, sanding and/or wire brushing.

    2.3   Subcontractor shall remove all rust spots by sanding and wire brushing.

QUANTUM LAKE VILLAS – BLDG. #s 1 thru 19

Owner: _____
Subcontractor: _____

| Subcontractor: | Franklin Bay General Contractors, Inc. |
| Trade: | Exterior Painting |
| Contract No. | QLV I - 022220 |
| Page No. | 11 of 15 |

2.4   Subcontractor shall dull hard or glossy paints by sanding to insure maximum adhesion.

### 3.   _Wood (Wood Beams, Siding & Trellis)_

3.1   Subcontractor shall fill nail holes and small cracks prior to painting.

3.2   Subcontractor shall wash with water and/or other solutions all dirt, chalk, mildew and other contaminates.

3.3   Subcontractor shall sand all loose or peeling paint to provide maximum adhesion.

3.4   Subcontractor shall dull hard or glossy paints by sanding to insure maximum adhesion.

3.5   Subcontractor shall caulk any openings that allow water intrusion with ICI Ultra Seal 45 year Latex Silicone Sealant # 21875, to prevent water or moisture from getting behind the paint film.

### 4.   _Galvanized Metal Gutters & Flashing_

4.1   Subcontractor shall ensure that all galvanized metal gutters & flashing are thoroughly cleaned free of dirt and/or other contaminates.

4.2   Subcontractor shall ensure that all bare or new galvanized metal is solvent cleaned.

### 5.   _Stucco Surfaces / Textured Surfaces_

5.1   Subcontractor shall repair minor areas where stucco is damaged, cracked, or missing in accordance to industry standards.

5.2   Subcontractor shall remove all chalk, mud stains, mildew efflorescence and/or any other contaminants or stains by pressure washing and scrubbing, utilizing detergents or other chemicals as required to remove the stains or contaminants.
Inadequate cleaning of the surfaces might result in stains bleeding through the finish coat of paint and/or the failure of the topcoat to adhere properly.

5.3   Subcontractor shall test any areas where stains cannot be completely removed for tendency of stains to bleed through prior to painting the entire surface.

5.4   Subcontractor shall caulk any openings that allow water intrusion with ICI Ultra Seal 45 year Latex Silicone Sealant # 21875, to prevent water or moisture from getting behind the paint film.

## B. Exterior Painting and Finishing Schedule

### 1.   _Stucco_

1.1   Subcontractor shall apply a full coat of tinted prime to achieve 100% body coverage, utilizing Bond Prep Acrylic Primer # 3030.

1.2   Subcontractor shall apply finish coat(s) to achieve 100% body coverage, utilizing Dulux pro 100% Acrylic Flat Finish # 2200 (Spray & Back Roll).

### 2.   _Wood Doors, Wood Fascia, Drip Edge and Wood Louvers_

2.1   Subcontractor shall apply a full coat of tinted prime to achieve 100% body coverage, utilizing Prep & Prime Gripper # 3210.

2.2   Subcontractor shall apply finish coat(s) to achieve 100% body coverage, utilizing Dulux pro 100% Acrylic Satin Finish # 2402.

QUANTUM LAKE VILLAS – BLDG. #s 1 thru 19

Owner:

Subcontractor:

| Subcontractor: | Franklin Bay General Contractors, Inc. |
| Trade: | Exterior Painting |
| Contract No. | QLV I - 022220 |
| Page No. | 12 of 16 |

3. **_Nonferrous Metal: Electrical Boxes, Aluminum Roof Vents, Plumbing Stacks and All Other Applicable Items_**

   3.1  Subcontractor shall apply a spot prime coat to achieve 100% body coverage, utilizing Bond Prep Acrylic Primer # 3030.

   3.2  Subcontractor shall apply finish coat(s) to achieve 100% body coverage, utilizing Dulux pro 100% Acrylic Satin Finish # 2402.

4. **_Ferrous Metals: Meter Room Doors_**

   4.1  Subcontractor shall apply a full prime coat to achieve 100% body coverafe, utilizing Deveflex DTM Primer # 4020.

   4.2  Subcontractor shall apply finish coat(s) to achieve 100% boady coverage, utilizing Devflex HP WB Acrylic Semi Gloss Enamel # 4216.

5. **_Caulking_**

   5.1  Subcontractor shall caulk any openings that allow water intrusion with ICI Ultrahide 45 year Acrylic Silicone Sealant # 21875, to prevent water or moisture from getting behind the paint film.

      5.1.1  Subcontractor shall remove all loose, hardened and/or deteriorated caulking presently installed.

      5.1.2  Subcontractor shall tool joint in a professional manner to insure proper adhesion and workmanlike appearance.

   5.2  Subcontractor shall detail all hairline cracks (less than 1/16") with Elastomeric Patching Compound textured brush grade.

      5.2.1  Subcontractor shall force sealant into crack to insure adhesion to inner wall surface.

      5.2.2  Subcontractor shall allow sealant to tack cure and then apply a detailed coat of Lastic textured brush-grade over repair.

      5.2.3  Subcontractor shall bridge cracks approximately 1/16" to allow for thermal movement.

      5.2.4  Subcontractor shall remove any loose or spalling stucco adjacent to crack.

   5.3  Subcontractor shall patch existing stucco texture as closely as possible.

**C. Color Scheme**

   1.  Subcontractor shall complete all contracted exterior painting in accordance to Owner's approved color scheme.

| A-1 | 2200-0300 Interm | BLK 1 P54<br>YOX 3 P 5 + | GRN 0 P 26 |
| A-2 | 2200-0400 | BLK 4 P 38<br>GRN 0 P 36 | LFY 3 P 54+<br>WHT 1 P 32 |
| B-1 | 2200-0400 Deep | BLK 0 P 42+<br>OXR 1 P 16 | YOX 11 P 54+ |
| B-2 | 2200-0400 Deep | BLK 0 P 30<br>OXR 2 P 31+ | LFY 6 P 55 |
| C-1 | 2200-0300 Interm | BLK 1 P 47+<br>YOX 5 P 11 | OXR 0 P 17+ |

QUANTUM LAKE VILLAS – BLDG. #s 1 thru 19

                                    Owner:

                      Subcontractor:

Subcontractor: <u>Franklin Bay General Contractors, Inc.</u>
Trade: <u>Exterior Painting</u>
Contract No. <u>QLV I - 022220</u>
Page No. <u>13 of 15</u>

| C-2 | 2200-0400 Deep | BLK 2 P 44+<br>YOX 6 P 52+ | OXR 01 P 31 |
| D-1 | 2200-0300 Interm | BLK 0 P 35<br>YOX 4 P 42+ | OXR 0 P 4 |
| D-2 | 2200-0400 Deep | BLK 2 P 29<br>YOX 5 P 15 | OXR 1 P 19+ |
| Facial | 2200-0400 Deep | BLK 3 P 7<br>YOX 3 P 36+ | GRN 3 P 14 |
| Trim  &<br>Bands | 2200-0110 Wht TB | BLK 0 P 6<br>YOX 0 P 24 | OXR 0 P 2 |

### D. Warranties

1.  Subcontractor shall warranty labor only, for labor related paint failures, and ICI Paints shall warranty all paint materials and sundry items related to paint failure, for seven (7) years against chipping, peeling, or flaking and excessive chalking, as a direct result of faulty workmanship and/or material failure, respectively. If paint failure is due to manufacture defect, the labor for such correction is not included in Subcontractor's labor warranty.

    Stucco:            Dulux Pro 100% Acrylic Flat Finish # 2200
    Wood:             Dulux Pro 100% Acrylic Satin Finish # 2403
    NonFerrous     Dulux Pro 100% Acrylic Satin Finish # 2402
    Metals:
    Ferrous Metal:    Devflex HP WB Acrylic Semi-Gloss Enamel # 4216

14. Debris: All leftover construction debris is to be placed into dumpsters provided by others.

15. ICI Inspections shall be attached to all invoices.

16. Payments will only be made after each phase of work has been completed and has an approved inspection by Owner. Owner agrees to inspect buildings in a timely manner.

C. Owner shall approve all installation, shop drawings, and specifications.

D. Work is not to be commenced until authorized by Olen's Vice President of Florida Property Services.

### IV. CONSTRUCTION PROCEDURES AND CONDITIONS

A. Subcontractor shall work only in areas designated by the Owner to allow other Subcontractors to begin work as soon as possible and shall allow sufficient time, as determined by the Owner, between each phase of his work to allow for other phases of work to be properly completed.

B. Subcontractor will cooperate with other Subcontractors in the performance of their work as it relates to site and building plumbing, mechanical, electrical, telephone and cable television construction.

C. All equipment and/or material delivered to the job site will be stored at a location to be designated by Owner. Equipment/material is stored at Subcontractor's sole and absolute risk.

D. Subcontractor shall maintain an average schedule of one (1) complete buildings per week for each phase of operation. Weather related delays will be documented; any delays caused by documented inclement weather will be considered an extension of time.

E. Subcontractor shall provide his own hoisting of men and material.

F. Subcontractor shall provide his own staging.

QUANTUM LAKE VILLAS – BLDG. #s 1 thru 19

Owner:
Subcontractor:

| | |
|---|---|
| Subcontractor: | Franklin Bay General Contractors, Inc. |
| Trade: | Exterior Painting |
| Contract No. | QLV 1 - 022220 |
| Page No. | 14 of 15 |

G. Owner shall provide, at no cost to Subcontractor, the following temporary facilities: Sanitation and location to obtain water.

H. Saturday shall be a mandatory workday if behind schedule only.

I. Subcontractor agrees to attend all weekly job site meetings while performing work included in this Subcontract. Subcontractor agrees to accept any schedule presented at meeting of which he does not attend.

J. Subcontractor agrees to be bound by the performance times as indicated in the construction schedule and other performance durations changed from time to time by Owner, as Owner determines as necessary. Owner will alter above schedule by issuing notice to Subcontractor by one or more of the following written means: (1) updated Construction Schedule; (2) letter; (3) memo; (4) job meetings (verified by written minutes which are posted in the Field Office bulletin board); (5) other means as mutually agreed upon. Duration of each operation will not be shortened without mutual consent.

K. Quantities and other information contained in the Schedule "B" of Values shall be used for the progress payment purpose only and shall not be construed as work description or as a limitation of quantities of labor and/or materials or scope of work required for the completion of this and shall include all items and labor required to complete the portion of the project it pertains to, as described in the Construction Documents.

L.1. **Locate Utilities**

48 hours prior to construction, the Subcontractor shall contact the Owner, UNCLE, FPL, Cable TV, Southern Bell (Fiber Optics), and all other necessary parties in order to locate existing underground utilities. All coordination shall be the Subcontractor's responsibility. Any damage caused to underground utilities shall be the expense of the Subcontractor.

2. **Verify Utilities**

Subcontractor shall be responsible for locating and verifying all utilities prior to beginning construction. Any and all conflicts with existing utilities shall be reported to the Owner. This work by the Subcontractor shall be considered incidental to the contract and no additional compensation shall be allowed.

3. **Safeguard Utilities**

Subcontractor shall take the necessary precautions to safeguard all existing structures and utilities. The location of existing utilities shown on these plans are approximate only and are based on survey and as-built information. Additional utilities may exist which are not shown on these plans. Subcontractor is solely responsible for damage he may create to existing utilities (overhead or underground and roadways) and such damage will be repaired at the Subcontractor's expense.

L. THE JOB SITE SUPERINTENDENT AND HIS ASSISTANT HAVE NO AUTHORITY TO APPROVE EXTRA WORK ABOVE THE SCOPE OF WORK IN RELATION TO THIS CONSTRUCTION AGREEMENT AND OLEN DEVELOPMENT CORP. WILL NOT BE RESPONSIBLE FOR PAYMENT OF SUCH WORK.

QUANTUM LAKE VILLAS – BLDG. #s 1 thru 19

Owner:

Subcontractor:

| | |
|---|---|
| Subcontractor: | Franklin Bay General Contractors, Inc. |
| Trade: | Exterior Painting |
| Contract No. | QLV I - 022220 |
| Page No. | 15 of 15 |

## "Addendum B"

## Code of Safe Practices
## and
## Safety Program for All Projects

All Subcontractors shall adhere to the following safety requirements. This list shall not be construed as final or complete, but shall be used as a tool to aid you and your workmen in developing and maintaining your own safety programs and procedures

1  All Subcontractors shall have their foreman attend a mandatory Monday morning safety meeting.

2  All Subcontractors shall have a weekly safety meeting with their own workmen. NOTE: This meeting is separate from item No. 1.

3  All Subcontractors shall provide a OSHA approved first aid kit in a readily accessible location for the use of their workmen.

4  All Subcontractors shall adhere to all OSHA and other related safety codes,

5  All Subcontractors' workmen shall wear Franklin Bay t-shirts and any other appropriate clothing for their type of business at all times.

6  Subcontractor's employees shall report any unsafe working conditions to their immediate supervisor who in turn shall notify an Olen Development Corp employee so that this condition can be corrected.

7  Any Subcontractor, and/or his employee, who fails to conduct business under any of the above codes or requirements, shall be subject to immediate removal from the job site and any and all required corrective work will be at the Subcontractor's sole expense.

8  Pursuant to the contract, all Subcontractors shall keep their work in a neat and orderly manner and shall maintain the work place in a broom swept condition free from all work debris and break debris.

9  There shall be no alcoholic beverages or controlled substances consumed by any Subcontractor or his employees at any time.

10 There shall be no radios allowed on the job site.

The intent of this Addendum is not to be a burden, but to make our work place safer and more profitable for all of us.

OWNER:                                          SUBCONTRACTOR:

VILLAS AT QUANTUM LAKES, INC                    FRANKLIN BAY GENERAL
                                                CONTRACTORS, INC.

BY:  _____           BY:  _____
     Danny Owens
     Vice President
     Florida Property Services

     (954) 340-4904 Phone
     (954) 344-4608 Fax


QUANTUM LAKE VILLAS – BLDG. #s 1 thru 19 _____

                                        Owner: _____
                                        Subcontractor: _____

SCHEDULE "B"

Page 1 of 1

SUBCONTRACTORS APPLICATION FOR PAYMENT

Progress Payment Request     09/04/07     Project:   QUANTUM LAKE VILLAS - BLDG. #21 Rev 06

Date:

SUBCONTRACTOR:     FRANKLIN BAY GENERAL CONTRACTORS, INC.

Contract For:     PRESSURE CLEANING, SEALING, CAULKING, EXTERIOR PAINTING

Application is made for payment for work performed balance
Due
In the NET AMOUNT OF _____     $     0.00000

SUMMARY OF BILLINGS

| | | | |
|---|---|---|---|
| A) | Original Contract Amount | $ | 145,970.34 |
| B) | Approved Change Orders | $ | 0.00 |
| C) | Current Contract Amount (A + B) | $ | 145,970.34 |
| D) | Total Completed to Date | $ | 0.00 |
| E) | Less Retainage | $ | 0.00 |
| F) | Total (Compl Less Retainage) (D-E) | $ | 0.00 |
| G) | Less Previously Approved & Paid | $ | 0.00 |
| H) | Current Application (or Thsf) (F-G) | $ | 0.00 |

RETAINAGE

| | | | |
|---|---|---|---|
| I) | Total Retainage Held to Date | $ | 0.00 |
| J) | Previous Balance of Retainage | $ | 0.00 |
| K) | Current Request for Retainage | $ | 0.00 |
| L) | Retainage Balance to Release (I+J-K) | $ | 0.00 |
| M) | Less Joint Check Amount | $ | 0.00 |
| N) | Less Agreements/Bankruptcies, Etc. | $ | 0.00 |
| O) | Net Payment to Subcontractor | $ | 0.00 |
| P) | Contract Balance to Complete (C-D) | $ | 145,970.34 |



APPROVED     CONSTRUCTION _____
            CONSTRUCTION _____
            CONSTRUCTION _____
            ACCOUNTING _____
            ACCOUNTING _____

CKP
DATE: _____

SCHEDULE OF VALUES

SUBCONTRACTOR

CONTRACT FOR:

QUIVIRA LAKE VILLAGE - BLDG. #9 THRU 15
a.k.a. QUARTOP PHASE ONE

FRANK/ALBERT GENERAL CONTRACTORS, INC.

PRESSURE CLEANING, SEALING, CAULKING, EXTERIOR PAINTING
AND ALL RELATED WORK

APPLICATION #:
APPLICATION DATE:

04-Jun-07

Page 1 of 4

| ITEM NO. | DESCRIPTION OF WORK | ORIGINAL CONTRACT AMOUNT | ADJUSTMENTS (C.O.'s) | REVISED CONTRACT AMOUNT | WORK COMPLETED | | | TOTAL COMPLETED TO DATE (C+E) | % | BALANCE TO FINISH (C-G) | % | RETAINAGE REC'D | PREVIOUS RELEASE OF RETAINAGE | RETAINAGE APPLICATION / RETAINAGE REQUEST | TOTAL RETAINAGE P/C/D (I+K) | RETAINAGE BALANCE C-L | COST CODE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | PREVIOUS APPLICATIONS | WORK IN PLACE | APPLICATION | | | | | | | | | | |
| | BUILDING #9 - 2395 Quivira Lake Drive EXTERIOR PAINTING 15 UNITS AT $548.42 PRESSURE CLEAN AND PAINT EXTERIOR OF 15 UNIT BLDG. IN ACCORDANCE TO OWNER'S SPECIFIC DIRECTION. | 8,381.04 | 0.00 | 8,381.04 | 0.00 | | | 0.00 | 0% | 8,381.04 | 5% | 0.00 | 0.00 | | | 0.00 | 032205 |
| | GENERAL BUILDING #10 BUILDING #10 thru #19 - 2854 Quartop's Liberty Drive EXTERIOR PAINTING 20 UNITS AT $548.42 PRESSURE CLEAN AND PAINT EXTERIOR OF 20 UNIT BLDG. IN ACCORDANCE TO OWNER'S SPECIFIC DIRECTION. | 10,968.40 | 0.00 | 10,968.40 | 0.00 | | | 0.00 | 0% | 10,968.40 | 5% | 0.00 | 0.00 | | | 0.00 | 032205 |
| | SUBTOTAL BUILDING #10 BUILDING #11 #19 - 2845 Quivira Lake Drive EXTERIOR PAINTING 20 UNIT AT $548.42 PRESSURE CLEAN AND PAINT EXTERIOR OF 20 UNIT BLDG. IN ACCORDANCE TO OWNER'S SPECIFIC DIRECTION. | 10,968.40 | 0.00 | 10,968.40 | 0.00 | | | 0.00 | 0% | 10,968.40 | 5% | 0.00 | 0.00 | | | 0.00 | 032205 |
| | GENERAL BUILDING #11 BUILDING #12 #19 - 2451 Quivira Lake Drive EXTERIOR PAINTING 20 UNITS AT $548.42 PRESSURE CLEAN AND PAINT EXTERIOR OF 20 UNIT BLDG. IN ACCORDANCE TO OWNER'S SPECIFIC DIRECTION. | 10,968.40 | 0.00 | 10,968.40 | 0.00 | | | 0.00 | 0% | 10,968.40 | 5% | 0.00 | 0.00 | | | 0.00 | 032205 |
| | SUBTOTAL BUILDING #12 BUILDING #13 - 2814 Quartop's Liberty Drive EXTERIOR PAINTING 20 UNITS AT $548.42 PRESSURE CLEAN AND PAINT EXTERIOR OF 20 UNIT BLDG. IN ACCORDANCE TO OWNER'S SPECIFIC DIRECTION. | 10,968.40 | 0.00 | 10,968.40 | 0.00 | | | 0.00 | 0% | 10,968.40 | 5% | 0.00 | 0.00 | | | 0.00 | 032205 |
| | SUBTOTAL BUILDING #13 BUILDING #14 - 2831 Quivira Lake Drive EXTERIOR PAINTING 14 UNITS AT $548.42 PRESSURE CLEAN AND PAINT EXTERIOR OF 14 UNIT BLDG. IN ACCORDANCE TO OWNER'S SPECIFIED DIRECTION. | 7,677.88 | 0.00 | 7,677.88 | 0.00 | | | 0.00 | 0% | 7,677.88 | 5% | 0.00 | 0.00 | | | 0.00 | 032205 |
| | SUBTOTAL BUILDING #14 BUILDING #15 - 2845 Quartop's Liberty Drive EXTERIOR PAINTING 11 UNITS AT $548.42 PRESSURE CLEAN AND PAINT EXTERIOR OF 11 UNIT BLDG. IN ACCORDANCE TO OWNER'S SPECIFIED DIRECTION. | 6,031.64 | 0.00 | 6,031.64 | 0.00 | | | 0.00 | 0% | 6,031.64 | 5% | 0.00 | 0.00 | | | 0.00 | 032205 |
| | SUBTOTAL BUILDING #15 | 5,245.64 | 0.00 | 5,245.64 | 0.00 | | | 0.00 | 0% | 5,245.64 | 5% | 0.00 | 0.00 | | | 0.00 | |

| ITEM NO. | DESCRIPTION OF WORK | ORIGINAL CONTRACT AMOUNT | ADJUSTMENTS (C.O.'S) | REVISED CONTRACT AMOUNT | PREVIOUS APPLICATIONS | THIS APPLICATION | TOTAL COMPLETED TO DATE (D+E) | % | BALANCE TO FINISH ($-G) | % | RETAINAGE HELD | PREVIOUS RELEASE OF RETAINAGE | RETAINAGE THIS APPLICATION | TOTAL RETAINAGE HELD (LINE) | RETAINAGE BALANCE (I-L) | COST CODE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | BUILDING #1 2854 - 2870 Guardian Lakes Drive EXTERIOR PAINTING: 16 UNITS AT $341.42 | | | | | | | | | | | | | | | |
| | PRESSURE CLEAN AND PAINT EXTERIOR OF 16 UNIT BLDG. IN ACCORDANCE TO OWNERS SPECIFIC DIRECTION. | 5,454.20 | 0.00 | 5,454.20 | 0.00 | | 5,454.20 | 5% | 5,454.20 | 5% | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 052223 |
| | BUILDING # 5 2874 - 2896 Guardian Lakes Drive EXTERIOR PAINTING: 12 UNITS AT $549.42 | | | | | | | | | | | | | | | |
| | PRESSURE CLEAN AND PAINT EXTERIOR OF 12 UNIT BLDG. IN ACCORDANCE TO OWNERS SPECIFIC DIRECTION. | 6,494.20 | 0.00 | 6,494.20 | 0.00 | | 6,494.20 | 5% | 6,494.20 | 5% | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 052223 |
| | BUILDING # 6 2894 - 2915 Guardian Lakes Drive EXTERIOR PAINTING: 30 UNITS AT $549.42 | | | | | | | | | | | | | | | |
| | PRESSURE CLEAN AND PAINT EXTERIOR OF 30 UNIT BLDG. IN ACCORDANCE TO OWNERS SPECIFIC DIRECTION. | 16,496.00 | 0.00 | 16,496.00 | 0.00 | | 16,496.00 | 5% | 16,496.00 | 5% | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 052223 |
| | BUILDING # 10 2916 - 2770 Guardian Lakes Drive EXTERIOR PAINTING: 14 UNITS AT $349.42 | | | | | | | | | | | | | | | |
| | PRESSURE CLEAN AND PAINT EXTERIOR OF 14 UNIT BLDG. IN ACCORDANCE TO OWNERS SPECIFIC DIRECTION. | 5,494.20 | 0.00 | 5,494.20 | 0.00 | | 5,494.20 | 5% | 5,494.20 | 5% | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 052223 |
| | BUILDING # 12 2770-2914 Guardian Lakes Drive EXTERIOR PAINTING: 14 UNITS AT $349.42 | | | | | | | | | | | | | | | |
| | PRESSURE CLEAN AND PAINT EXTERIOR OF 14 UNIT BLDG. IN ACCORDANCE TO OWNERS SPECIFIC DIRECTION. | 7,977.86 | 0.00 | 7,977.86 | 0.00 | | 7,977.86 | 5% | 7,977.86 | 5% | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 052223 |
| | BUILDING # 14 2772 - 2914 Guardian Lakes Drive EXTERIOR PAINTING: 18 UNITS AT $549.42 | | | | | | | | | | | | | | | |
| | PRESSURE CLEAN AND PAINT EXTERIOR OF 18 UNIT BLDG. IN ACCORDANCE TO OWNERS SPECIFIC DIRECTION. | 9,891.64 | 0.00 | 9,891.64 | 0.00 | | 9,891.64 | 5% | 9,891.64 | 5% | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 052223 |
| | BUILDING # 16 2880 - 2914 Guardian Lakes Drive EXTERIOR PAINTING: 10 UNITS AT $549.42 | | | | | | | | | | | | | | | |
| | PRESSURE CLEAN AND PAINT EXTERIOR OF 10 UNIT BLDG. IN ACCORDANCE TO OWNERS SPECIFIC DIRECTION. | 6,494.04 | 0.00 | 6,494.04 | 0.00 | | 6,494.04 | 5% | 6,494.04 | 5% | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 052223 |
| | BUILDING # 18 2800 - 2854 Guardian Lakes Drive EXTERIOR PAINTING: 10 UNITS AT $349.42 | | | | | | | | | | | | | | | |
| | PRESSURE CLEAN AND PAINT EXTERIOR OF 10 UNIT BLDG. IN ACCORDANCE TO OWNERS SPECIFIC DIRECTION. | 3,494.20 | 0.00 | 3,494.20 | 0.00 | | 3,494.20 | 5% | 3,494.20 | 5% | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 052223 |
| | BUILDING # 19 2562 - 2574 Guardian Lakes Drive EXTERIOR PAINTING: 14 UNITS AT $549.42 | | | | | | | | | | | | | | | |
| | PRESSURE CLEAN AND PAINT EXTERIOR OF 14 UNIT BLDG. IN ACCORDANCE TO OWNERS SPECIFIC DIRECTION. | 7,977.88 | 0.00 | 7,977.88 | 0.00 | | 7,977.88 | 5% | 7,977.88 | 5% | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 052223 |

| ITEM NO. | DESCRIPTION OF WORK | ORIGINAL CONTRACT AMOUNT | ADJUSTMENTS (CCOR) | REVISED CONTRACT AMOUNT | PREVIOUS APPLICATIONS | WORK COMPLETED THIS APPLICATION | TOTAL COMPLETED TO DATE (G+F) | % | BALANCE TO FINISH (C-G) | RETAINAGE HELD | PREVIOUS RELEASE OF RETAINAGE | RETAINAGE THIS APPLICATION RELEASED THIS REQUEST | TOTAL RETAINAGE PAID (L+K) | RETAINAGE BALANCE (H-L) | COST CODE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | BUILDING 6 ITL TUNA ~ 2519 Chieftain Lakes Drive EXTERIOR PAINTING 12 UNITS AT $544.42 | | | | | | | | | | | | | | |
| | PRESSURE CLEAN AND PAINT EXTERIOR OF 12 UNIT BLDG. IN ACCORDANCE TO OWNERS SPECIFIC DIRECTION. | 6,591.04 | 0.00 | 6,591.04 | 0.00 | | 0.00 | 0% | 6,591.04 | 0.00 | 0.00 | | 0.00 | 0.00 | 030320 |
| | SUBTOTAL BUILDING 6 | 6,591.04 | 0.00 | 6,591.04 | 0.00 | | 0.00 | 0% | 6,591.04 | 0.00 | 0.00 | | 0.00 | 0.00 | |
| | BUILDING 7 #6 2561 ~ 2565 Chieftain Lakes Drive EXTERIOR PAINTING 20 UNITS AT $549.42 | | | | | | | | | | | | | | |
| | PRESSURE CLEAN AND PAINT EXTERIOR OF 20 UNIT BLDG. IN ACCORDANCE TO OWNERS SPECIFIC DIRECTION. | 10,988.40 | 0.00 | 10,988.40 | 0.00 | | 0.00 | 0% | 10,988.40 | 0.00 | 0.00 | | 0.00 | 0.00 | 030320 |
| | SUBTOTAL BUILDING 7 | 10,988.40 | 0.00 | 10,988.40 | 0.00 | | 0.00 | 0% | 10,988.40 | 0.00 | 0.00 | | 0.00 | 0.00 | |
| | PRESSURE CLEAN AND PAINT EXTERIOR OF 18 UNIT BLDG. IN ACCORDANCE TO OWNERS SPECIFIC DIRECTION. | 6,591.04 | 0.00 | 6,591.04 | 0.00 | | 0.00 | 0% | 6,591.04 | 0.00 | 0.00 | | 0.00 | 0.00 | 030320 |
| | CLUBHOUSE 2708 Chieftain Lakes Drive | | | | | | | | | | | | | | |
| | PRESSURE CLEAN AND PAINT EXTERIOR OF CLUBHOUSE, IN ACCORDANCE TO OWNERS SPECIFIC DIRECTION. | INCLUDED | 0.00 | 0.00 | 0.00 | | 0.00 | 0% | 0.00 | 0.00 | 0.00 | | 0.00 | 0.00 | 030320 |
| | SUBTOTAL CLUBHOUSE | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 | 0% | 0.00 | 0.00 | 0.00 | | 0.00 | 0.00 | |
| | DUMPSTER 2700A Chieftain Lakes Drive | | | | | | | | | | | | | | |
| | PRESSURE CLEAN AND PAINT EXTERIOR OF DUMPSTER ENCLOSURE IN ACCORDANCE TO OWNERS SPECIFIC DIRECTION. | INCLUDED | 0.00 | 0.00 | 0.00 | | 0.00 | 0% | 0.00 | 0.00 | 0.00 | | 0.00 | 0.00 | 030320 |
| | SUBTOTAL DUMPSTER | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 | 0% | 0.00 | 0.00 | 0.00 | | 0.00 | 0.00 | |
| | STORAGE 2900-A Chieftain Lakes Drive | | | | | | | | | | | | | | |
| | PRESSURE CLEAN AND PAINT EXTERIOR OF STORAGE BLDG. IN ACCORDANCE TO OWNERS SPECIFIC DIRECTION. | INCLUDED | 0.00 | 0.00 | 0.00 | | 0.00 | 0% | 0.00 | 0.00 | 0.00 | | 0.00 | 0.00 | 030320 |
| | SUBTOTAL STORAGE | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 | 0% | 0.00 | 0.00 | 0.00 | | 0.00 | 0.00 | |
| | VARIOUS STRUCTURES | | | | | | | | | | | | | | |
| | PRESSURE CLEAN AND PAINT EXTERIOR OF 2 MONUMENT SIGNS, 3 COLUMNS AND ALL GUTTERS AND DOWNSPOUTS IN ACCORDANCE TO OWNERS SPECIFIC. | | | | | | | | | | | | | | |
| | TWO (2) MONUMENT SIGNS | INCLUDED | 0.00 | 0.00 | 0.00 | | 0.00 | 0% | 0.00 | 0.00 | 0.00 | | 0.00 | 0.00 | 030390-21 |
| | FIVE (5) COLUMNS | INCLUDED | 0.00 | 0.00 | 0.00 | | 0.00 | 0% | 0.00 | 0.00 | 0.00 | | 0.00 | 0.00 | 030390-3-3 |
| | ALL GUTTERS AND DOWNSPOUTS | INCLUDED | 0.00 | 0.00 | 0.00 | | 0.00 | 0% | 0.00 | 0.00 | 0.00 | | 0.00 | 0.00 | 030390-4-3 |
| | SUBTOTAL VARIOUS STRUCTURES | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 | 0% | 0.00 | 0.00 | 0.00 | | 0.00 | 0.00 | |



Page 1 of 4

| ITEM NO. | DESCRIPTION OF WORK | ORIGINAL CONTRACT AMOUNT | ADJUSTMENTS (BLGTS) | REVISED CONTRACT AMOUNT | PREVIOUS APPLICATIONS | THIS APPLICATION WORK IN PLACE | TOTAL COMPLETED TO DATE (D+E) | % | BALANCE TO FINISH (C-G) | RETAINAGE HELD | PREVIOUS RELEASE OF RETAINAGE | RETAINAGE THIS APPLICATION RECEIPT | TOTAL RETAINAGE PAID (J+K) | RETAINAGE BALANCE (I-L) | CODE CODE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | TOTALS | 52,518.40 | 0.00 | 52,518.40 | 0.00 | | 0.00 | 0% | 52,518.40 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 52,000.00 |
| K | 1st UNIT BLDGS = 6 BLDGS. (Pk 2,3,4,5,10,16) | 32,495.20 | 0.00 | 32,495.20 | 0.00 | | 0.00 | 0% | 32,495.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 62,000.00 |
| U | 1st UNIT BLDGS = 6 BLDGS. (Pk 1,7,13,17,18) | 37,421.08 | 0.00 | 37,421.08 | 0.00 | | 0.00 | 0% | 37,421.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 62,000.00 |
| D | 1st UNIT BLDGS = 6 BLDGS. (Pk 8,9,11,14,12) | 23,060.84 | 0.00 | 23,060.84 | 0.00 | | 0.00 | 0% | 23,060.84 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 62,000.00 |
| L | CLUBHOUSE | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 | 0% | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 62,000.00 |
| E | DUMPSTER | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 | 0% | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 62,000.00 |
| G | SITEWORK | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 | 0% | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 62,000.00 |
| Z | VARIOUS STRUCTURES | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 | 0% | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | New 75Q-00 |
| | TOTAL CONTRACT | 145,173.24 | 0.00 | 145,173.24 | | | 0.00 | 0% | 145,173.24 | 0.00 | | | | 0.00 | |

CONTRACT SUMMARY FOR:   FRANKLIN BAY GENERAL CONTRACTORS, INC.

| | REVISED CONTRACT AMOUNT | PREVIOUS INVOICES | TOTAL INVOICED THIS MTH | BALANCE REMAINING | RETAINAGE RELEASE | | TOTAL RETAINAGE PAID | PREVIOUS RELEASE OF RETAINAGE | TOTAL RETAINAGE RELEASED | BALANCE |
|---|---|---|---|---|---|---|---|---|---|---|
| Contractor | 145,173.24 | 0.00 | 0.00 | 145,173.24 | | | | 0.00 | 0.00 | 0.00 |
| | 145,173.24 | 0.00 | 0.00 | 145,173.24 | | | | 0.00 | 0.00 | 0.00 |



# Franklin Bay

**GENERAL CONTRACTORS, INC.**

# PROPOSAL

PROPOSAL #06-0503
April 16, 2007
Submitted By: Jack Stevens

**PROPOSAL SUBMITTED TO:**
Danny Owens
Olen Properties
1062 Coral Ridge Dr.
Coral Springs, FL 33071

**PROJECT LOCATION:**
Quantum Lake Villas Apartments
2700 Quantum Lakes Dr.
Boynton Beach, FL 33426

Architect: NA        Engineer: NA        Date of Plans: NA

We propose to furnish all labor and materials to complete the following scope of work in accordance with the plans and specifications provided by the owner and in accordance with all local code requirements. All material is guaranteed to be as specified. All work to be completed in a professional, workmanlike manner according to standard construction practices. Any alteration or deviation from specifications or scope of work will be executed only upon written orders, and will become an extra charge over and above this proposal. Prices contained in this proposal are based on one deployment, unless otherwise stated. This proposal is valid for thirty days. THIS PROPOSAL IS BASED ON A VISUAL, NON-DESTRUCTIVE INVESTIGATION; OTHER DAMAGES MAY EXIST.

PROPOSAL FOR EXTERIOR COATING APPLICATION -- PHASE I ONLY

**SCOPE OF WORK:**

- The following exterior coating system will be applied to 272 residential units, one office/clubhouse building, the trash compactor areas, one perimeter wall/fencing, and all previously painted sandblasted raised-letter signage. Parking lot light poles are factory finished and are not included the base bid.

- In preparation for coating applications, all previously painted exterior surfaces shall be thoroughly pressure cleaned, using chlorine and tri-sodium phosphate as required, to remove dirt and debris, and any loose, peeling, or flaking paint.

- Previously painted metals will be cleaned and sanded, as needed, to remove dirt, rust, oils and other contaminants. Glossy metal surfaces will be abraded to allow for proper adhesion of new coatings.

- Acrylic Urethane Sealant will be applied around window trim and door jambs, at all butt-joint locations, at intersections of dissimilar surfaces, and to all masonry cracks. A brush-grade and knife-grade patch will be applied to masonry surfaces as needed to match the existing texture as close as possible. Sealant will not be applied to any decking surfaces.

- All bare wood to be coated will receive an application of Devflex 4020PF Primer. All bare metal to be coated will receive an application of Devflex 4020PF Primer; all previously painted metals will be spot primed as needed, to allow for proper adhesion of coatings.

- All exposed masonry surfaces to be coated will receive an application of ICI Prep & Prime Masonry Bonding Primer Sealer.
- One finish coating will be applied: Masonry and wood surfaces shall receive one finish coat of Dulux Professional 100% Acrylic, flat finish; Metal surfaces will receive one finish coat of Devflex 4020PF Coating.
- The existing railings are factory finished aluminum, and are not included in the base repaint proposal.
- Phase II of the property is not included in this proposal.

**PROPOSAL PRICE:**

$149,170.24 *(One Hundred Forty-Nine Thousand, One Hundred Seventy Dollars and Twenty-Four Cents)* (272 units at $548.42 per unit)

**EXCLUSIONS AND CLARIFICATIONS:**

- All work stated herein shall be completed in accordance with the Olen Properties /ICI Master Repaint Specifications provided.
- This proposal does not include caulking, sealing or painting of any concrete decks, concrete floors, or breezeway decks.
- Color selections for finish products to be completed prior to commencement of contract. The proposal price listed above presumes that the new colors selected will be similar in color and tone to the existing colors; significant color changes may require an additional charge.
- Staging Area Requirements: A block of approximately six parking spaces located on the property, at a location convenient for management and residents.
- Contractor to provide a five year workmanship warranty, and the manufacturer's material warranty applicable to products selected.
- Owner to remove one screen panel at end of each balcony/patio location to allow contractor access. Owner to reinstall screen once contractor has completed the balcony/patio coating application.
- Balcony/patio railings are excluded.
- Stair railings and stair stringers are excluded.
- Owner to cut back plant material throughout the property prior to commencement, to allow access to buildings.
- Contractor will coat exposed wall surfaces only. Walls covered by vines will be painted only to the extent reasonably possible.
- Painting of doors is excluded.
- Painting of parking lot light poles is excluded.

**Authorization to Proceed:** The undersigned hereby states that she/he is an authorized representative of the owner of the project stated above, and has the authority to execute this contract. By executing this contract, the undersigned authorizes The Franklin Bay Company, Inc. to proceed with the work stated in this proposal, and further agrees to net 30 terms of payment.

_____          _____          _____
Authorized Representative (signature)          Authorized Representative (name)          Date



## Quantum Lakes Apartments & Manatee Bay Apartments
### Paint Schedule

### Painting and Finishing Schedule (Exterior)

All Stucco Surfaces: Mail Box Center, Planter Walls, Patio Privacy Walls, Pool house, Maintenance Shop, Dumpster Enclosures, Decorative Wood Pop-Outs, Stucco Columns at West & North of Property.

#### Stucco

A.   Full Prime Coat –  Bond-Prep Acrylic Primer #3030

B.   1 Finish Coat – Dulux Pro 100% Acrylic Flat Finish  #2200
     *(Spray & Back-Roll)*

#### Wood : Wood Doors, Wood Fascia, Drip-Edge, and Wood Louvers.

A.   Full Prime Coat – Prep & Prime Gripper #3210

B.   1 Finish Coat(s) – Dulux Pro100% Acrylic Satin Finish #2402

#### Nonferrous Metal: (Electrical Boxes, Aluminum, Roof Vents & Plumbing Stacks, etc):

A.   Full Prime Coat – Bond-Prep 100% Acrylic Primer #3030

B.   1 Finish Coat(s) – Dulux Pro100% Acrylic Satin Finish  #2402

#### Ferrous Metal: (Entrance, Maintenance, & Service Doors,):

A.   Full Prime Coat – Devflex DTM Primer #4020

B.   1 Finish Coat(s) – Devflex HP WB Acrylic Semi-Gloss Enamel #4216

Addendum "C"
Contract No. QLV I - 022220 issued
to Franklin Bay General Contractors,
Inc. for Exterior Painting
*1 of 17*

JUN-04-2007 11:55 PM                                                    P.03



**PREP & PRIME™ BOND-PREP**
Interior/Exterior Water-Based Pigmented
Masonry Bonding Primer Sealer
3030-1200



9 | FINISHES
PAINTING (09900)

## Product Description

A premium-quality waterborne acrylic pigmented
bonding primer specifically designed to seal and
condition masonry surfaces. May be used on interior
and exterior concrete, stucco, precast concrete,
plaster, and previously painted masonry or metal
surfaces. Excellent for previously painted surfaces
that are worn and chalky. May be used under alkyd,
latex, acrylic, or elastomeric smooth and textured
finishes. Features excellent penetration and
adhesion over chalky surfaces. Not recommended
over exterior wood surfaces. **Highly alkali
resistant. May be applied to new concrete or
masonry surfaces with a pH up to 13.0 and
prior to a 30 day cure.**

## Features

- Adhesion over chalky surfaces
- Excellent penetration
- Seals and strengthens masonry surfaces
- Promotes adhesion
- Surface conditioner
- Alkali resistant
- Good hiding
- Low odor
- Low VOC

## Specifications

**Color:**
    White (tintable, limit 2 oz/gal)

**Finish:**
    Flat

**Clean-up Solvent:**
    Soap and water

**Density:**
    11.1 lbs/gal (1.33 kg/L)

**VOC:**
    0.90 lbs/gal (108 g/L)

**Solids:**
    Volume - 38% ± 1%
    Weight - 52% ± 1%

**Practical Coverage:**
    Apply at 350-450 sq ft/gal (9-11 m²/L). Actual
    coverage may vary depending on substrate and
    application method.

**Flash Point:**
    None

**Dry Time 77°F (25°C) & 50% RH:**
    To touch - 1 hour
    To recoat - 4 hours

**Shelf Life:**
    1 year minimum - unopened

## Composition

- Acrylic Resin
- Titanium Dioxide and Extender Pigments
- Not manufactured with lead or mercury
  containing materials.

9 | FINISHES
PAINTING (09900)

JUN 04 2001 11:56 PM                                                                    P.84

## General Surface Preparation

All surfaces must be sound, dry, clean and free of oil, grease, dirt, mildew, form release agents, curing compounds, loose and flaking paint and other foreign substances.

**NEW SURFACES: Concrete, Masonry and Plaster** - Cure at least three days before painting, poured in place concrete must cure for at least seven days. pH must be 13.0 or lower. Roughen slick poured or precast concrete and remove sealers by chemical cleaning or abrasive method such as sandsweeping. Rinse thoroughly with water and allow to dry. Remove loose aggregate. Prime with this product. Fill block with PREP & PRIME BLOCK FILLER 3010 or PREP & PRIMER GRIPPER BLOCKSURFACER 3010 water-based primer sealer or BLOXFIL® 4000 acrylic block filler.

**PREVIOUSLY PAINTED SURFACES:** Wash to remove contaminants. Rinse thoroughly with water and allow to dry. Dull glossy areas by light sanding. Remove sanding dust. Remove loose or peeling

paint back to sound surface by high pressure water washing (minimum 2000 psi). Scrub heavy chalk areas and overhead areas such as eaves with soap and water. Remove all mildew by washing with a solution of 16 oz (473 mL) liquid household bleach and two oz (59 mL) non-ammoniated liquid detergent per gallon (3.785 L) of water. Rinse surfaces clean with water and allow to dry for 24 hours. Prime with this product.

**WARNING!** If you scrape, sand or remove old paint from any surface, you may release lead dust. LEAD IS TOXIC. EXPOSURE TO LEAD DUST CAN CAUSE SERIOUS ILLNESS, SUCH AS BRAIN DAMAGE, ESPECIALLY IN CHILDREN. PREGNANT WOMEN SHOULD ALSO AVOID EXPOSURE. Wear a NIOSH-approved respirator to control lead exposure. Carefully clean up with a wet mop or HEPA vacuum. Before you start, find out how to protect yourself and your family by contacting the U.S. EPA/Lead Information Hotline at 1-800-424-LEAD (5323) or log on to www.epa.gov/lead.

## Directions For Use

**TINTING:** May be tinted with up to two oz/gal of ICI Colorants.

**SPREADING RATE:** Apply at 350-450 sq ft/gal (9-11 m²/L). Actual coverage may vary depending on substrate and application method. For best hiding, tint primers towards finish coat color. Certain shades of yellow, orange, pink and red may require multiple coats.

**APPLICATION:** Mix thoroughly before use. May be applied by brush, roller or spray. No thinning required. To work material in more effectively,

brushing is the preferred method of application over chalky substrates. For spray application, use a .015-.017" tip. Adjust pressure as needed. Do not apply when the surface or air temperature is below 50°F (10°C).

**DRYING TIME:** At 77°F (25°C) and 50% R.H., dries to touch in one hour and to recoat in four hours. Low temperature, high humidity, thick films or poor ventilation will increase these times.

**CLEAN-UP:** Clean immediately with warm, soapy water.

## Precautions

WARNING! CAUSES EYE, SKIN AND RESPIRATORY TRACT IRRITATION. CONTAINS CRYSTALLINE SILICA WHICH CAN CAUSE LUNG CANCER AND OTHER LUNG DAMAGE IF INHALED. POTENTIAL CANCER HAZARD. CONTAINS FORMALDEHYDE WHICH HAS BEEN SHOWN TO CAUSE UPPER RESPIRATORY TRACT CANCER AND ALLERGIC RESPIRATORY REACTION. MAY CAUSE ALLERGIC SKIN REACTION. MAY BE HARMFUL IF SWALLOWED. WHEN TINTED, CONTAINS ETHYLENE GLYCOL WHICH CAN CAUSE SEVERE KIDNEY DAMAGE WHEN INGESTED AND HAS BEEN SHOWN TO CAUSE BIRTH DEFECTS IN LABORATORY ANIMALS. USE ONLY WITH ADEQUATE VENTILATION! KEEP OUT OF THE REACH OF CHILDREN. For emergency information call (800) 545-2643. For additional safety information, refer to the Material Safety Data Sheet for this product. If sanding is done, wear a dust mask to avoid breathing of sanding dust. Do not breathe vapors or spray mist. If you experience eye watering, headaches, or dizziness, leave the area. If properly used, a respirator may offer additional protection. Obtain professional advice before using. Close container after each use. FIRST AID: In case of skin contact, wash off quickly with plenty of soap and water, remove contaminated clothing. For eye contact, flush immediately with large amounts of water, for at least 15 minutes. Obtain emergency medical treatment. If swallowed, obtain medical treatment immediately. If inhalation causes physical discomfort, remove to fresh air. If discomfort persists or any breathing difficulty occurs, get medical help. KEEP FROM FREEZING. Note: These warnings encompass the product series. Prior to use, read and follow product-specific MSDS and label information.

## Shipping

**FREIGHT CLASSIFICATION:**
Paint, Freezable

**FLASH POINT:**
None

**PACKAGING:**
1 gallon (3.785 L)
5 gallons (18.925 L)

Addendum "C"
Contract No. QLV I - 022220 issued
to Franklin Bay General Contractors,
Inc. for Exterior Painting
*3 of 17*



**Paints**

LIMITATION OF LIABILITY To the best of our knowledge, the technical data contained herein are true and accurate. All the data of issuance but are subject to change without prior notice. We guarantee our product to conform to the specifications contained herein. WE MAKE NO OTHER WARRANTY OR GUARANTEE OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING MERCHANTABILITY AND FITNESS FOR PARTICULAR PURPOSE. Liability, if any, is limited to replacement of the product or refund of the purchase price. LABOR OR COST OF LABOR AND OTHER CONSEQUENTIAL DAMAGES ARE HEREBY EXCLUDED.

ICI Paints, 925 Euclid Ave., Cleveland, Ohio 44115  1-800-984-5444  www.icipaintstores.com

Page Item 3000 - 6/02  No. 02985B



**DULUX PROFESSIONAL**
**Exterior 100% Acrylic**
**Flat Finish**
2200-XXXX

## Product Description

Our premium quality professional exterior 100% acrylic flat finish specially formulated to provide exceptional weathering resistance, low temperature application and quick curing, resulting in good resistance to early moisture exposure. Dulux Professional uses the latest advances in 100% acrylic latex waterborne technology which allows professionals to extend the painting season with confidence. Ideal for use on properly prepared wood siding, trim and sash, shakes, shingles, masonry, weathered aluminum siding, weathered vinyl siding, metal and sound painted surfaces.

## Features

- Durable and tough
- Fade and chalk resistant
- Gives a mildew resistant coating
- Moisture resistant
- Excellent adhesion
- Resists blistering, peeling and flaking
- Easy application
- Low temperature application - to 35°F
- Low odor
- Quick drying and recoat
- Performance alternate for Federal Paint Specifications TT-P-19D and TT-P-96D

## Composition

- 100% Acrylic Resin
- Titanium Dioxide and Extender Pigments
- Not manufactured with lead or mercury containing materials.

## Specifications

**Color:**
White, ready-mix & custom colors

**Finish:**
Flat

**Clean-up Solvent:**
Soap and water

**Density:**
11.3 lbs/gal (1.35 kg/L)

**VOC:**
Maximum 100 g/L (0.83 lbs./gal.)

**Solids:**
Volume - 37% ± 1%
Weight - 54% ± 1%

**Practical Coverage:**
Apply at 300-400 sq ft/gal (7-10 m²/L). Actual coverage may vary depending on substrate and application method.

**Flash Point:**
None

| **Dry Time:** | **77°F (25°C)/50%RH** | **35°F (2°C)** |
|---|---|---|
| To touch | 30-60 minutes | 3-6 hours |
| To recoat | 2-3 hours | 24 hours |

**Shelf Life:**
1 year minimum - unopened

## General Surface Preparation

All surfaces must be sound, dry, clean and free of oil, grease, dirt, mildew, form release agents, curing compounds, loose and flaking paint and other foreign substances.

**NEW SURFACES: Wood** - Spot prime pine knots with acrylic primer Dulux Professional 2000. Prime entire surface with acrylic primer Dulux Professional 2000. Caulk with Decra-Seal. **Preprimed and Unprimed Hardboard** - Prime entire surface and all edges with acrylic primer Dulux Professional 2000 or alkyd primer 2110. Caulk with Decra-Seal. **Steel** - Prime with waterborne metal primer 4020 or solventborne metal primer 4160 or 4100. **Galvanized Metal and Aluminum** - Prime with acrylic primer Dulux Professional 2000. **Concrete and Masonry** - Cure at least 30 days before painting. pH must be 10.0 or lower. Roughen unusually slick poured or precast concrete by acid etching or sandsweeping. Follow acid manufacturer's application and safety instructions. Rinse thoroughly with water and allow to dry. Remove loose aggregate. Prime with this product or acrylic primer Dulux Professional 2000. Fill masonry block with latex block filler 3010 or 4000.

**PREVIOUSLY PAINTED SURFACES:** Wash to remove contaminants. Rinse thoroughly with water and allow to dry.

Dull glossy areas by light sanding. Remove sanding dust. Remove loose paint. Scrub heavy chalk areas and overhead areas such as eaves with soap and water. Remove all mildew by washing with a solution of 16 oz (473 mL) liquid household bleach and two oz (59 mL) non-ammoniated liquid detergent per gallon (3.785 L) of water. Rinse surfaces clean with water and allow to dry for 24 hours. Prime bare areas with primer specified under NEW SURFACES. **Weathered Aluminum and Vinyl Siding** - Remove dirt and chalk. Prime with this product. If chalk remains after cleaning, prime with acrylic primer Dulux Professional 2000. Do not repaint vinyl siding with colors darker than the original color; the siding may warp.

**NOTE:** Blistering and peeling of exterior house paints down to bare wood is usually caused by moisture behind the paint film. Moisture pressure forces the paint away from the surface. Sources of excess moisture in the wood must be eliminated prior to repainting to obtain normal service life of these paints. Old, unsound multiple coat paint systems may be subject to peeling when repainted due to the added weight and stress created by the paint layers. In such cases, all old paint layers must be removed back to the bare wood before repainting.

## Directions For Use

**TINTING:** Tint the appropriate base with ICI Colorants.

**SPREADING RATE:** Apply at 300-400 sq ft/gal (7-10 m²/L). Actual coverage may vary depending on substrate and application method. For best hiding, tint primers towards finish coat color. Certain shades of yellow, orange, pink and red may require multiple coats.

**APPLICATION:** Mix thoroughly before use. May be applied by brush, roller or spray. No thinning required. For spray application, use a .015-.017" tip. Adjust pressure as needed. Establish that air, surface and material temperatures are above 35°F (2°C) and at least

5°F above the dew point prior to painting. Do not apply if rain, snow or lower temperatures are expected within two to three hours. On large expanses of metal, temperatures must be 50°F (10°C) or higher. Check temperature requirements on any accompanying primer used.

**DRYING TIME:** At 77°F (25°C) and 50% R.H., dries to touch in 30-60 minutes and to recoat in two to three hours. At 35°F (2°C), dries to touch in three to six hours and to recoat in 24 hours. High humidity, thick films or poor ventilation will increase these times.

**CLEAN-UP:** Clean immediately with warm, soapy water.

## Precautions

**WARNING! CAUSES EYE BURNS. CAUSES SKIN AND RESPIRATORY TRACT IRRITATION. HARMFUL IF SWALLOWED. CONTAINS ETHYLENE GLYCOL WHICH CAN CAUSE SEVERE KIDNEY DAMAGE WHEN INGESTED AND HAS BEEN SHOWN TO CAUSE BIRTH DEFECTS IN LABORATORY ANIMALS. OVEREXPOSURE MAY CAUSE LIVER, KIDNEY, BLOOD DAMAGE. USE ONLY WITH ADEQUATE VENTILATION. KEEP OUT OF THE REACH OF CHILDREN. NOTICE:** This product contains solvents. Reports have associated repeated and prolonged occupational overexposure to solvents with permanent brain and nervous system damage. Intentional misuse by deliberately concentrating and inhaling the contents may be harmful or fatal. For emergency information call (800) 545-2643. For additional safety information, refer to the Material Safety Data Sheet for this product. If sanding is done, wear a dust mask to avoid breathing of sanding dust. Do not breathe vapors or spray mist. If you experience eye watering, headaches, or dizziness, leave the area. If properly used, a respirator may offer additional protection. Obtain professional advice before using. Close container after each use. FIRST AID: In case of skin contact, wash off quickly with plenty of soap and water, remove contaminated clothing. For eye contact flush immediately with large amounts of water, for at least 15 minutes. Obtain emergency medical treatment. If swallowed, obtain medical treatment immediately. If inhalation causes physical discomfort, remove to fresh air. If discomfort persists or any breathing difficulty occurs, get medical help. KEEP FROM FREEZING. Note: These warnings encompass the product series. Prior to use, read and follow product-specific MSDS and label information.

## Shipping

**FREIGHT CLASSIFICATION:**
Paint, Freezable

**FLASH POINT:**
None

**PACKAGING:**
1 gallon (3.785 L)
5 gallons (18.925L)

Addendum "C"
Contract No. QLV I - 022220 issued
to Franklin Bay General Contractors,
Inc. for Exterior Painting
*5 of 17*

**Paints**

ICI Paints, 925 Euclid Ave., Cleveland, Ohio 44115  1-800-984-5444  www.icipaintstores.com

Page two: 2200 - 6/01  No. 02843C

LIMITATION OF LIABILITY: To the best of our knowledge, the technical data contained herein are true and accurate at the date of issuance but are subject to change without prior notice. We guarantee our product to conform to the specifications contained herein. WE MAKE NO OTHER WARRANTY OR GUARANTEE OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING MERCHANTABILITY AND FITNESS FOR PARTICULAR PURPOSE. Liability, if any, is limited to replacement of the product or refund of the purchase price. LABOR OR COST OF LABOR AND OTHER CONSEQUENTIAL DAMAGES ARE HEREBY EXCLUDED.

P.06

 **Paints** (ICI)

**PREP & PRIME™**
**GRIPPER MULTI-PURPOSE**
**Interior/Exterior Water-Based**
**Primer Sealer**
3210-1200

## Product Description

Our premium quality water-based acrylic multi-purpose bonding primer, fast drying, primer sealer and stain killer for use on all wood, masonry or previously painted surfaces. Suitable for interior or exterior applications. Provides excellent adhesion to a variety of surfaces including drywall, wood, cured plaster, masonry or galvanized metal and aluminum. An excellent stain killer for water stains, lipstick, smoke, ink, crayons and knots or sap streaks. Resists nail head and tannin staining over woods such as redwood or cedar. Resists checking and cracking when used over bare exterior plywood, T-1-11, Douglas fir or yellow pine. **Highly alkali resistant. May be applied to new concrete or masonry surfaces with a pH up to 13.0 and prior to a 30 day cure.**

## Features

- Interior/exterior usage
- Blocks stains
- High hiding
- Excellent sealing
- Excellent adhesion and hide
- Low odor
- Quick drying and recoat
- Easy application
- Moisture and alkali resistant up to 13.0 pH
- Good stain resistance over cedar and redwood
- Multiple surface usage
- Low VOC
- Performance alternate for Federal Paint Specification TT-P-650D

## Composition

- Waterborne Acrylic Resin
- Titanium Dioxide and Extender Pigments
- Not manufactured with lead or mercury containing materials.

## Specifications

**Color:**
White (tintable, limit 2 oz/gal)

**Finish:**
Flat

**Clean-up Solvent:**
Soap and water

**Density:**
11.2 lbs/gal (1.34 kg/L)

**VOC:**
0.95 lbs/gal (114 g/L)

**Solids:**
Volume - 48% ± 1%
Weight - 61% ± 1%

**Practical Coverage:**
Apply at 300-450 sq ft/gal (7-11 m²/L). Actual coverage may vary depending on substrate and application method.

**Flash Point:**
None

**Dry Time 77°F (25°C) & 50% RH:**
To touch - 30 minutes
To recoat - 1 hour

**Shelf Life:**
1 year minimum - unopened

Addendum "C"
Contract No. QLV I - 022220 issued
to Franklin Bay General Contractors,
Inc. for Exterior Painting
6 of 17

## Performance Data

| Property | Test Method | Results |
| --- | --- | --- |
| Dry Opacity (Hiding) | ASTM D 2805 | Excellent, 0.96 |
| Directional Reflectance | ASTM E 97 | 92% |
| Adhesion | ASTM D 3359 | Excellent, 5A |
| Flexibility | ASTM D 522, 1/8" mandel | Excellent, no cracking or flaking |

9 FINISHES PAINTING (09900)

9 FINISHES PAINTING (09900)

Paints   

Paints (ICI)

... ........ ...... .. ......., ..., ..... .... .... .. .., grease, dirt, mildew, form release agents, curing compounds, loose and flaking paint and other foreign substances.

**NEW SURFACES: Concrete, Masonry and Plaster** - Cure at least three days before painting, poured in place concrete must cure for at least seven days. pH must be 13.0 or lower. Roughen slick poured or precast concrete and remove sealers by chemical cleaning or abrasive method such as sandsweeping. Rinse thoroughly with water and allow to dry. Must be internally dry. Remove loose aggregate. Prime concrete and plaster with this product. Fill masonry block with PREP & PRIME BLOCK FILLER 3010 water-based block filler or BLOXFIL 4000 acrylic block filler. **Drywall** - Remove sanding dust. Prime with this product. **Wood** - Interior, sand smooth and dust clean. Prime with this product. Exterior, counter sink nails. Caulk with latex-type caulk. Prime with this product. **Steel** - Prime with DEVFLEX. 4020PF water- based metal primer or DEVGUARD, 4160 or DEVGUARD 4100 solvent-based metal primer.

........ ....... ..... .... ......... . .... ...... galvanized metal and aluminum with this product.

**PREVIOUSLY PAINTED SURFACES:** Wash to remove contaminants. Rinse thoroughly with water and allow to dry. Sanding not required if the surface is properly and thoroughly cleaned (scuff sanding is required only on glossy, hard, slick or dense surfaces which are subject to high levels of moisture). Remove loose paint. Prime bare areas with primer specified under **NEW SURFACES**.

**WARNING!** If you scrape, sand or remove old paint from any surface, you may release lead dust. LEAD IS TOXIC. EXPOSURE TO LEAD DUST CAN CAUSE SERIOUS ILLNESS, SUCH AS BRAIN DAMAGE, ESPECIALLY IN CHILDREN, PREGNANT WOMEN SHOULD ALSO AVOID EXPOSURE. Wear a NIOSH-approved respirator to control lead exposure. Carefully clean up with a wet mop or HEPA vacuum. Before you start, find out how to protect yourself and your family by contacting the U.S. EPA/Lead Information Hotline at 1-800-424-LEAD (5323) or log on to www.epa.gov/lead.

## Directions For Use

**TINTING:** May be tinted with up to two oz/gal of ICI Paints Colorants.

**SPREADING RATE:** Apply at 300-450 sq ft/gal (7-11 m²/L). Actual coverage may vary depending on substrate and application method.

**APPLICATION:** Mix thoroughly before use. May be applied by brush, roller or spray. Brushing is the preferred method of application over chalky substrates. For airless spray application, use a .015" tip. Seals water stains, inks, crayon, ballpoint pen marks, lipstick, bleeding paints, knots, sap streaks, smoke stains. Some stains may require a second coat. Some highly water sensitive stains may require the application of PREP & PRIME STAIN JAMMER 1110 solvent-based primer sealer for best results. If painting will be interrupted for

more than 15 minutes, keep brushes and rollers wet by wrapping them with tinfoil or plastic wrap. This will prevent the paint from drying in the equipment and will make clean up much easier when the job is finished. For exterior applications, stop painting at least two hours before you expect heavy dew, rain, or temperatures below 45°F (7°C).

**DRYING TIME:** At 77°F (25°C) and 50% R.H., dries to touch in 30 minutes and to recoat in one hour. For maximum stain resistance, allow four hours before topcoating. Low temperature, high humidity, thick films or poor ventilation will increase these times.

**CLEAN-UP:** Clean spatter and equipment immediately with warm, soapy water.

## Precautions

WARNING! CAUSES EYE BURNS. CAUSES SKIN AND RESPIRATORY TRACT IRRITATION. HARMFUL IF SWALLOWED. CONTAINS ETHYLENE GLYCOL WHICH CAN CAUSE SEVERE KIDNEY DAMAGE WHEN INGESTED AND HAS BEEN SHOWN TO CAUSE BIRTH DEFECTS IN LABORATORY ANIMALS. CONTAINS CRYSTALLINE SILICA WHICH CAN CAUSE LUNG CANCER AND OTHER LUNG DAMAGE IF INHALED. OVEREXPOSURE MAY CAUSE LIVER, KIDNEY, BLOOD DAMAGE. USE ONLY WITH ADEQUATE VENTILATION. KEEP OUT OF THE REACH OF CHILDREN. NOTICE: Products in this series may contain solvents. Reports have associated repeated and prolonged occupational overexposure to solvents with permanent brain and nervous system damage. Intentional misuse by deliberately concentrating and inhaling the contents may be harmful or fatal. Products in this series may contain chemicals subject to California Proposition 65. For emergency information call (800) 545-2643. For additional safety information, refer to the Material Safety Data Sheet for this product. If sanding is done, wear a dust mask to avoid breathing of sanding dust. Do not breathe vapors or spray mist. If you experience eye watering, headaches, or dizziness, leave the area. If properly used, a respirator may offer additional protection. Obtain professional advice before using. Close container after each use. FIRST AID: In case of skin contact, wash off quickly with plenty of soap and water, remove contaminated clothing. For eye contact flush immediately with large amounts of water, for at least 15 minutes. Obtain emergency medical treatment. If swallowed, obtain medical treatment immediately. If inhalation causes physical discomfort, remove to fresh air. If discomfort persists or any breathing difficulty occurs, get medical help. KEEP FROM FREEZING. Note: These warnings encompass the product series. Prior to use, read and follow product specific MSDS and label information.                                                                                                             nn-nn

## Shipping

**FREIGHT CLASSIFICATION:** Paint, Freezable

**FLASH POINT:** None

**PACKAGING:** 1 quart (0.946 L) 1 gallon (3.785 L) 5 gallons (18,925 L)



Addendum "C"
Contract No. QLV I - 022220 issued to Franklin Bay General Contractors, Inc. for Exterior Painting
7 of 17

*Paints*

ICI Paints, 925 Euclid Ave., Cleveland, Ohio 44115  1-800-984-5444  www.icipaintstores.com

LIMITATION OF LIABILITY To the best of our knowledge, the technical data contained herein are true and accurate at the date of issuance but are subject to change without prior notice. We guarantee our product to conform to the specifications contained herein. WE MAKE NO OTHER WARRANTY OR GUARANTEE OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING MERCHANTABILITY AND FITNESS FOR PARTICULAR PURPOSE. Liability, if any, is limited to replacement of the product or refund of the purchase price. LABOR OR COST OF LABOR AND OTHER CONSEQUENTIAL DAMAGES ARE HEREBY EXCLUDED.

JUN-04-2007 11:59 PM                                                    P.97

**ICI Paints**

# DULUX PROFESSIONAL
## Exterior 100% Acrylic
## Satin Finish
### 2402-XXXX

## Product Description

Our premium quality professional exterior 100% acrylic satin finish specially formulated to provide exceptional weathering resistance, low temperature application and quick curing, resulting in good resistance to early moisture exposure. Dulux Professional uses the latest advances in 100% acrylic latex waterborne technology which allows professionals to extend the painting season with confidence. Ideal for use on properly prepared wood siding, trim and sash, shakes, shingles, masonry, weathered aluminum siding, weathered vinyl siding, metal and sound painted surfaces.



9 | FINISHES
PAINTING (09900)

## Features

• Durable and tough
• Fade and chalk resistant
• Gives a mildew resistant coating
• Moisture resistant
• Excellent adhesion
• Resists blistering, peeling and flaking
• Easy application
• Low temperature application - to 35°F
• Low odor
• Quick drying and recoat
• Performance alternate for Federal Paint Specification TT-P-19D

## Composition

• 100% Acrylic Resin
• Titanium Dioxide and Extender Pigments
• Not manufactured with lead or mercury containing materials.

## Specifications

**Color:**
White, ready-mix & custom colors

**Finish:**
Satin, 8-18 units @ 85°

**Clean-up Solvent:**
Soap and water

**Density:**
10.8 lbs/gal (1.29 kg/L)

**VOC:**
1.25 lbs/gal (150 g/L) Maximum

**Solids:**
Volume - 34% ± 1%
Weight - 49% ± 1%

**Practical Coverage:**
Apply at 300-400 sq ft/gal (7-10 m²/L). Actual coverage may vary depending on substrate and application method.

**Flash Point:**
None

| Dry Time: | 77°F (25°C)/50%RH | 35°F (2°C) |
|---|---|---|
| To touch | 30-60 minutes | 3-6 hours |
| To recoat | 2-3 hours | 24 hours |

**Shelf Life:**
1 year minimum - unopened

**ICI Paints**

9 | FINISHES
PAINTING (09900)



Addendum "C"
Contract No. QLV I - 022220 issued
to Franklin Bay General Contractors,
Inc. for Exterior Painting
8 of 17

JUN-04-2007 11:59 PM                                                      P.09

## General Surface Preparation

All surfaces must be sound, dry, clean and free of oil, grease, dirt, mildew, form release agents, curing compounds, loose and flaking paint and other foreign substances.

**NEW SURFACES: Wood** - Spot prime pine knots with acrylic primer 2000. Prime entire surface with acrylic primer 2000. Caulk with Decra-Seal. **Preprimed and Unprimed Hardboard** - Prime entire surface and all edges with acrylic primer 2000 or alkyd primer 2110. Caulk with Decra-Seal. **Steel** - Prime with waterborne metal primer 4020 or solventborne metal primer 4160 or 4100. **Galvanized Metal and Aluminum** - Prime with acrylic primer 2000. **Concrete and Masonry** - Cure at least 30 days before painting. pH must be 10.0 or lower. Roughen unusually slick poured or precast concrete by acid etching or sandsweeping. Follow acid manufacturer's application and safety instructions. Rinse thoroughly with water and allow to dry. Remove loose aggregate. Prime with this product or acrylic primer 2000. Fill masonry block with latex block filler 3010 or 4000.

**PREVIOUSLY PAINTED SURFACES:** Wash to remove contaminants. Rinse thoroughly with water and allow to

dry. Dull glossy areas by light sanding. Remove sanding dust. Remove loose paint. Scrub heavy chalk areas and overhead areas such as eaves with soap and water. Remove all mildew by washing with a solution of 16 oz (473 mL) liquid household bleach and two oz (59 mL) non-ammoniated liquid detergent per gallon (3.785 L) of water. Rinse surfaces clean with water and allow to dry for 24 hours. Prime bare areas with primer specified under **NEW SURFACES. Weathered Aluminum and Vinyl Siding** - Remove dirt and chalk. Prime with this product. If chalk remains after cleaning, prime with acrylic primer 2000. Do not repaint vinyl siding with colors darker than the original color; the siding may warp.

**NOTE:** Blistering and peeling of exterior house paints down to bare wood is usually caused by moisture behind the paint film. Moisture pressure forces the paint away from the surface. Sources of excess moisture in the wood must be eliminated prior to repainting to obtain normal service life of these paints. Old, unsound multiple coat paint systems may be subject to peeling when repainted due to the added weight and stress created by the paint layers. In such cases, all old paint layers must be removed back to the bare wood before repainting.

## Directions For Use

**TINTING:** Tint the appropriate base with ICI Colorants.

**SPREADING RATE:** Apply at 300-400 sq ft/gal (7-10 m²/L). Actual coverage may vary depending on substrate and application method. For best hiding, tint primers towards finish coat color. Certain shades of yellow, orange, pink and red may require multiple coats.

**APPLICATION:** Mix thoroughly before use. May be applied by brush, roller or spray. No thinning required. For spray application, use a .015-.017" tip. Adjust pressure as needed. Establish that air, surface and material temperatures are above 35°F (2°C) and at least 5°F above

the dew point prior to painting. Do not apply if rain, snow or lower temperatures are expected within two to three hours. On large expanses of metal, temperatures must be 50°F (10°C) or higher. Check temperature requirements on any accompanying label.

**DRYING TIME:** At 77°F (25°C) and 50% R.H., dries to touch in 30-60 minutes and to recoat in two to three hours. At 35°F (2°C), dries to touch in three to six hours and to recoat in 24 hours. High humidity, thick films or poor ventilation will increase these times.

**CLEAN-UP:** Clean immediately with warm, soapy water.

## Precautions

WARNING! CAUSES EYE BURNS. CAUSES SKIN AND RESPIRATORY TRACT IRRITATION. HARMFUL IF INHALED. MAY CAUSE CENTRAL NERVOUS SYSTEM EFFECTS INCLUDING DIZZINESS, HEADACHE OR NAUSEA. OVEREXPOSURE MAY CAUSE BLOOD, LIVER, KIDNEY DAMAGE. HARMFUL IF SWALLOWED. CONTAINS ETHYLENE GLYCOL WHICH CAN CAUSE SEVERE KIDNEY DAMAGE WHEN INGESTED AND HAS BEEN SHOWN TO CAUSE BIRTH DEFECTS IN LABORATORY ANIMALS. USE ONLY WITH ADEQUATE VENTILATION. KEEP OUT OF THE REACH OF CHILDREN. NOTICE: This product contains solvents. Reports have associated repeated and prolonged occupational overexposure to solvents with permanent brain and nervous system damage. Intentional misuse by deliberately concentrating and inhaling the contents may be harmful or fatal. For emergency information call (800) 645-2643. For additional safety information, refer to the Material Safety Data Sheet for this product. If sanding is done, wear a dust mask to avoid breathing of sanding dust. Do not breathe vapors or spray mist. If you experience eye watering, headaches, or dizziness, leave the area. If properly used, a respirator may offer additional protection. Obtain professional advice before using. Close container after each use. FIRST AID: In case of skin contact, wash off quickly with plenty of soap and water, remove contaminated clothing. For eye contact flush immediately with large amounts of water, for at least 15 minutes. Obtain emergency medical treatment. If swallowed, obtain medical treatment immediately. If inhalation causes physical discomfort, remove to fresh air. If discomfort persists or any breathing difficulty occurs, get medical help. KEEP FROM FREEZING. Note: These warnings encompass the product series. Prior to use, read and follow product-specific MSDS and label information.

## Shipping

**FREIGHT CLASSIFICATION:**
Paint, Freezable

**FLASH POINT:**
None

**PACKAGING:**
1 gallon (3.785 L)
5 gallons (18.925L)

Addendum "C"
Contract No. QLV I - 022220 issued
to Franklin Bay General Contractors,
Inc. for Exterior Painting
9 of 17

 **Paints**

ICI Paints, 925 Euclid Ave., Cleveland, Ohio 44115  1-800-984-5444  www.icipaintstores.com

Page two: 2402 - 3/03   No. 029440

LIMITATION OF LIABILITY To the best of our knowledge, the technical data contained herein are true and accurate at the date of issuance but are subject to change without prior notice. We guarantee our product to conform to the specifications contained herein. WE MAKE NO OTHER WARRANTY OR GUARANTEE OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING MERCHANTABILITY AND FITNESS FOR PARTICULAR PURPOSE. Liability, if any, is limited to replacement of the product or refund of the purchase price. LABOR OR COST OF LABOR AND OTHER CONSEQUENTIAL DAMAGES ARE HEREBY EXCLUDED.

JUN-05-2007 12:00 AM                                                    P.89



 **DEVFLEX™ 4020PF**
Direct to Metal Primer & Flat Finish

**Cat. # 4020-1000 White/4020-7100 Red**



9 | FINISHES / HIGH PERFORMANCE COATINGS (09960)

## PRODUCT DESCRIPTION

**Generic:** Waterborne Acrylic

**General Description:** An advanced technology, premium quality, flat waterborne acrylic coating for use as a protective maintenance rust inhibitive direct-to-metal (DTM) primer and finish. Bonds to clean glossy, hard surfaces such as aged oil base or alkyd enamels without sanding.

**Typical Uses:** Ideal for the exterior of tanks, metal buildings, structural steel, piping, handrails and masonry construction. Can be applied directly to interior or exterior steel, weathered or properly cleaned galvanized steel and masonry in institutional, residential, and light industrial areas.

## SPECIFICATION DATA

**Color:** White (4020-1000), & Red (4020-7100)
**Finish:** Flat
**Clean-up Solvent:** Soap and water
**Weight/Gallon (White):** 11.8 lbs./gal. (1.41 kg/L) - varies with color
**VOC (White):** 0.76 lbs./gal. (91 g/L.) - varies with color
**Solids By Volume (White):** 44% ± 2% - varies with color
**Theoretical Coverage at 1.0 Mil Dry:** 705 sq.ft./gal.(17 m²/L)
**Practical Coverage:** Apply at 275-350 sq. ft./gal. (7-9 m²/L). Actual coverage may vary depending on substrate and application method.
**Recommended Film Thickness:** 2.2-3.5 mils (55-88 microns) dry - 5.0-8.0 mils (125-200 microns) wet
**Systems:** Please consult the appropriate system guide, the particular job specification or your ICI Paints' Representative for proper systems using this product. Systems must be selected considering the particular environment involved.

**Dry Time @ 77°F (25°C) & 50% RH:**
To touch - 30 minutes
To recoat - 2 hours

| Substrate Temperature | 77°F (25°C) |
|---|---|
| Minimum Recoat | 2 Hours |
| Dry Hard | 2 Hours |
| Maximum Recoat | |
| Self | No Limit |
| Devflex | No Limit |

**Warning:** The above table provides general guidelines only. Always consult your ICI Paints' Representative for appropriate recoat windows since the maximum aged recoat (free of this product) may be significantly shortened or lengthened by a variety of conditions, including, but not limited to humidity, surface temperature, and the use of additives or thinners. The use of accelerators or force curing may shorten the aged recoat of individual coatings. The above recoat windows may not apply if recoating with a product other than those listed above. If the maximum aged recoat window is exceeded, please consult your ICI Paints' Representative for appropriate recommendations to enhance adhesion. Failure to observe these precautions may result in intercoat delamination.

**Shelf Life:** 1 year minimum - unopened

## FEATURES

**Advantages:**
- Direct-to-metal or masonry primer
- Multiple surface usage - interior and exterior steel, masonry or interior wood
- Ideal for shop applications
- Low VOC
- Low odor and water clean-up
- Fast dry and recoat
- Resists flash rust
- Corrosion resistant
- Easy application by brush, roll or spray
- Performance alternate for Federal Specifications MIL-P-28577B and TT-P-1975

**Limitations of Use:** Not recommended for exterior wood. May only be topcoated with DEVFLEX waterborne and conventional latex finishes.

9 | FINISHES / HIGH PERFORMANCE COATINGS (09960)

## PERFORMANCE DATA

| PROPERTY | TEST METHOD | RESULTS |
|---|---|---|
| Pencil Hardness | ASTM D 3363 | 2B |
| Flexibility | ASTM D 522, Method B, 1/8" | No cracking or flaking |
| Impact Resistance | ASTM D 2794 | 160 in-lbs |
| Humidity/Corrosion Resistance | ASTM D 4585, 1000 hours | No effect |
| Flash Rust Resistance | Sandblasted Steel @ 90F & 90% RH | No rusting |
| Service Temperature Limit: | | 200°F (93°C) in air |
| Flame Spread Rating: | ASTM E 84 | Class A (0-25) over non-combustible surfaces |

09950

and Material Safety Data Sheet Prior to Use. See other cautions on last page.

DSF1-0090

P. 18

Back Page: 4020-XXXX

## GENERAL SURFACE PREPARATION

All surfaces must be sound, dry, clean and free of oil, grease, dirt, mildew, form release agents, curing compounds, efflorescence, loose and flaking paint and other foreign substances.

**New Surfaces: Steel** – Best results are obtained over a surface sandblasted to a Commercial Blast (SSPC-SP6). Performance over hand or powertool cleaned surfaces is dependent on the degree of cleaning. Prime with this product. If rust staining occurs, apply a second coat of this product. **Galvanized Metal and Aluminum** – Prime with this product. **Concrete, Plaster and Masonry** – Must cure at least 30 days before painting. pH must be 10.0 or lower. Roughen slick poured or precast concrete and remove sealers by chemical cleaning or abrasive method such as sandsweeping. Rinse thoroughly with water and allow to dry. Remove loose aggregate. Prime with this product. Fill block with latex block filler BLOXFIL® 4000 or PREP & PRIME® 3010 filler. **Interior Wood** – Prime with this product.

**Previously Painted Surfaces:** Wash to remove contaminants. Rinse thoroughly with water and allow to dry. Sanding is not required if the surface is properly and thoroughly cleaned (scuff sanding is required only on glossy, hard, slick or dense surfaces which are subject to high levels of moisture). Remove loose paint. Scrub heavy chalk exterior areas and overhead areas such as eaves with soap and water. All existing mildew must be removed by washing with a solution of 16 oz. (473 mL) liquid household bleach and two oz.(59 mL) nonammoniated liquid detergent per gallon (3.785 L) of water. Rinse surfaces clean with water and allow to dry for 24 hours. Prime bare areas with primer specified under New Surfaces. May be used selfprimed over previously painted interior surfaces.

**WARNING!** If you scrape, sand, or remove old paint, you may release lead dust. LEAD IS TOXIC. EXPOSURE TO LEAD DUST CAN CAUSE SERIOUS ILLNESS, SUCH AS BRAIN DAMAGE, ESPECIALLY IN CHILDREN. PREGNANT WOMEN SHOULD ALSO AVOID EXPOSURE. Wear a NIOSH-approved respirator to control lead exposure. Clean up carefully with a HEPA vacuum and a wet mop. Before you start, find out how to protect yourself and your family by contacting the National Lead Information Hotline at 1-800-424-LEAD or log on to www.epa.gov/lead.

## DIRECTIONS FOR USE

**Tinting:** White may be tinted with up to four oz./gal. of ICI Paints' Colorants. Prime coats used direct-to-steel should not be tinted for best flash rust resistance.

**Spreading Rate:** Apply at 200-320 sq. ft./gal. (5-8 m²/L) or 6.0-8.0 mils wet (2.2-3.5 mils dry). Actual coverage may vary depending on substrate and application method. For best hiding, tint primer toward finish coat color.

**Application:** Mix thoroughly before use. May be applied by brush, roll or spray. No thinning required. Spray is preferred for application to bare steel to ensure adequate film build and protection. For airless spray, use a .015" tip. Adjust pressure as needed. Do not apply when air or surface temperature is below 50°F (10°C).

**Drying Time:** At 77°F (25°C) and 50% R.H., dries to touch in 30 minutes and to recoat in two hours. Low temperature, high humidity, thick films or poor ventilation will increase these times.

**Clean-up:** Clean immediately with warm, soapy water.

## PRECAUTIONS

WARNING! HARMFUL OR FATAL IF SWALLOWED. ASPIRATION HAZARD-CAN ENTER LUNGS AND CAUSE DAMAGE. HARMFUL IF INHALED. MAY CAUSE CENTRAL NERVOUS SYSTEM EFFECTS, INCLUDING DIZZINESS, HEADACHE OR NAUSEA. CAUSES EYE, SKIN AND RESPIRATORY TRACT IRRITATION. CAUSES EYE BURNS. CONTAINS CRYSTALLINE SILICA WHICH CAN CAUSE LUNG CANCER AND OTHER LUNG DAMAGE IF INHALED. OVEREXPOSURE MAY CAUSE BLOOD, LIVER, KIDNEY DAMAGE. USE ONLY WITH ADEQUATE VENTILATION. KEEP OUT OF THE REACH OF CHILDREN. NOTICE: Products in this series contain solvents. Reports have associated repeated and prolonged occupational overexposure to solvents with permanent brain and nervous system damage. Intentional misuse by deliberately concentrating and inhaling the contents may be harmful or fatal. For emergency information call (800) 545-2643. Note: These warnings encompass the product series. Prior to use, read and follow product-specific MSDS and label information. If sanding is done, wear a dust mask to avoid breathing of sanding dust. Do not breathe vapors or spray mist. Ensure fresh air entry during application and drying. Avoid contact with eyes and skin. If you experience eye watering, headaches, or dizziness, leave the area. If properly used, a respirator may offer additional protection. Obtain professional advice before using. Close container after each use. FIRST AID: In case of skin contact, wash thoroughly with soap and water. If any product remains, gently rub petroleum jelly, vegetable or mineral/baby oil onto skin, then wash again with soap and water. Repeated applications may be needed. Remove contaminated clothing. For eye contact, flush immediately with large amounts of water, for at least 15 minutes. Obtain emergency medical treatment. If swallowed, obtain medical treatment immediately. If inhalation causes physical discomfort, remove to fresh air. If discomfort persists or any breathing difficulty occurs, get medical help. KEEP FROM FREEZING.

## SHIPPING

**Flash Point:** Paint
**Packaging:** 1 gallon (3.785L)
5 gallon (18.925L)

**Shipping Weight:** 4 gallon case - 50 lbs. (22.7 kg)
5 gallon pail - 62 lbs. (28.1 kg)

4020-XXXX (5/06)
Ad Block #696020



ICI Paints
Strongsville,
Ohio, U.S.A.
800-654-2616

...atings.com

LIMITATION OF LIABILITY: To the best of our knowledge, the technical data contained herein are true and accurate at the date of issuance but are subject to change without prior notice. We guarantee our product to conform to the specifications contained herein. WE MAKE NO OTHER WARRANTY OR GUARANTEE OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING MERCHANTABILITY AND FITNESS FOR PARTICULAR PURPOSE. Liability, if any, is limited to replacement of the product or refund of the purchase price. LABOR OR COST OF LABOR AND OTHER CONSEQUENTIAL DAMAGES ARE HEREBY EXCLUDED.

Addendum "C"
Contract No. QLV I - 022220 issued
to Franklin Bay General Contractors,
Inc. for Exterior Painting

JUN 05 2001 12:02 AM                                                                P.11



# DEVFLEX™ 4216HP
## High Performance Waterborne Acrylic Semi-Gloss Enamel

### Cat. # 4216-XXXX



## PRODUCT DESCRIPTION

**Generic:** Waterborne Acrylic

**General Description:** A premium quality, direct to metal acrylic semi-gloss enamel for high traffic interior-exterior areas of commercial, institutional, residential and industrial structures. Features a non-yellowing film, excellent durability with a low VOC.

**Typical Uses:** May be applied directly to interior or exterior steel and aluminum, and to properly prepared galvanized metal, wood or masonry surfaces.

## SPECIFICATION DATA

**Color:** White, safety colors & custom colors

**Finish:** Semi-Gloss, 60-65 units @ 60°

**Clean-up Solvent:** Soap and water

**Weight/Gallon:** 10.4 lbs./gal. (1.25 kg/L) - varies with color

**VOC:** 1.87 lbs./gal. (225 g/L) - varies with color

**Solids By Volume:** 36% ± 2% - varies with color

**Theoretical Coverage at 1.0 Mil Dry:** 577 sq. ft./gal. (15 m²/L)

**Practical Coverage:** Apply at 138-368 sq. ft./gal. (3-9 m²/L). Actual coverage may vary depending on substrate and application method.

**Recommended Film Thickness:** 1.5-4.0 mils (38-100 microns) dry - 4.0-11.6 mils (100-290 microns) wet

**Systems:** Please consult the appropriate system guide, the particular job specification or your ICI Paints' Representative for proper systems using this product. Systems must be selected considering the particular environment involved.

**Dry Time @ 77°F (25°C) & 50% RH:**
To touch - 1 hour
To recoat - 4 hours

| Substrate Temperature | 50°F (10°C) | 60°F (16°C) | 77°F (25°C) |
|---|---|---|---|
| Minimum Recoat | 36 Hours | 30 Hours | 24 Hours |
| Dry Hard | 36 Hours | 30 Hours | 24 Hours |
| Maximum Recoat | | | |
| Self | No Limit | No Limit | No Limit |

**Warning:** The above table provides general guidelines only. Always consult your ICI Paints' Representative for appropriate recoat windows since the maximum aged recoat time of this product may be significantly shortened or lengthened by a variety of conditions, including, but not limited to humidity, surface temperature, and the use of additives or thinners. The use of accelerators or force curing may shorten the aged recoat of individual coatings. The above recoat windows may not apply if recoating with a product other than those listed above. If the maximum aged recoat window is exceeded, please consult your ICI Paints' Representative for appropriate recommendations to enhance adhesion. Failure to observe these precautions may result in intercoat delamination.

**Shelf Life:** 1 year minimum - unopened

## FEATURES

**Advantages:**
- Alkyd-like hardness and durability
- Excellent gloss and color retention
- High hiding
- Non-yellowing
- All purpose finish for multiple surfaces
- Excellent resistance to grease, oil and water
- Excellent fuse and leveling
- Resists peeling and chipping
- Washable and scrubbable
- Good abrasion resistance
- Easy application - brush, roll or spray
- Low odor and water clean-up
- Low VOC
- May be applied direct to steel and aluminum

**Limitations of Use:** Not recommended for large expanses of exterior wood such as wood siding.

## PERFORMANCE DATA

| PROPERTY | TEST METHOD | RESULTS |
|---|---|---|
| Abrasion Resistance | ASTM D 4060, Tabor, CS-17 wheels, 1000g load, 300 cycles | 40mg loss |
| Pencil Hardness | ASTM D 3363 | 2B |
| Flexibility | ASTM D 522, 1/8" mandral | No cracking or flaking |
| Impact Resistance | ASTM D 2794 | 160 in-lbs |
| Accelerated Weathering | ASTM G 23, QUV 1000 hrs | Excellent gloss retention |
| Service Temperature Limit | | 200°F (93°C) in air |
| Flame Spread Rating | ASTM E 84 | Class A (0-25) over non-combustible surfaces |

09960

Read Label and Material Safety Data Sheet Prior to Use. See other cautions on last page.
DSF1-0600

**Addendum "C"**
Contract No. QLV I - 022220 issued
to Franklin Bay General Contractors,
Inc. for Exterior Painting
12 of 17

Back Page: 4218-XXXX

## GENERAL SURFACE PREPARATION

All surfaces must be sound, dry, clean and free of oil, grease, wax, polish, dirt, mildew, form release agents, curing compounds, efflorescence, loose and flaking paint and other foreign substances.

**New Surfaces:** Steel and Aluminum - Best results are obtained over a surface abrasive blasted to a commercial blast cleanliness (SSPC-SP6) or ISO-Sa2. Performance over hand or power tool cleaned surfaces is dependent on the degree of cleaning. Prime with this product or DEVFLEX™ 4020 primer. For maximum corrosion protection, prime with DEVGUARD™ 4160 or DEVGUARD 4360 primers depending on local VOC regulations. When using colors tinted with more than 2 oz./gal. of ICI Paints Colorants, a primer is recommended. When using as a DTM finish without a primer, a minimum of two coats is recommended for best corrosion resistance. Galvanized Metal - Prime with DEVRAN® 205 or DEVRAN 203 epoxy primers, DEVFLEX 4020 acrylic primer or DEVGUARD 4160 or DEV-GUARD 4360 primers depending on local VOC regulations. Wood - Interior, set nails and fill holes with latex spackle. Sand smooth. Dust clean. Self-prime or prime with PREP & PRIME® GRIPPER® 3210 primer sealer. Do not use this product with lacquer undercoats. Exterior, spot prime pine knots with PREP & PRIME® HYDROSEALER® 6001 primer. Prime entire surface with PREP & PRIME HYDROSEALER 6001 primer. Drywall - Prime with PREP & PRIME GRIPPER 3210 primer sealer. Concrete, Plaster and Masonry - Cure at least 30 days before painting. pH must be 10.0 or lower. Roughen slick poured or precast concrete and remove sealers by chemical

cleaning or abrasive blasting. Rinse thoroughly with water and allow to dry. Remove loose aggregate. Prime interior concrete or plaster with this product or with PREP & PRIME GRIPPER 3210 primer sealer. Prime exterior masonry with PREP & PRIME HYDROSEALER 6001 primer. Fill concrete block with BLOXFIL® 4000 or PREP & PRIME 3010 fillers.

**Previously Painted Surfaces:** Remove oil or grease residue by washing. Rinse thoroughly with water and allow to dry. Dull glossy areas by light sanding. Remove sanding dust. Remove loose paint. Scrub heavy chalk areas and overhead areas such as eaves with soap and water. Remove all mildew by washing with a solution of 16 oz. (473 mL) liquid household bleach and two oz. (59 mL) non-ammoniated liquid detergent per gallon (3.785 L) of water. Rinse surfaces clean. Prime bare areas with primer specified under New Surfaces. Can be used self-primed over previously painted surfaces followed by a finish coat of this product.

**WARNING!** If you scrape, sand, or remove old paint, you may release lead dust. LEAD IS TOXIC. EXPOSURE TO LEAD DUST CAN CAUSE SERIOUS ILLNESS, SUCH AS BRAIN DAMAGE, ESPECIALLY IN CHILDREN. PREGNANT WOMEN SHOULD ALSO AVOID EXPOSURE. Wear a NIOSH-approved respirator to control lead exposure. Clean up carefully with a HEPA vacuum and a wet mop. Before you start, find out how to protect yourself and your family by contacting the National Lead Information Hotline at 1-800-424-LEAD or log on to www.epa.gov/lead.

## DIRECTIONS FOR USE

**Tinting:** Tint the appropriate base with ICI Paints Colorants.

**Spreading Rate:** Apply at 138-368 sq. ft./gal. (3-9 m²/L) or 4.4-11.6 mils wet (1.5-4.0 mils dry). Actual coverage may vary depending on substrate and application method. For best hiding, tint primers toward finish coat color. Certain colors such as yellow, orange and pink may require multiple coats.

**Application:** Mix thoroughly before use. May be applied by brush, roll or spray. No thinning required. Due to fast dry, brushing should be limited to small areas where a wet edge can be maintained. Rinse out brush in warm water periodically during extended brush application periods. If touch-up is

required after the enamel has set, wait until it has thoroughly dried. For airless spray, use a .015" tip. Adjust pressure as needed. Use two coats of this enamel for maximum durability and uniformity. Do not apply when surface or air temperature is below 50°F (10°C). Brushing and rolling may require multiple coats to achieve correct film thickness and/or hiding.

**Drying Time:** At 77°F (25°C) and 50% R.H., dries to touch in one hour and to recoat in 4 hours. Low temperature, high humidity, thick films or poor ventilation will increase these times.

**Clean-up:** Clean immediately with warm, soapy water.

## PRECAUTIONS

WARNING! CAUSES EYE BURNS. HARMFUL IF INHALED. MAY CAUSE CENTRAL NERVOUS SYSTEM EFFECTS INCLUDING DIZZINESS, HEADACHE OR NAUSEA. CAUSES SKIN AND RESPIRATORY TRACT IRRITATION. MAY BE HARMFUL IF SWALLOWED. OVEREXPOSURE MAY CAUSE BLOOD, LIVER, KIDNEY, REPRODUCTIVE SYSTEM DAMAGE. WHEN TINTED, CONTAINS ETHYLENE GLYCOL WHICH CAN CAUSE SEVERE KIDNEY DAMAGE WHEN INGESTED AND HAS BEEN SHOWN TO CAUSE BIRTH DEFECTS IN LABORATORY ANIMALS. USE ONLY WITH ADEQUATE VENTILATION. KEEP OUT OF THE REACH OF CHILDREN. NOTICE: Products in this series contain solvents. Reports have associated repeated and prolonged occupational overexposure to solvents with permanent brain and nervous system damage. Intentional misuse by deliberately concentrating and inhaling the contents may be harmful or fatal. For emergency information call (800) 545-2643. Note: These warnings encompass the product series. Prior to use, read and follow product-specific MSDS and label information. If sanding is done, wear a dust mask to avoid breathing of sanding dust. Do not breathe vapors or spray mist. Ensure fresh air entry during application and drying. Avoid contact with eyes and skin. If you experience eye watering, headaches, or dizziness, leave the area. If properly used, a respirator may offer additional protection. Obtain professional advice before using. Close container after each use. FIRST AID: In case of skin contact, wash thoroughly with soap and water. If any product remains, gently rub petroleum jelly, vegetable or mineral/baby oil onto skin, then wash again with soap and water. Repeated applications may be needed. Remove contaminated clothing. For eye contact, flush immediately with large amounts of water, for at least 15 minutes. Obtain emergency medical treatment. If swallowed, obtain medical treatment immediately. If inhalation causes physical discomfort, remove to fresh air. If discomfort persists or any breathing difficulty occurs, get medical help. KEEP FROM FREEZING.

## SHIPPING

Flash Point:  None
Packaging:   1 gallon (3.785L)
             5 gallons (18.925L)

Shipping Weight:  4 gallon case - 44 lbs. (20.0 kg)
                  6 gallon pail - 64 lbs. (24.5 kg)

4218-XXXX (05/05)
Ad Stock #66777D



ICI Paints
Strongsville,
Ohio, U.S.A.
800-654-2616
voccoatings.com

LIMITATION OF LIABILITY: To the best of our knowledge, the technical data contained herein are true and accurate at the date of issuance but are subject to change without prior notice. We guarantee our product to conform to the specifications contained herein. WE MAKE NO OTHER WARRANTY OR GUARANTEE OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING MERCHANTABILITY AND FITNESS FOR PARTICULAR PURPOSE. Liability in any, is limited to replacement of the product or refund of the purchase price. LABOR OR COST OF LABOR AND OTHER CONSEQUENTIAL DAMAGES ARE HEREBY EXCLUDED.

Addendum "C"
Contract No. QLV I - 022220 issued
to Franklin Bay General Contractors,
Inc. for Exterior Painting

 *Paints*

## 7 YEAR LIMITED MATERIALS AND LABOR WARRANTY

ICI Paints warrants to (Olen Properties) that the following paint product(s): Dulux Professional Flat applied at:

Project Location Name:    ***Quantum Lake Apartments***
                         ***Boynton Beach, Florida***

                         ***Manatee Bay Apartments***
                         ***Boynton Beach, Florida***

Application Date(s):      **June 6, 2007**
Contractor Name:          ***Franklin Bay***

Addendum "C"
Contract No. QLV I - 022220 issued
to Franklin Bay General Contractors,
Inc. for Exterior Painting
*14 of 17*

are free of manufacturing defects. ICI Paints also warrants that the products will not peel, crack or blister as a result of defect in the products. This Limited Warranty is given provided that a) the products have been applied and maintained according to ICI Paints label directions and/or specifications and b) pre-application, progress and final inspections have been conducted and certified by authorized ICI Paints personnel.

ICI Paints does not warrant and this warranty does not apply to any failures except those stated above or to any failures which result from a) improper surface preparation, b) improper application, c) failure of an existing, previous coating, d) structural defects, e) mechanical damage, f) vandalism, g) acts of God or war, h) misuse, i) abnormal environmental conditions, j) delamination. Also, some fading and chalking of the products, which is expected to normally occur over time, is not considered a paint failure or a breach of this warranty. It is further acknowledged that ICI Paints personnel will not be able to inspect 100% of the surface areas to be coated or to observe all of the surface preparation and application of the products. ICI Paints will certify inspections based upon its observations and representations made by the contractor/applicator and its personnel. Failures which occur in areas a) not inspected by ICI Paints, b) which have been certified based on the contractor's/applicator's misrepresentation of surface preparation or application of the products or c) which have been certified based on misrepresentations by the owner/owner's representative regarding the condition of the substrate and previous coatings are not covered by this Limited Warranty.

In the event the products do not perform as stated in this Limited Warranty, the owner of the coated surfaces must promptly notify ICI Paints of the failure and give ICI Paints an opportunity to inspect the failed areas. Failure of the owner to promptly notify or give ICI Paints an opportunity to inspect will release ICI Paints from its obligations to repair the failed areas or replace defective product. The original warranty period will not be extended in the event ICI Paints provides product to replace defective product or repair failed areas.

In the event the products do not perform as stated in this Limited Warranty, the owner's and/or Contractor's exclusive remedy and ICI Paints exclusive liability will be to provide replacement products in an amount which will repair the failed surface area.

**Dulux**            

Confidential                         Page 1 of 2                              6/5/2007

JUN-06-2007 12:48 AM                                                                P.03

 **Paints**

In no event will ICI Paints be liable for any special, incidental or consequential damages whether based in tort, contract or under common law.

THIS WARRANTY IS GIVEN AS THE EXCLUSIVE WARRANTY AND REMEDY. NO OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE OR OF MERCHANTABILITY ARE GIVEN.

This warranty gives you specific legal rights. You may have other rights which vary from state to state.

RE:   *Olen Properties*
     Danny Owens

Addendum "C"
Contract No. QLV I - 022220 issued
to Franklin Bay General Contractors,
Inc. for Exterior Painting
*15 of 17*

This warranty is valid only if signed by ICI Paints.

Owner/Contractor states that he/she has read and fully understands the terms and conditions of this warranty.

ICI Paints Store (Delray Beach, Florida)

_____          _____
Owner                            ICI Paints Sales Representative

_____          _____
Date                             Date

_____          _____
Manager, National Account        ICI District Sales Manager

_____          _____
Date                             Date

*Dulux*    SINCLAIR    GLIDDEN    Glidden    

Confidential                Page 2 of 2                6/5/2007

Addendum "C"
Contract No. QLV I - 022220 issued
to Franklin Bay General Contractors,
Inc. for Exterior Painting
*16 of 17*

 **Paints**

## OLEN PROPERTIES DEVELOPMENT

### WEEKLY NEW CONSTRUCTION OR RENOVATION JOB VISIT WORKSHEET

DATE_____

PROJECT NAME _____

REP NAME_____

CONTRACTOR_____

WEEKLY OR FINAL INSPECTION_____

BUILDING #'S WALKED FOR SURFACE PREP THIS VISIT

_____

BUILDING'S WALKED FOR COATING APPLICATION THIS VISIT

_____

1. WAS SURFACE PREPARATION DONE IN ACCORDANCE WITH THE SPECIFICATIONS? (Y OR N) _____

2. IS ALL WORK BEING PERFORMED ACCORDING TO THE SPECIFICATIONS?
(Y OR N)_____

3. WERE CORRECT METHODS OF APPLICATION USED ON ALL SUBSTRATES?
(Y OR N)_____

4. ARE ALL PRODUCTS PROVIDING THE APPEARANCE & UNIFORMITY REQUIRED?
(Y OR N)_____

5. ARE ALL PRODUCTS PROVIDING ANTICIPATED HIDE & COVERAGE?
(Y OR N)_____

6. ARE ALL PRODUCTS ADHERING PROPERLY TO THE SURFACES?
(Y OR N)_____

**Olen Properties Continued:**

7. IF STUCCO (PRESENT) WAS PH CHECKED ON THIS VISIT?

BLD #'S & READINGS_____

8. PLEASE SUPPLY WET FILM TEST READING ON ALL
SUBSTRATES/PRODUCTS COMPLETED THIS VISIT.

_____

9. IS CONTRACTOR PERFORMING WORK ON A TIMELY BASIS?
(Y OR N) _____

10. DID/DO ANY AREAS HAVE TO BE REDONE TO MEET THE
SPECIFICATIONS?
(Y OR N)_____

Any questions that were answered NO need to be explained below with the
exception of #10 and if #10 was answered yes then please explain reasons
below! Also add any other concerns as needed.

UPON COMPLETION LEAVE A COPY OF THIS REPORT WITH THE JOB
SUPERINTENDANT AND EMAIL OR FAX A COPY OF THIS REPORT TO THE
PROPROPETY SERVICES MANAGER JOHN THOMPSON.

Addendum "C"
Contract No. QLV I - 022220 issued
to Franklin Bay General Contractors,
Inc. for Exterior Painting
17 of 17

LOG #  STO-08-00443



# LIMITED WARRANTY

## SEVEN (7) YEAR LIMITED INTERIOR FINISHES MATERIAL AND SEVEN (7) YEAR LABOR WARRANTY

Beginning Date:    December 15, 2007
Warranty Period:   SEVEN (7) Years
Owner:    Olen Properties, 2700 Quantum Lakes Dr, Boynton Beach, FL 83426
Project:    All Buildings, Office & Maintenance Bldg, 2700 Quantum Lakes Dr, Boynton Beach, FL 33426 (Villa 1-14)
Applicator:    Franklin Bay General Contractors.
Substrate(s):    Prev. Painted Stucco
System:    Per product labels & product data sheets instruction
Product(s):    3030 Prep & Prime
           2200 Dulux Professional

The Glidden Company d/b/a ICI Paints ("ICI Paints") does hereby warrant (this "Warranty") the property owner set forth above ("Owner"), that its Product(s)/System(s) set forth above ("Coatings") have been manufactured without defect. ICI Paints further warrants that the Coatings, when properly applied, maintained and used in strict accordance with all specifications, instructions, chemical resistance tables and/or written directions issued by ICI Paints and as set forth in ICI Paints' instructions contained on the product labels and data sheets, will not peel, crack, or blister for a period of Seven (7) years following application on a result of a defect in the Coatings.
ICI Paints' liability under the terms of this Warranty is limited to supplying sufficient Coatings for SEVEN (7) years and labor for SEVEN (7) years to repaint the failed area(s). This warranty period shall not be extended by repainting; however, the remaining warranty period will remain in effect and be applicable to any repainted area(s).

ICI Paints assumes no obligation to select or approve the selection of the applicator or accept the applicator's work. Additionally, any site visit by ICI Paints does not constitute an inspection, approval, supervision, or acceptance of surface preparation, application, or building integrity.

Any repair or repainting of any failed area(s) covered by this warranty by any person or entity prior to ICI Paints' inspection shall invalidate this Warranty. Repainting, including remedial painting, shall be performed by using standard finishing practices and coatings (not necessarily the original products specified). In all instances ICI Paints shall be the sole judge as to whether a partial or complete repainting of the failed area(s) is required to fulfil its obligation under this Warranty. ICI Paints reserves the right to select or approve the products and painting contractor to be used for the repainting of any failed area(s).

This Warranty does not cover failure of the Coatings or portions thereof caused by error in application or misuse of the Coatings, defective substrates, patches or fillers not specifically recommended by ICI Paints, Coatings not applied within six (6) months of delivery to Owner or Owner's contractor(s), acts of God, (e.g., fire, hail, hurricane, tornado, earthquake, acts of war or explosion), prior paint system or construction defects, structural defects, physical or mechanical damage to the Coatings, vandalism, applicable's negligence, including but not limited to, inadequate surface preparation and/or improper application, inadequate or improper maintenance or cleaning, standing water or moisture in the substrate, pollution or abnormal weather conditions or changes in the exposure environment, or any other condition which is beyond the control of ICI Paints.

This Warranty is conditioned upon full payment of all ICI Paints' Coatings which are subject to the warranty herein.

Claims under this Warranty must be directed to ICI Paints technical Services, 15885 West Sprague Road Strongsville, Ohio 44136, with a copy to ICI Paints Legal Department at the same address, in writing during the warranty period and within sixty (60) days after Owner or Owner's contractor(s) or representative(s) has actual or constructive knowledge of a breach of warranty hereunder. Failure to give notice within the specified time shall release and discharge ICI Paints from any and all obligations under this Warranty. It is agreed that time periods referred to herein are of the essence to the Warranty.

THIS WARRANTY IS GIVEN AS THE EXCLUSIVE WARRANTY. NO OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ARE MADE. ICI PAINTS SHALL NOT BE LIABLE FOR ANY SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES EVEN IF ADVISED OF SUCH POSSIBILITY, AND ICI PAINTS HEREBY DISCLAIMS ALL LIABILITY FOR NEGLIGENCE OR STRICT PRODUCT LIABILITY, WHETHER UNDER RESTATEMENT OF TORTS, UNDER THE COMMON LAW, OR OTHERWISE.

This Warranty contains the entire agreement of the parties regarding the subject matter contained herein and supersedes all prior verbal or written agreements, representations, and/or understandings regarding the same, including without limitation, any warranties that may be set out in product literature, labels or product containers. If any provision of this Warranty is found to be invalid or void by a court of competent jurisdiction then that provision shall be stricken and the remaining provisions of the Warranty shall be in full force and effect to the maximum extent allowed by law.

The validity, construction and performance of this Warranty shall be governed and interpreted in accordance with the substantive and procedural laws of the State of Ohio and the parties hereby irrevocably consent to the exclusive jurisdiction of the Federal or state courts located in Cuyahoga County, Ohio, to hear and resolve any formal legal action between the parties related to this Warranty. Further, this Warranty is not transferable without ICI Paints' written consent, which must be signed by an officer of ICI Paints, and may not be modified or enlarged in scope by any other employee, representative or agent of ICI Paints. Failure of ICI Paints or Owner to exercise any right hereunder on one occasion shall not waive the right to exercise the same on another occasion. Neither course of performance, course of dealing or usage of trade shall be used to interpret, construe, qualify, modify, explain or supplement any of the terms of this Warranty.

THE PARTIES STATE THAT THEY HAVE READ AND FULLY UNDERSTAND THE TERMS AND CONDITIONS OF THIS WARRANTY and the persons signing this Warranty are duly authorized by their respective parties to execute the same.

OWNER: _____

By: _____
Name: Danny Owens
Title: V.P. Florida Property Services
Date: Feb-05-08

ICI PAINTS

By: _____
Lori Bremer-Technical Supervisor-Warranty Administration
Date: January 18, 2008